UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
New Jersey Carpenters Health Fund, On Behalf    :
of Itself and All Others Similarly Situated    :
   :
                    Plaintiffs,    :      Civil Action No.  1:08-CV-6762 (UA)
   :
         -against-    :
                           :      **DECLARATION OF JOEL P.**
Lehman XS Trust Series 2005-5N, Lehman XS    :      **LAITMAN IN SUPPORT OF**
Trust Series 2005-7N, Lehman XS Trust Series    :      **PLAINTIFF'S MOTION FOR**
2005-9N, Lehman XS Trust Series 2006-2N,    :      <u>**REMAND TO SATATE COURT**</u>
Lehman XS Trust Series 2006-16N, Structured    :
Asset Securities Corporation, Mark L. Zusy,    :
Samir Tabet, James J. Sullivan and Lehman    :
Brothers, Inc.,    :
   :
              Defendants.    :
-------------------------------------------------------------X

     I, JOEL P. LAITMAN, declare as follows:

     1.     I am an attorney duly licensed to practice before all of the courts of the State of New York.  I am a member of the law firm of Schoengold Sporn Laitman & Lometti, P.C., counsel of record for Plaintiff in the above-entitled action.  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

     2.     Attached hereto as Exhibit A is a true and correct copy of the class action complaint filed in the Supreme Court of the State of New York, County of New York, in the above-referenced action.

     3.     Attached hereto as Exhibit B is a true and correct copy of Defendants Lehman Brothers Inc. and Structured Asset Securities Corporation's Notice of Removal in the above-referenced action.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed this 28th day of August, 2008, at New York, New York.


                        \_\_\_\_/s/ Joel P. Laitman_____

                              Joel P. Laitman

## CERTIFICATE OF SERVICE

I, Frank Schirripa, counsel for the Plaintiff, hereby certify that on August 28, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of much filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and by sending a copy of the foregoing to each of the addresses listed below:

SIMPSON THACHER & BARTLETT LLP
Michael J. Chepiga
mchepiga@stblaw.com
Paul C. Curnin
pcurnin@stblaw.com
Eric M. Albert
ealbert@stblaw.com
425 Lexington Avenue
New York, NY  10017-3954
Telephone (212) 455-2000
Facsimile:  (212) 455-2502
*Attorneys for Defendants Lehman Brothers Inc.*
*And Structured Asset Securities Corporation*


_____/s/   Frank R. Schirripa_____
             Frank R. Schirripa

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

_____X

New Jersey Carpenters Health Fund, On Behalf     :
of Itself and All Others Similarly Situated,      :
                                                  :        Index No.
                    Plaintiff,                    :
                                                  :        08- 602158
         v.                                       :
                                                  :
Lehman XS Trust Series 2005-5N, Lehman XS         :        **SUMMONS**
Trust Series 2005-7N, Lehman XS Trust Series      :
2005-9N, Lehman XS Trust Series 2006-2N,          :
Lehman XS Trust Series 2006-16N, Structured       :              **NEW YORK**
Asset Securities Corporation, Mark L. Zusy,       :        **COUNTY CLERK'S OFFICE**
Samir Tabet, James J. Sullivan and Lehman         :
Brothers, Inc.,                                   :              **JUL 23 2008**
                                                  :
                    Defendants.                   :            **NOT COMPARED**
_____X            **WITH COPY FILE**

To the above named Defendants:

    **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorneys a
Verified Answer to the Verified Complaint in this action within twenty (20) days after the
service of this summons, exclusive of the day of service, or within thirty (30) days after service
is complete if this summons is not personally delivered to you within the State of New York. In
case of your failure to answer, judgment will be taken against you by default for the relief
demanded in the complaint.

Dated: July 21, 2008

                                Daniel B. Rehns, Esq.
                                Schoengold Sporn Laitman & Lometti, PC
                                19 Fulton Street, Suite 406
                                New York, New York 10036
                                Tel: (212) 964-0046
                                _Counsel for Plaintiff and_
                                         _the Proposed Class_

Trial is desired in the County of New York.

The basis of venue designated above is that Defendants maintain and/or conduct their business in
the County of New York.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

## NATURE OF THE ACTION

1.     This is a class action brought by New Jersey Carpenters Health Fund (the "Carpenters Health Fund") alleging violations of Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ("Securities Act"), on behalf of purchasers of Lehman XS Trust Mortgage Pass-Through Certificates Series 2005-5N, Lehman XS Trust Mortgage Pass-Through Certificates Series 2005-7N, Lehman XS Trust Mortgage Pass-Through Certificates Series 2005-9N, Lehman XS Trust Mortgage Pass-Through Certificates Series 2006-2N, and Lehman XS Trust Mortgage Pass-Through Certificates Series 2006-16N (the "Certificates" or the "LXST Certificates") who purchased the Certificates, backed by a pool of primarily conventional, first lien, adjustable, fully amortizing-rate subprime second-lien residential mortgage loans, pursuant to or traceable to the $2,740,586,000.00 Offering of Series 2005-5N Mortgage Pass-Through Certificates on or about October 28, 2005 issued by Defendant Lehman XS Trust, Series 2005-5N (the "October 2005 Offering"), the $2,391,151,000.00 Offering of Series 2005-7N Mortgage Pass-Through Certificates on or about November 29, 2005 issued by Defendant Lehman XS Trust, Series 2005-7N (the "November 2005 Offering"), the $1,628,731,000.00 Offering of Series 2005-9N Mortgage Pass-Through Certificates on or about December 29, 2005 issued by Defendant Lehman XS Trust, Series 2005-9N (the "December 2005 Offering"), the $2,131,095,000.00 Offering of Series 2006-2N Mortgage Pass-Through Certificates on or about January 30, 2006 issued by Defendant Lehman XS Trust, Series 2006-2N (the "January 2006 Offering"), the $2,191,599,000.00 Offering of Series 2006-16N Mortgage Pass-Through Certificates on or about September 28, 2006 issued by Defendant Lehman XS Trust, Series 2006-2N (the "September 2006 Offering") (collectively, the "Offerings" or the "LXST Offerings").

2.     The Series 2005-5N, 2005-7N, 2005-9N and 2006-2N Certificates were issued pursuant to a common Registration Statement filed with the Securities Exchange Commission ("SEC") on or about September 26, 2005 (the "September 2005 Registration Statement"). The 2006-16N Certificates were issued pursuant to a Form FWP Registration Statement filed with the SEC on or about September 13, 2006 which relates back to the Registration Statement filed on or about August 8, 2006 (the "August 2006 Registration Statement"). The Offerings also occurred in this venue. The Certificates herein are Mortgage Pass-Through Certificates ("PTCs") collateralized by mortgages originated by IndyMac Bank, F.S.B. ("IMB") and Countrywide Home Loans, Inc. ("CHL" or "Countrywide"), both of which at all relevant times were commercial and residential lenders. The mortgages and liens on the mortgaged properties constituting the Certificates collateral were, as set forth in the Prospectuses, to be the principal source by which Certificate purchasers were to obtain repayment of their investment plus interest. As also set forth in the Registration Statements, the Certificate collateral was purportedly originated by IMB and CHL pursuant to specific underwriting procedures and guidelines.

3.     The Underwriter for the Offerings was Defendant Lehman Brothers, Inc. ("LB" or the "Underwriter"). The Underwriter was obligated to conduct meaningful due diligence to ensure that the Registration Statement contained no material misstatements and omissions including as related to the stated manner in which the mortgages had been originated. The Underwriter received massive fees for its work in connection with the Offerings. At the time of the Offerings, the Certificates were issued at approximately par or $1000.00 per Certificate.

4.     Following the issuance of the Certificates, disclosures began to emerge revealing that IMB and CHL routinely disregarded the underwriting guidelines in originating mortgage

3

collateral. These disclosures were confirmed by substantially higher rates of delinquencies and foreclosures on collateral for such highly-rated debt issues. The revelations set forth below regarding the true underwriting practices used to originate the collateral and the true value and quality of the Certificate collateral caused the value of the Certificates to substantially collapse. Plaintiff purchased Certificates at par for $125,781.25 at the time of the October 2005 Offerings, but now, at the commencement of the action herein, they are valued at $48,629.56 – a *61% percent* decline in value. The claims asserted herein under the Securities Act do not sound in or arise from allegations of fraud.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

6.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

7.      Venue is proper in this County pursuant to Section 22 of the Securities Act. Many of the acts and transactions alleged herein, including the preparation and dissemination of many of the material misstatements and omissions contained in the Registration Statements and Prospectuses filed in connection with the Offerings, occurred in substantial part in this County. Additionally, the Certificates were actively marketed and sold in this County. In addition, Defendants LXST, SASC and LB maintain offices in this County, and all Defendants' have and continue to transact business in this county in connection with the Offerings of the LXST Certificates.

4

## PARTIES

8.     Plaintiff, the New Jersey Carpenters Health Fund, is a Taft-Hartley benefit fund with offices located in Edison, New Jersey.   The New Jersey Carpenters Health Fund purchased $125,000.00 face value of the Lehman XS Trust, Series 2005-5N, Class M2 Certificates at par value on the Offerings on or about October 3, 2005.  Plaintiff and the Class purchased pursuant to the Registration Statement and Prospectus which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  Plaintiff relied on the misstatements in the Prospectus and has suffered damages pursuant to Sections 11 and 12 of the Securities Act.

9.     Defendant Lehman XS Trust, Series 2005-5N was the issuing entity for the October 2005 Offering.  Per its filings with the SEC, LXST 2005-5N has listed 745 Seventh Avenue, New York, New York 10019 as its principal office location.  Defendant LXST 2005-5N is a trust formed under the laws of the State of New York.

10.    Defendant Lehman XS Trust, Series 2005-7N was the issuing entity for the November 2005 Offering.  Per its filings with the SEC, LXST 2005-7N has listed 745 Seventh Avenue, New York, New York 10019 as its principal office location.  Defendant LXST 2005-7N is a trust formed under the laws of the State of New York.

11.    Defendant Lehman XS Trust, Series 2005-9N was the issuing entity for the December 2005 Offering.  Per its filings with the SEC, LXST 2005-9N has listed 745 Seventh Avenue, New York, New York 10019 as its principal office location.  Defendant LXST 2005-9N is a trust formed under the laws of the State of New York.

12.    Defendant Lehman XS Trust, Series 2006-2N was the issuing entity for the January 2006 Offering.  Per its filings with the SEC, LXST 2006-2N has listed 745 Seventh

Avenue, New York, New York 10019 as its principal office location. Defendant LXST 2006-2N is a trust formed under the laws of the State of New York.

13.    Defendant Lehman XS Trust 2006-16N was the issuing entity for the September 2006 Offering. Per its filings with the SEC, LXST 2006-16N has listed 745 Seventh Avenue, New York, New York 10019 as its principal office location. Defendant LXST 2006-16N is a trust formed under the laws of the State of New York.

14.    Defendant Structured Asset Securities Corporation is the Depositor for the Offerings, and the Parent Company of the Issuers. According to its SEC filings, SASC is a Delaware special purpose corporation and maintains its principal offices located at 745 Seventh Avenue, New York, New York 10019. The ultimate parent company of SASC is Lehman Brothers Holdings, Inc.

15.    Defendant Mark L. Zusy ("Zusy") was, at all relevant times, Chairman, President and Managing Director of SASC. Zusy signed the September 2005 Registration Statement and the August 2006 Registration Statement on behalf of himself and as Attorney-In-Fact.

16.    Defendant Samir Tabat ("Tabat") was, at all relevant times, a Managing Director of SASC.

17.    Defendant James J. Sullivan ("Sullivan") was, at all relevant times, a Director of SASC.

18.    Defendant Zusy, Tabat and Sullivan are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with SASC, possessed the power and authority to control the contents of SASC's submissions to the SEC and the market, and participated in the drafting and editing of the Prospectuses. The Individual

6

Defendants all conducted business and had business residences at 745 Seventh Avenue, New York, New York 10019.

19.    The Individual Defendants were officers and/or directors of SASC at the time the Registration Statements and Prospectuses for the Offerings became effective, and with their consent were identified as such in the Registration Statements. In addition, they signed the Registration Statements or authorized it to be signed on their behalf.

20.    The Individual Defendants, as officers and/or directors each had a duty to promptly disseminate accurate and truthful information with respect to LXST and SASC, and to correct any previously issued statements issued by, or on behalf of LXST and SASC that had become materially misleading. The Individual Defendants' misrepresentations and omissions in the Prospectuses violated these specific requirements and obligations. The Individual Defendants were signatories to the Registration Statement filed with the SEC and incorporated by reference in the Prospectuses.

21.    The Defendants are all liable, jointly and severally, as participants in the issuance of the LXST Certificates, including issuing, causing, or making materially misleading statements in the Prospectuses and omitting material facts necessary to make the statements contained therein not misleading.

22.    Defendant Lehman Brothers, Inc., ("LB" or the "Underwriter") is an international investment banking firm with its worldwide headquarters located in this County at 745 Seventh Avenue, New York, New York 10019. LB is a leading underwriter of a market-maker in residential and commercial mortgage- and asset-backed securities and is active in all areas of secured lending, structured finance and securitized products. LB underwrites and makes markets in the full range of U.S. agency-backed mortgage products, mortgage-backed securities, asset-

backed securities and whole loan products.

23.    Defendant LB served as the Underwriter and lead Manager and Book-Runner for the Offerings. Defendant LB was intimately involved in the Offerings. Defendant Lehman failed to perform the requisite level of due diligence in connection with the Offerings complained of herein. The Prospectuses disseminated in connection with the Offerings contained material misstatements and omissions of material fact relating to the "Underwriting Practices" employed in originating the underlying subprime mortgage loans.

## CLASS ACTION ALLEGATIONS

24.    Plaintiff brings this action as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules ("CPLR") on behalf of a class consisting of all persons who purchased or acquired the Certificates (the "Class") pursuant and/or traceable to the Registration Statement and Prospectuses issued in connection with the Offerings from the effective date through the date of the filing of this action. Excluded from the Class are Defendants, their respective officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

25.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff reasonably believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Defendants and/or the Trustee for the Certificates and may be notified of the pendency of this action by mail, the internet or publication using the form of notice similar to that customarily used in securities class actions.

26.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of statutory law complained of herein.

27.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained Schoengold, Sporn, Laitman & Lometti, P.C., counsel competent and experienced in class and securities litigation.

28.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a)    whether the provisions of the Securities Act of 1933 were violated by the Defendants as alleged herein;

        b)    whether the Registration Statements and Prospectuses contained materially untrue statements or omitted statements of material fact; and

        c)    to what extent the members of the Class have sustained damages pursuant to the statutory measure of damages.

29.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

9

## SUBSTANTIVE ALLEGATIONS

30.     Currently, the United States is ensnared in a financial crisis arising, in material part, from the greed which drove financial firms to issue billions of dollars of debt securities "collateralized" or securitized with mortgages which only recently have been revealed to have been recklessly underwritten and originated.    The Plaintiff and Class as purchasers of the Certificates have been the victims of just such negligent practices, having purchased the Certificates pursuant to a Registration Statements which contained misstatements and omissions concerning the mortgage collateral "securitizing" the Certificates.    SASC and other entities related to the Offerings, *i.e.*, the Depositor and Underwriter Defendants, had enormous financial incentive to consummate the Offering of the Certificates as quickly as possible since they were paid upon completion a percentage of the total dollar amount of the Offering sold to investors. Since the risk of the PTC's collateral failing was not assumed by LXST, SASC or the Underwriters, they all had enormous incentive not to conduct full complete and meaningful due diligence of the statements in the Registration Statement including those relating to the mortgage collateral.

31.     The structure of the Offerings was as follows: on or about September 26, 2005, SASC filed a Registration Statement with the SEC in connection with the issuance of various series and classes of debt securities which would be governed by said Registration Statement.    At some time prior to the Offerings, SASC formed several trusts under the laws of the State of New York, the Lehman XS Trust 2005-5N, Lehman XS Trust 2005-7N, Lehman XS Trust 2005-9N and Lehman XS Trust 2006-2N which then filed Prospectuses as the Issuing entity of the Certificates at issue herein.    Thereafter, on or about September 13, 2006, SASC filed a Registration Statement with the SEC in connection with the issuance of the Lehman XS Trust

Series 2006-16N Certificates.  At some point prior to the consummating the Offering of the 2006-16N Certificates, SASC formed a trust under the Laws of the State of New York, Lehman XS Trust 2006-16N, which then filed a Prospectus as the Issuer of the 2006-16N Certificates at issue herein.

32.    Typically, the loans are originated by the Sponsor, who then disposes of its loans primarily by selling them to third parties and through securitizations.  The Sponsor works with the underwriters and the rating agencies to select the pool of mortgage loans and structure the securitization transaction. The Sponsor also services the mortgage loans.  On the closing date of the Offerings, the Sponsor conveys the initial mortgage loans and the related mortgage insurance policies to the Depositor, who will in turn convey the initial mortgage loans and the related mortgage insurance policies to the Trustee.  The Certificates are backed by the Issuer, and consist of, *inter alia*, the mortgage loans; collections in respect of principal and interest of the mortgage loans received; and the amounts on deposit in the collection account, including the payment account in which amounts are deposited prior to payment to the certificate holders.  On the payment date, the certificate holders receive payments from the Trustee based on the particular tranche purchased; typically, available funds for each distribution date will equal the amount received by the trustee and available in the payment account on that distribution date, including interest which differs depending upon the tranche held.

33.    In connection with the LXST Offerings, SASC, LXST and LB prepared and disseminated the Registration Statements and Prospectuses that contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading that were reasonably relied upon by Plaintiff and the Class to their own detriment.

**The Registration Statements And Prospectuses**
**Contained Material Misstatements And Omissions of Fact**

34.     The Registration Statements represented that all of the loans which made up the pool of residential, subprime mortgages used to support the Certificates were subject to certain underwriting guidelines which assessed the borrower's creditworthiness, including multi-level reviews of loan applications and appraisals with only "case by case" exceptions to guidelines.

35.     The Registration Statements disclosed that the majority of the underlying loans were originated by two entities for each Offerings – IMB (69.14%) and CHL (30.16%) in the case of the 2005-5N Certificates – and described the mortgage pool as follows:

### Description of the Mortgage Pools

**General**

Except where otherwise specifically indicated, the discussion that follows and the statistical information presented therein are derived solely from the characteristics of the Mortgage Loans as of the Cut-off Date. Whenever reference is made herein to the characteristics of the Mortgage Loans or to a percentage of the Mortgage Loans, unless otherwise specified, that reference is based on the Cut-off Date Balance.

The Trust Fund will consist of approximately 7,474 conventional, adjustable rate, fully amortizing, negative amortization Mortgage Loans, all of which have original terms to maturity from the first due date of the Scheduled Payment of 30 years, having a Cut-off Date Balance (after giving effect to Scheduled Payments due on such date) of approximately $2,757,128,955.71. Pool 2 will consist of Mortgage Loans with original principal balances which do not exceed the applicable Freddie Mac maximum original loan amount limitations for one- to four-family residential mortgaged properties. The Mortgage Loans generally provide for adjustment of the applicable Mortgage Rate, as specified in the related Mortgage Note, based on the 1-Year MTA Index and for corresponding adjustments to the monthly payment amount due thereon, in each case as specified in the related Mortgage Note and subject to the limitations described below. The Mortgage Loans have Mortgage Rates that provide for adjustments to the Mortgage Rates on a monthly basis (after the initial fixed rate period).

All of Mortgage Loans were originated by IndyMac or by Countrywide Home Loans. IndyMac originated approximately 69.84% of the Mortgage Loans, including approximately 50.19% of the Pool 1 Mortgage Loans, all of the Pool 2

12

Mortgage Loans and approximately 72.31% of the Pool 3 Mortgage Loans. Countrywide Home Loans originated approximately 30.16% of the Mortgage Loans, including approximately 49.81% of the Pool 1 Mortgage Loans and 27.69% of the Pool 3 Mortgage Loans. The Mortgage Loans were acquired by the Seller from the Originators, as described under "Underwriting Guidelines" and "Trust Agreement—Assignment of Mortgage Loans" herein.

Approximately 0.61% of the Pool 1 Mortgage Loans, 0.19% of the Pool 2 Mortgage Loans and 0.69% of the Pool 3 Mortgage Loans were originated under "no documentation" programs or "no ratio documentation" programs, pursuant to which no information was obtained regarding borrowers' income or employment and there was no verification of the borrowers' assets. Certain documentation with respect to some Mortgage Loans, including in some cases, the related Mortgage Note, Mortgage or title insurance policy, is unavailable. Except as otherwise noted below, the Seller will make only limited representations and warranties with respect to the Mortgage Loans. See "Trust Agreement—Assignment of Mortgage Loans" herein.

All of the Mortgage Loans are adjustable rate, negative amortization mortgage loans, as described in more detail below. Interest on the Mortgage Loans accrues on the basis of a 360-day year consisting of twelve 30-day months.

*See* LXST, Registration Statement & Prospectuses, October 28, 2005, at S-51; *see also*, November 29, 2005 at S-65; December 29, 2005 at S-53; January 30, 2006 at S-58; September 28, 2006 at S-57-58.

36.    The statements in the preceding paragraph contained misstatements and material omissions including in connection with the underwriting of the collateral mortgages.  As set forth below, a material portion of the underlying collateral for the LXST Certificates originated by IMB and CHL were not in accordance with applicable credit, appraisal and underwriting standards.

37.    The Registration Statements represented, with respect to the collateral originated by IMB, that all the underlying loans were subject to strict underwriting guidelines which stressed homeowner credit-worthiness:

**IndyMac Underwriting Guidelines**

IndyMac originates the majority of its mortgage loans through brokers and through its own retail operations; in both cases the mortgage loans are originated

13

in IndyMac's name.   IndyMac also originates mortgage loans through correspondents (entities that originate mortgage loans to IndyMac's requirements); IndyMac's operations today are an extension of the conduit program established by IndyMac, Inc. in April 1993 to purchase conventional conforming and non-conforming mortgage loans on one- to four-family residential properties. IndyMac also acquires mortgage loans through bulk acquisitions in the secondary market. Conventional mortgage loans are loans that are not insured by the FHA or partially guaranteed by the VA. Conforming mortgage loans are loans that qualify for sale to Fannie Mae and Freddie Mac, whereas non-conforming mortgage loans are loans that do not so qualify. IndyMac will originate and acquire mortgage loans secured by first or second liens on the related mortgaged properties, including home equity lines of credit.

Non-conforming mortgage loans originated or purchased by IndyMac pursuant to its underwriting programs typically differ from conforming loans primarily with respect to loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent that these programs reflect underwriting standards different from those of Fannie Mae, Freddie Mac and Ginnie Mae, the performance of loans made pursuant to these different underwriting standards may reflect higher delinquency rates and/or credit losses.

IndyMac has two principal underwriting methods designed to be responsive to the needs of its mortgage loan customers: traditional underwriting and e-MITS (Electronic Mortgage Information and Transaction System) underwriting. In 2003, it generated most of its mortgage loans through the e-MITS underwriting process. Through the traditional underwriting method, customers submit mortgage loans that are underwritten in accordance with IndyMac's guidelines prior to purchase. E-MITS is an automated, internet-based underwriting and risk-based pricing system. E-MITS generally enables IndyMac to estimate expected credit loss, interest rate risk and prepayment risk more objectively than traditional underwriting. Risk-based pricing is based on a number of borrower and loan characteristics, including, among other loan variables, credit score, occupancy, documentation type, purpose, loan-to-value ratio and prepayment assumptions based on an analysis of interest rates.

*IndyMac's underwriting standards for conventionally underwritten mortgage loans are based on traditional underwriting factors, including the creditworthiness of the mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and the value of the related mortgaged property.* Among other factors, IndyMac will consider such factors as loan-to-value ratios, debt-to-income ratio, FICO Credit Score, loan amount, and the extent to which IndyMac can verify the mortgagor's application and supporting documentation. These standards are applied in accordance with applicable federal and state laws and regulations. Exceptions to these underwriting standards are

permitted where compensating factors are present or in the context of negotiated bulk purchases.

IndyMac currently operates two mortgage loan purchase programs as part of its conduit operations:

1.    *Prior Approval Program.* Under this program, IndyMac performs a full credit review and analysis of each mortgage loan to be purchased to ensure compliance with its underwriting guidelines. Only after IndyMac issues an approval notice to a loan originator is a mortgage loan eligible for purchase pursuant to this program.

2.    *Preferred Delegated Underwriting Program.* Under this program, loan originators that meet certain eligibility requirements are allowed to tender mortgage loans for purchase without the need for IndyMac to verify mortgagor information. The eligibility requirements for participation in the Preferred Delegated Underwriting Program vary based on the net worth of the loan originators with more stringent requirements imposed on loan originators with a lower net worth. Under the Preferred Delegated Underwriting Program, each eligible loan originator is required to underwrite mortgage loans in compliance with IndyMac's underwriting guidelines normally by use of e-MITS or, infrequently, by submission of the mortgage loan to IndyMac for traditional underwriting. A greater percentage of mortgage loans purchased pursuant to this program are selected for post-purchase quality control review than for the other program.

Under both programs, IndyMac permits the use of IndyMac-approved contract underwriters.

For each mortgage loan with a Loan-to-Value Ratio at origination exceeding 80%, IndyMac will usually require a primary mortgage guarantee insurance policy that conforms to the guidelines of Fannie Mae and Freddie Mac. After the date on which the Loan-to-Value Ratio of a mortgage loan is 80% or less, either because of principal payments on the mortgage loan or because of a new appraisal of the mortgaged property, no primary mortgage guaranty insurance policy will be required on that mortgage loan.

All of the insurers that have issued primary mortgage guaranty insurance policies with respect to the mortgage loans meet Fannie Mae's or Freddie Mac's standards or are acceptable to the Rating Agencies. In some circumstances, however, IndyMac does not require primary mortgage guaranty insurance on mortgage loans with Loan-to-Value Ratios greater than 80%.

IndyMac purchases loans that have been originated under one of seven documentation programs: Full/Alternate, FastForward, Limited, Stated Income, No Ratio, No Income/No Asset and No Doc.

Under the Full/Alternate Documentation Program, the prospective borrower's employment, income and assets are verified through written or telephonic communications. All loans may be submitted under the Full/Alternate Documentation Program. The Full/Alternate Documentation Program also provides for alternative methods of employment verification generally using W-2 forms or pay stubs. Borrowers applying under the Full/Alternate Documentation Program may, based on certain credit and loan characteristics, qualify for IndyMac's FastForward program and be entitled to income and asset documentation relief. Borrowers who qualify for FastForward must state their income, provide a signed Internal Revenue Service Form 4506 (authorizing IndyMac to obtain copies of their tax returns), and state their assets; IndyMac does not require any verification of income or assets under this program.

The Limited Documentation Program is similar to the Full/Alternate Documentation Program except that borrowers are generally not required to submit copies of their tax returns and only must document income for one year (rather than two, as required by the Full/Alternate Documentation Program).

Under the Stated Income Documentation Program and the No Ratio Program, more emphasis is placed on the prospective borrower's credit score and on the value and adequacy of the mortgaged property as collateral and other assets of the prospective borrower than on income underwriting. The Stated Income Documentation Program requires prospective borrowers to provide information regarding their assets and income. Information regarding assets is verified through written communications. Information regarding income is not verified. The No Ratio Program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications. The No Ratio Program does not require prospective borrowers to provide information regarding their income. Employment is orally verified under both programs.

Under the No Income/No Asset Documentation Program and the No Doc Documentation Program, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the mortgaged property as collateral, rather than on the income and the assets of the prospective borrower. Prospective borrowers are not required to provide information regarding their assets or income under either program, although under the No Income/No Asset Documentation Program, employment is orally verified.

IndyMac generally will not re-verify income, assets, and employment for mortgage loans it acquires from brokers or correspondents.

October 2005 Offering Prospectus at S-56-58; *see also, generally,* November 2005 Offering Prospectus at S-70-72; December 2005 Offering Prospectus at S-57-59; January 2006 Offering Prospectus S-66-70; September 2006 Offering Prospectus at S-64-68.

16

38.    The statements in the preceding paragraph contained misstatements and material omissions including in connection with the underwriting of the collateral mortgages. As set forth below, a materia portion of the underlying collateral for the LXST Certificates originated by IMB were not in accordance with its credit, appraisal and underwriting standards.

39.    Moreover, with respect to the loans originated by CHL, the Prospectuses stated as follows:

**Countrywide Underwriting Guidelines**

The Mortgage Loans in the trust fund which have been originated or acquired by Countrywide Home Loans will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.

As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

In assessing a prospective borrower's creditworthiness, Countrywide Home Loans may use FICO Credit Scores. FICO Credit Scores are statistical credit scores designed to assess a borrower's creditworthiness and likelihood to default on a consumer obligation over a two-year period based on a borrower's credit history. FICO Credit Scores were not developed to predict the likelihood of default on mortgage loans and, accordingly, may not be indicative of the ability of a borrower to repay its Mortgage Loan. FICO Credit Scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. Under Countrywide Home Loans' underwriting guidelines, borrowers possessing higher FICO Credit Scores, which indicate a more favorable credit history and who give Countrywide Home Loans the right to obtain the tax returns they filed for the preceding two years, may be eligible for Countrywide Home Loans' processing program. Countrywide Home Loans may waive some

17

documentation requirements for mortgage loans originated under the Preferred Processing Program.

Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself.

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. If the prospective borrower has applied for an interest-only 6 Month LIBOR Loan, the interest component of the monthly mortgage expense is calculated based upon the initial interest rate plus 2%. If the prospective borrower has applied for a 3/1 Mortgage Loan and the Loan-to-Value Ratio is less than or equal to 75%, the interest component of the monthly mortgage expense is calculated based on the initial loan interest rate; if the Loan-to-Value Ratio exceeds 75%, the interest component of the monthly mortgage expense calculation is based on the initial loan interest rate plus 2%. If the prospective borrower has applied for a 5/1 Mortgage Loan, a 7/1 Mortgage Loan or a 10/1 Mortgage Loan, the interest component of the monthly mortgage expense is calculated based on the initial loan interest rate. If the prospective borrower has applied for a negative amortization loan, the interest component of the monthly housing expense calculation is based upon the greater of 4.25% or the initial interest rate on the mortgage loan. The maximum acceptable debt-to-income ratio,

which is determined on a loan-by-loan basis, varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower. Additionally, Countrywide Home Loans does permit its adjustable rate mortgage loans, hybrid adjustable rate mortgage loans and negative amortization mortgage loans to be assumed by a purchaser of the related mortgaged property, so long as the mortgage loan is in its adjustable rate period and the related purchaser meets Countrywide Home Loans' underwriting standards that are then in effect.

Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (*i.e.*, first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%. Countrywide Home Loans' underwriting guidelines do not prohibit or otherwise restrict a borrower from obtaining secondary financing from lenders other than Countrywide Home Loans, whether at origination of the mortgage loan or thereafter.

The nature of the information that a borrower is required to disclose and whether the information is verified depends, in part, on the documentation program used in the origination process. In general under the Full Documentation Loan Program, each prospective borrower is required to complete an application which includes information with respect to the applicant's assets, liabilities, income, credit history, employment history and other personal information. Self-employed individuals are generally required to submit their two most recent federal income tax returns. Under the Full Documentation Program, the underwriter verifies the information contained in the application relating to employment, income, assets and mortgages.

A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both.

Countrywide Home Loans offers the following documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program, a Reduced Documentation Loan Program, a CLUES Plus Documentation Loan Program, a No Income/No Asset Documentation Loan Program, a Stated Income/Stated Asset Documentation Loan Program and a Streamlined Documentation Loan Program.

For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loans obtains a credit report relating to the applicant from a

credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

Countrywide Home Loans requires title insurance on all of its mortgage loans secured by first liens on real property. Countrywide Home Loans also requires that fire and extended coverage casualty insurance be maintained on the mortgaged property in an amount at least equal to the principal balance of the related single-family mortgage loan or the replacement cost of the mortgaged property, whichever is less.

In addition to Countrywide Home Loans' standard underwriting guidelines (the "Standard Underwriting Guidelines"), which are consistent in many respects with the guidelines applied to mortgage loans purchased by Fannie Mae and Freddie Mac, Countrywide Home Loans uses underwriting guidelines featuring expanded criteria (the "Expanded Underwriting Guidelines"). The Standard Underwriting Guidelines and the Expanded Underwriting Guidelines are described further under the next two headings.

October 2005 Offering Prospectus at S-58-60; *see also, generally,* November 2005 Offering Prospectus at S-72-74; January 2006 Offering Prospectus at S-70-73; September 2006 Offering Prospectus at S-68-71.

40.    The statements in the preceding paragraph contained misstatements and material

omissions including in connection with the underwriting of the collateral mortgages.  As set forth

below, a material portion of the underlying collateral for the LXST Certificates originated by

CHL were not in accordance with its credit, appraisal and underwriting standards, and moreover,

"credit risk" and "quality control" were materially disregarded in favor of generating sufficient loan volume to complete the massive Certificate securitizations alleged herein.

      41.    Moreover, the Prospectuses further states that, in addition to the Underwriting Guidelines set forth above pertaining to the loans originated by CHL, CHL also employs "Standard Underwriting Guidelines", which are more consistent in many respects with the guidelines applied to mortgage loans purchased by Fannie Mae and Freddie Mac, which include CHL's ability to enforce "expanded underwriting guidelines" in purchasing loans which would not otherwise be deemed fit under the above standards:

**Standard Underwriting Guidelines**

Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.

For cash-out refinance mortgage loans, Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 75% and original principal balances ranging up to $650,000. The maximum "cash-out" amount permitted is $200,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan. As used in this section of the prospectus supplement, a refinance mortgage loan is classified as a cash-out refinance mortgage loan by Countrywide Home Loans if the borrower retains an amount greater than the lesser of 2% of the entire amount of the proceeds from the refinancing of the existing loan or $2,000.

Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 95% on 1 unit properties with principal balances up to $359,650 ($539,475 in Alaska and Hawaii) and 2 unit properties with principal balances up to $460,400 ($690,600 in Alaska and Hawaii) and up to 80% on 3 unit properties with principal balances of up to $556,500 ($834,750 in Alaska and Hawaii) and 4 unit properties with principal balances of up to

$691,600 ($1,037,400 in Alaska and Hawaii). On second homes, Countrywide Home Loans'
Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $359,650 ($539,475 in Alaska and Hawaii). Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $359,650 ($539,475 in Alaska and Hawaii) and 2 unit properties with principal balances up to $460,400 ($690,600 in Alaska and Hawaii) and up to 75% on 3 unit properties with principal balances of up to $556,500 ($834,750 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $691,600 ($1,037,400 in Alaska and Hawaii).

Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.

In connection with the Standard Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Program, the CLUES Plus Documentation Program or the Streamlined Documentation Program.

The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.

Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 75%.

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month

immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

**Expanded Underwriting Guidelines**

Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

For cash-out refinance mortgage loans, Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 90% and original principal balances ranging up to $1,500,000. The maximum

23

"cash-out" amount permitted is $400,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan.

Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 100% on 1 unit properties with principal balances up to $359,650 ($539,475 in Alaska and Hawaii) and 2 unit properties with principal balances up to $460,400 ($690,600 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $556,500 ($834,750 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $691,600 ($1,037,400 in Alaska and Hawaii). On second homes, Countrywide Home Loans'
Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $359,650 ($539,475 in Alaska and Hawaii). Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $359,650 ($539,475 in Alaska and Hawaii) and 2 unit properties with principal balances up to $460,400 ($690,600 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $556,500 ($834,750 in Alaska and Hawaii) and 4 unit properties
with principal balances of up to $691,600 ($1,037,400 in Alaska and Hawaii).

Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

In connection with the Expanded Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Loan Program, the No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program. Neither the No Income/No Asset Documentation Program nor the Stated Income/Stated Asset Documentation Program is available under the Standard Underwriting Guidelines.

The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

Similarly, the same documentation and verification requirements apply to mortgage loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for mortgage loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%. The borrower is not required to disclose any income information for some mortgage loans originated under the Reduced Documentation Program, and accordingly debt-to-income ratios are not calculated or included in the underwriting analysis. The maximum Loan-to-Value Ratio, including secondary financing, for those mortgage loans ranges up to 85%.

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or
Freddie Mac.

Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income. The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%. Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Expanded Underwriting Guidelines, Countrywide Home Loans may also provide mortgage loans to borrowers who are not U.S. citizens, including permanent and non-permanent residents. The borrower is required to have a valid U.S. social security number or a certificate of foreign status (IRS form W-8). The borrower's income and assets must be verified under the Full Documentation Program or the Alternative Documentation Program. The maximum Loan-to-Value Ratio, including secondary financing, is 80%.

October 2005 Offering Prospectus at S-61-64; *see also,* November 2005 Offering Prospectus at S-74-77; January 2006 Offering Prospectus at S-73-76; September 2006 Offering Prospectus at S-72-75.

42.     The statements in the preceding paragraph contained misstatements and material omissions including that the "guidelines" for determining exceptions were materially disregarded in favor of generating sufficient loan volume to complete the massive Certificate securitizations alleged herein.

**The Truth Begins To Emerge:  Countrywide's
Systematic Improper Lending Practices**

43.     In or around early 2007, disclosures began to emerge that revealed that investment banks and home loan lenders had issued billions of dollars of mortgage backed securities collateralized with home loans which were made to uncreditworthy borrowers, significantly inflating the value of those securities.  At the center of these predatory lending practices was the world's largest mortgage lender, Countrywide.

44.     On or about July 24, 2007, Countrywide shocked the market by reporting that the Company was forced to write-down $417 million in loans in the second fiscal quarter of 2007 alone.  In a press release, Countrywide stated the following:

Credit-related costs in the second quarter included:

*Impairment on credit-sensitive retained interests.  Impairment charges of $417 million were taken during the quarter on the Company's investments in credit-sensitive retained interests.  This included $388 million, or approximately $0.40 in earnings per diluted share based on a normalized tax rate, or prime home equity loans.  The impairment charges on these residuals were attributable to accelerated increases in delinquency levels and increases in the estimates of future and loss severities on the underlying loans.*

45.     As a result of these disclosures that Countrywide had engaged in the practice of writing bad loans to uncreditworthy borrowers and that it was much more heavily invested in the failing subprime and non-traditional loan markets than had been previously disclosed, rating agencies began what would become a series of ratings downgrades on Countrywide.   Standard

& Poor's downgraded Countrywide's credit rating on or about August 16, 2007 from "A/A-1" to "A-/A-2" – which made it more expensive for Countrywide to borrow money. This downgrade was followed up by Fitch Ratings' downgrade of Countrywide Home Loan's (a subsidiary of Countrywide Financial Corporation) servicer ratings on August 24, 2007.

46.    Countrywide is currently under investigation by a panel of the United States Senate for predatory lending – a practice whereby a lender deceptively convinces a borrower to agree to unfair and abusive loan terms, including interest and fees that are unreasonably high. Countrywide's increased risk of not being able to collect on these predatory mortgage loans puts the LXST Certificates underlying mortgage collateral at risk, thereby further increasing the risk to Plaintiff and the Class.

47.    During an August 29, 2007 press conference reported in The Wall Street Journal, Senator Charles Schumer, chairman of the Senate panel investigating Countrywide's predatory lending practices stated:

> "Countrywide's most lucrative brokers are those that make bad loans that are largely designed to fail the borrower …. [Countrywide's] brokers can earn an extra 1 percent of the loan value in commission by adding a three-year prepayment penalty to loans."

48.    On or about October 26, 2007, Countrywide disclosed that it had been further hurt by the mortgage crisis and suffered a loss of over $1.2 billion in the third quarter of 2007, which was accompanied by forced write-downs of $690 million in subprime mortgages and non-traditional loans because of their rising delinquencies and defaults. This news resulted in a downgrade by Fitch Ratings of Countrywide long-term counterparty credit rating from "A-" to "BBB+." Subsequently, on or about November 19, 2007, Moody's announced that although it would maintain its rating on Countrywide, it had established a "negative outlook" on Countrywide – meaning that a downgrade was imminent.

49.   On or about March 10, 2008, the federal government disclosed that it had initiated a probe into the fraudulent mortgage practices engaged in by Countrywide, including manipulation of the subprime and non-traditional loan markets, knowledge of and disregard for underwriting inaccuracies and misrepresentations, and specific instructions to underwriters by Countrywide not to scrutinize certain types of loans it issued. Subsequently, on April 2, 2008, a Federal Bankruptcy Judge overseeing the proceedings of more than 300 Countrywide related bankruptcies ordered a further inquiry into the misconduct, and specifically the illegal inflation of fees throughout the loan process, that had been occurring at Countrywide.

50.   As a direct result of the allegations surrounding the investigation into Countrywide's wrongdoing, on March 12, 2008, Fitch downgraded its long-term issuer default rating to the lowest investment-grade of "BBB-" citing further deterioration of Countrywide's home mortgage portfolio. Soon after, on April 3, 2008, Moody's followed up with a downgrade of Countrywide's bank strength to "D" from "C-'" – indicating severe instability in the mortgage lenders' banking arm due to shrinking liquidity and heavy debt. Countrywide's shrinking liquidity and heavy debt burden were a direct result of Countrywide's huge portfolio of subprime and non-traditional loans whose market, by April 2008, had dried up completely, resulting in increasing write-downs and losses at Countrywide.

51.   Finally, on April 30, 2008, an article published in The Wall Street Journal entitled *Countrywide Loss Focuses Attention on Underwriting – Evidence of Abuses By Outside Brokers; A Fraud in Alaska*, revealed that a federal probe of Countrywide, the mortgage loan originator for the Bond collateral, found evidence Countrywide's sales executives deliberately overlooked inflated income figures for many borrowers. Indeed, Countrywide's "Fast and Easy"

mortgage program, in which borrowers were asked to provide little or no documentation of their finances, particularly was prone to abuse by loan offices and outside mortgage brokers.

52.    On May 7, 2008, The New York Times published a tongue-in-cheek article entitled "A Little Pity, Please, for Lenders," that attempted to put the onus on the borrowers for the current residential mortgage crisis. Particularly, the article noted that the low documentation and stated documentation loans that aggressive lenders specialized in – e.g., Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program – have "became known within the mortgage industry as "liars' loans" because many of the borrowers falsified their income." However, these relaxed and credit criteria-less loan program were the brain-child of aggressive lenders just looking to amass volume loans for securitizations.

53.    In addition to ongoing SEC, FBI and FTC investigations, the Attorneys General of California, Florida and Illinois all launched investigations of Countrywide for deceptive business practices relating to its mortgage lending, and more recently, both California and Illinois have commenced lawsuits against Countrywide.

54.    As reported in the June 25, 2008 edition of The New York Times, the Illinois attorney general is suing Countrywide and Angelo Mozilo, contending that the company and its executives defrauded borrowers in the state by selling them costly and defective loans that quickly went into foreclosure. The lawsuit accuses Countrywide and its chief executive of relaxing underwriting standards, structuring loans with risky features, misleading consumers with hidden fees and marketing claims, and creating incentives for its employees and brokers to sell questionable loans. The Illinois attorney general explained: "This mounting disaster has had an impact on individual homeowners statewide and is having an impact on the global economy. It is all from the greed of people like Mozilo." The Times reported that the complaint, which

was derived from 111,000 pages of Countrywide documents and interviews with former employees, "paints a picture of a lending machine that was more concerned with volume of loans than quality."

55.    As reported in the June 26, 2008 edition of The New York Times, California filed a similar lawsuit against Countrywide and Mozilo accusing defendants of engaging in unfair trade practices that encouraged homeowners to take out risky loans, regardless of whether they could repay them. Jerry Brown, California's attorney general, stated: "Countrywide exploited the American dream of homeownership and then sold its mortgages for huge profits on the secondary market."

**The Truth Begins To Emerge: IndyMac's
Systematic Improper Lending Practices**

56.    From 2001 until 2006, the United States experienced a bubble in the housing market resulting in inflated home valuations and a related refinancing boom. This booming real estate market opened up new opportunities for mortgage lenders like IndyMac to deal in new types of higher-risk loans. IndyMac operated as one of the nation's largest mortgage finance companies until its meltdown due to the United States mortgage crisis in early 2007.

### *IndyMac's Alt-A Loans Shared Characteristics of Subprime Loans*

57.    IndyMac's growth was propelled by its utilization of Alt-A stated income high CLTV/piggyback and negative/interest only amortizing loans. By the third quarter of 2006, IndyMac was the top Alt-A lender with over approximately $49 billion in Alt-A production which represented 77.5% of IndyMac's total origination volume. See Zelman Credit Suisse Analyst Report, "Mortgage Liquidity du Jour: Underestimated No More," March 12, 2007.

58.    In contrast to a traditional bank or mortgage broker who would be focused on prime or 30-year fixed mortgages, IndyMac stated in the Prospectuses that the primary products

sold were high quality loans and option ARMS.    However, this description of the IndyMac

mortgage production was misleading.  While at one time, Alt-A loans were primarily taken by

wealthy buyers with large down payments and excellent credit, in recent years more Alt-A

borrowers credit scores were closer to those of Subprime borrowers.  In fact, Moody's Investors

Service recently announced it will begin modeling Alt-A loans as Subprime loans absent strong

compensating factors, after finding "[a]ctual performance of weaker Alt-A loans has in many

cases been comparable to stronger subprime performance, signaling that underwriting standards

were likely closer to subprime guidelines."  Moody's Says Some 'Alt-A' Mortgages Are like

Subprime, Bloomberg News, July 31, 2007.

      59.    On March 15, 2007, IndyMac issued a press release claiming that it had been

inappropriately categorized by many media sources as a subprime lender.  IndyMac stated that it

is primarily a prime/Alt-A mortgage lender with minimal exposure to subprime.

> PASADENA, Calif.--(BUSINESS WIRE)--March 15, 2007--In light of current
> conditions impacting the subprime mortgage market, IndyMac Bancorp, Inc.
> (NYSE:NDE) ("Indymac(R)" or the "Company"), the holding company for
> IndyMac Bank, F.S.B. ("Indymac Bank(R)"), is providing this update to reaffirm
> the fundamental strength of its hybrid thrift/mortgage banking business model;
> clarify its position as a prime/Alt-A mortgage lender with minimal exposure to
> subprime; highlight the strengths of its federally chartered savings and loan
> (national thrift) structure in comparison to a mortgage REIT structure; and give
> additional information on the Company's credit outlook.
>
> Indymac's exposure to subprime mortgages is small, and the Company's credit
> performance statistics are reflective of prime/Alt-A mortgage lending.
>
> Indymac has been inappropriately categorized by many media sources as a
> subprime lender, and we wish to clarify our position as predominantly a
> prime/Alt-A lender with the following facts:
>
> > 1. Based on the definition of subprime established by the Office of Thrift
> > Supervision (OTS) for our regulatory filings, only 3.0 percent of
> > Indymac's $90 billion in mortgage loan production in 2006 was subprime.

2. Indymac's asset-backed securitizations (ABS) classified as subprime total $6.8 billion(1) and represent only 4.4 percent of our total $156 billion portfolio of loans serviced as of December 31, 2006.

3. We do not rank among the top 25 subprime lenders in the country in any current industry survey, nor are we part of the ABX Index of the top 20 subprime issuers.

4. Subprime mortgages generally include those loans where the borrower's FICO score is 620 or below. In contrast the average FICO score on Indymac's 2006 loan production was 701.

Alt-A loans are generally for prime credit quality borrowers who do not meet the published underwriting requirements of the GSEs, primarily because they choose not to fully document their income but instead elect to qualify for the loan based on their strong credit history, liquid cash reserves and home equity level. Despite not meeting the published underwriting requirements of the GSEs, most of our conforming-balance Alt-A loans are, in fact, eligible for sale to the GSEs pursuant to established contractual agreements. We do sell Alt-A loans to the GSEs when that is the best execution, and as of December 31, 2006, 21 percent of our $110 billion portfolio of Alt-A loans serviced for others was serviced for the GSEs.

Alt-A credit performance is considerably closer to prime, agency conforming loans than to subprime. As of December 31, 2006 (the most current industry data available), the 30+day delinquency percentage for Alt-A loans in the mortgage industry was 5.0 percent as compared to 22.7 percent for subprime loans.(2) There is no current industry data available for agency conforming loans as the GSEs have yet to file financial statements for 2006, which would include that data. Using Indymac's agency conforming data as a proxy for the industry, our 30+day delinquency percentage was 2.52 percent as of December 31, 2006.

60.     As reported on March 19, 2007 on CNNMoney.com 'Liars Loans': Mortgage woes beyond subprime, Alt-A mortgages issued by lenders, such as IndyMac, "could be the next threat to the troubled real estate market – and the economy."

NEW YORK (CNNMoney.com) -- Subprime mortgages have been generating a lot of attention, and worry, among investors, economists and regulators, but those loans may be only part of the threat posed to the housing market by risky lending.

Some experts in the field are now concerned about the so-called Alt. A mortgage loan market, which has grown even faster than the market for subprime mortgage loans to borrowers with less than top credit.

Alt. A refers to people with better credit scores (A-rated) who borrow with little or no verification of income, or so-called alternative documentation.

But some people in the industry call them "stated income" loans, or worse, "liar loans." And they were an important part of the record real estate boom of 2004 and 2005 that has recently shown signs of turning into a bust.

Standard & Poor's estimates that the Alt. A market has gone from less than $20 billion in loans in the fourth quarter of 2003 to more than $100 billion in each of the last three quarters. Overall, new Alt. A loans totaled $386 billion in 2006, according S&P's estimates - up 28 percent from 2005.

By comparison, subprime loans reached $640 billion in 2006, according to trade publication Inside Mortgage Finance, though that was down about 4 percent from the record level reached in 2005.

"Much of the growth of the last few years has come from reaching out beyond where the lenders should have reached out," said Guy Cecala, publisher of the trade publication. "It wasn't normal business that walked through their door. All was based on the idea that home price appreciation would cover over a lot of the problems that occurred. But that hasn't happened."

But just as the Alt. A market has grown even faster than subprime, some believe it could shrink even faster amid growing concerns in the marketplace. That means another pool of money that has supported home sales and housing prices being yanked just as home sales and prices are already in decline.

\*    \*    \*

But many in the field say that there is a real squeeze on Alt. A loans as lenders tighten up on underwriting standards. Mitch Ohlbaum, president of mortgage broker Legend Mortgage whose business was about 55 percent Alt. A, said he's seen a dramatic change in the business the last few years, and its now swinging back away from the loans.

"Stated income borrowers were typically self-employed people who write off a lot of income, so their tax returns really don't reflect what they're earning," said Ohlbaum. But he said the loans have grown in popularity for folks who had no money to put down on a home, or could only pay interest on a loan, especially by real estate investors.

"All that nutty stuff is going to disappear," said Ohlbaum. "Everyone today is shying away from the 100 percent of value loan. But anytime there's a big change in the market like there is now, everyone will overcompensate for a while. I think this will last for 12 to 14 months before things are back to normal, and I think you'll see more foreclosures, more people in trouble in the meantime."

And he said some types of Alt. A loans that had become popular, such as the no-money-down loans, are almost impossible to arrange today. And the definition of what is considered an A-quality borrower has tightened up.

*Inside Mortgage Finance's Cecala said he believes underwriting of the loans had grown too loose by the end of last year, and that even some subprime borrowers were getting so-called low-doc or no-doc loans. He believes as much as a quarter of Alt. A loans were going to subprime borrowers. "In some ways it's the worst possible combination," he said.*

Now with the market correcting, even some borrowers with good credit are having Alt. A loan applications rejected, Ohlbaum said. That will cut off another source of financing for the battered real estate market.

The biggest Alt. A lender is Pasadena, Calif-based IndyMac Bancorp. Trade publication Inside Mortgage Finance estimates it did $70.2 billion of the loans in 2006, up 48 percent from a year earlier. As the sector grew, its shares shot up nearly 50 percent in a year and hit a record high in April 2006. But with rising concern about the mortgage sector, its shares have plunged 36 percent since the start of 2007.

61.    51.    On March 21, 2007, Housing Market issued an article entitled "US Housing Market – IndyMac – We are Not a Subprime Lender!" which criticized the differentiation between subprime and Alt-A provided by IndyMac – "the king-pin of Alt-A loans." IndyMac's key differentiating factor – the borrower's FICO score – "is hardly the root cause of the escalating subprime defaults," but rather "[t]he problem lies in the type of loans that have been originated."

What is Alt-A?

Lenders use the term Alt-A (Alternative-documentation) to categorize or differentiate between borrowers. Applicants for this type of loan often lack proof of income from traditional employment. Investors and self-employed borrowers are good candidates. Commissioned employees with inconsistent income also fall into this group. IndyMac is the king-pin of Alt-A loans. Trade publication Inside Mortgage Finance estimates it did $70.2 billion Alt-A loans in 2006, up 48 percent from a year earlier. This was nearly 80% of the company's mortgage originations last year.

*Alt-A loans are also known as "Stated Income" or "Liar Loans" since income is taken as fact. No further documentation is required.* As long the automated

34

property appraisal software is functioning, approval is only a few keystrokes away. *These loans are tremendously profitable, since the underwriting costs are much lower and the rates are higher than a standard 30 year fixed mortgage.*

IndyMac pointed-out in its press release that subprime mortgages generally include loans where the borrower's FICO score is 620 or below and that their customer's average score was 701 in 2006. This is an interesting data point, but a person's FICO score is hardly the root cause of the escalating subprime defaults. The problem lies in the type of loans that have been originated.

Creative loans using teaser rates, negative amortization and interest-only are causing the chaos. Here is an example. An option ARM allows a borrower to pay full principle and interest, interest only or less than full interest based on a teaser rate. If a person elects to pay less than full interest the remainder of the interest is put back into the principle. This is called negative amortization. A person would choose this option, because it could cut their monthly payment in half versus a fully amortized product. However, like all good things - it must end at some point. Most of these loans typically reset interest rates in 1 or 2 years. What's worse is when the negative amortization reaches its limit, usually 110% of the original loan, not only does the interest rate reset, but both principal and interest must be paid going forward. This could double or triple the monthly payment.

Resetting of such loans is causing the subprime sector to explode. Guess what? Alt-A is dominated by these loans as well. Regardless of a person's FICO score, a doubling or tripling of their mortgage is going to cause a problem. The higher FICO person may be able to buy a little more time, but the end result will be the same.

62.    Further, it was after the Offerings, and only in 2007, that IndyMac first separated out its loan production to include a delineation of piggyback loans, which showed that a significant portion of IndyMac's loan production was risky 80/20 piggyback mortgage loans.

### *IndyMac's Aggressive Underwriting: A Game Hot Potato That Burned Investors*

63.    As the real estate market in this country softened and interest rates increased, IndyMac kept pushing to generate volume in the high quality mortgage market by loosening the Company's underwriting practices and introducing a growing percentage of higher risk mortgage products, including adjustable-rate, interest-only loans and "stated income" loans, where even W-2 wage earners did not have to bother verifying their stated income levels.

35

64.    In order to continue to grow its business in an already troubled market, IndyMac had to loosen underwriting standards and quickly dispose of the resulting "Hot Potato" mortgage loans before borrowers defaults, by selling the loans outright or securitizing them and selling the repacked loans, as they did in the October 2005 Offering, November 2005 Offering, December 2005 Offering, January 2006 Offering, and September 2006 Offering.

65.    Indeed, Michael W. Perry, Chairman of IndyMac Bancorp, Inc.'s Board of Directors and Chief Executive Officer conceded in an analyst conference call that IndyMac's securitizations are a game of "Hot Potato" where here the Plaintiff and the Class got burned:

> And generally what we try to do, when the [interest-rate] spreads are very tight, is *we try to play Hot Potato and sell* even our rate locks forward *into a securitization.*

January 26, 2006, IndyMac Earnings Conference Call at 19 [Thompson StreetEvents].

66.    Last fall following the collapse of the subprime market, members of Congress voiced their disapproval of the "Hot Potato" game played by financial institutions such as IndyMac: "[I] have heard that all the players duck their responsibility and point the finger at anyone but themselves.  This has become a game of hot potato – and it has to stop.  If you ask me, everyone is responsible and should be held accountable."  Hon. Senator Robert Menendez, New Jersey, Committee Statement on the The Role of Credit Agencies on the Subprime Credit Markets, September 26, 2007, at http://menendez.senate.gov/newsroom.  See also Congressman Kanjorski's statement:  "To me, it appears that none of the parties that put together or purchase these faulty home loans, packaged them into mortgage-backed securities, and then divided these securities into tranches and repackaged them into CDOs, CDOs-squared, and CDOs-cubed had any skin in the game.  In the end, it was the final investor left with this hot potato od subprime debt and significant losses."  Opening Statement of Congressman Paul Kanjorski, Subcommittee

on Capital Markets, Insurance, and Government Sponsored Enterprises, Hearing on the Role of the Credit Rating Agencies in the Structured Finance Market, September 27, 2007.

67.    An example of IndyMac's loose underwriting and aggressive mortgage lending is set forth in an August 20, 2007 Business Week article entitled, "Did Big Lenders Cross the Line? Law Suits Assert Some Firms Doctored Loan Documents." The article discusses the disturbing story of Elouise Manuel, whose stated-income loan was directed by an IndyMac underwriter to black-out certain income documentation in order for approval of that loan. The conditional approval letter from IndyMac notes, "Need [Social Security] benefits letters for last two years with income blacked out." Ultimately, Ms. Manuel was unable to pay the loan, and subsequently lost her home.

68.    These types of stated-income loans were the easiest to manipulate, and the easiest for IndyMac to follow through on due diligence had it so desired. IndyMac could have insisted on double-checking a client's stated income by utilizing IRS Form 4506. When asked by analysts during the November 2, 2006 Conference Call, as to what percentage of IndyMac's Alt-A customers provided IndyMac with IRS Form 4506, Michael W. Perry, Chairman of IndyMac Bancorp, Inc.'s Board of Directors and Chief Executive Officer was evasive and non-responsive. Indeed, studies have confirmed that upwards of 90% of stated-income loan borrowers exaggerated their state income by over 50%. "Eighth Periodic Mortgage Fraud Case to Report to Mortgage Bankers' Association," produced by Mortgage Asset Research Institute, Inc. April 2006.

**The Truth Becomes Revealed:  IndyMac Takes Responsibility For**
**Mistakes It Made Contributing To US Housing Market Crisis**

69.    It its Letter to Shareholders, contained in IndyMac Bancorp's 2007 Annual Report, dated February 12, 2008, IndyMac Bancorp Chairman and CEO Perry "[took] full

responsibility for the mistakes [IndyMac] made," indeed, that IndyMac's "innovative home lending went too far" and resulted in a "'systemic' underestimation of credit risk." Perry also confirmed that once "we began to realize [the systemic underestimation of credit risk], we tightened our [underwriting] guidelines throughout the last year...."

Dear shareholders,

2007 was a terrible ear for our industry, for IndyMac and for you, our owners. ...

\*    \*    \*

Who is to blame for the mortgage industry's financial losses and also the record number of Americans losing their homes?

*All home lenders, including Indymac, were a part of the problem, and, as Indymac's CEO, I take full responsibility for the mistakes that we made.* However, objective reviewers of this mortgage crisis understand that home lenders and mortgage brokers were not the only ones responsible. Systemic problems in our secondary mortgage markets and credit markets, and our government's over-stimulation of the housing market via monetary and tax policies (the capital gains tax break on home sales encouraged speculation), were all major factors that contributed to the problem. Indymac and most home lenders were not "greedy and stupid". *Most of us believed that innovative home lending served a legitimate economic and social purpose, allowing many U.S. consumers to be able to achieve the American dream of homeownership ... and we still do.* Homeownership is the main way we Americans accumulate wealth, and, in fact, a recent Federal Reserve Bank study shows that homeowners on average have 46 times the personal wealth of renters.

*As innovative home lending and loan products became more widespread, the result was more people succeeding (in homeownership) and more people failing (losing their home) than ever before.* But everyone, including both the government and consumer advocate groups who encouraged this lending via enforcement of CRA lending requirements, also bought into the concept that, if lenders and investors could properly price this increased risk, the higher number of failures was worth the social and economic goals of expanded homeownership. And it worked for many years; the homeownership rate, which had not moved in several decades, expanded from 64% to 69% from 1994 to 2006, allowing 4 million additional Americans the opportunity to have the American dream and build wealth.

*However, in retrospect, like many innovations (e.g., the Internet, railroads, etc.), innovative home lending went too far.* The housing bubble, caused primarily by the low interest rates for ARM mortgages fostered by the Fed's

accommodative monetary policy and even lower rates for fixed/long-term mortgages due largely to tremendous global liquidity, combined with *strong demand by institutional investors for assets with higher yields, resulted in a "systemic" underestimation of credit risk.* This systemic underestimation of credit risk was not just for mortgages but for many forms of credit. *By way of example, Indymac (and many other major financial institutions) has for years used one of the major credit rating agencies' models to assess and price credit risk on home loans. This model estimates expected lifetime losses on a loan level basis, and we closely monitor these average estimated lifetime losses for all of our loan production (that can be evaluated) on an ongoing basis. This particular rating agency revised its model in November 2007 (from version 6.0 to 6.1). Applying version 6.0 to our 4th quarter of 2006 production (the version in place at that time) indicated an average expected lifetime loss rate of 0.88%, which we felt was a reasonable level of expected losses at which we could properly and adequately price the loans. However, now applying the updated version 6.1 to this same 4th quarter of 2006 pool of loans results in an average expected lifetime loss rate of 1.88%, a 114% increase in expected losses in one year. This clearly indicates the extent to which the systemic underestimation of credit risk took place in the mortgage markets. As we began to realize this, we tightened our guidelines throughout the last year,* with the result that our average expected lifetime loss rate for 4th quarter of 2007 declined to 0.45% based on version 6.1, a 76% reduction in credit risk as compared to 4th quarter of 2006, boding well for the future credit quality and related credit provisions/costs of our new business model.

**Why didn't mortgage lenders see that things were going too far?**

*Lenders didn't see that things were going too far, partly because we were too close to it, but costly because objective evidence of this credit risk did not show up in our delinquencies and financial performance until it was too late to prevent significant losses.* And there were many events along the way that confirmed for those of us who believed that innovative home lending was possibly a paradigm shift (similar to widespread ownership of stocks by consumers) and definitely a legitimate marketplace: major financial institutions were offering these products and spending billions to purchase companies who specialized in these products; Wall Street firms and broker/dealers of major banks were underwriting our and others' transactions and also spending billions as recently as 2006 to buy non-GSE lenders in order to vertically integrate their home lending and securitization activities; major mortgage and bond insurers were insuring individual mortgages and pools of mortgages or bonds created from these mortgages; major credit rating agencies were providing strong ratings on our and others' transactions; and major investors around the world were purchasing these mortgage-backed bonds and even CDOs backed by these bonds (something we home lenders had no involvement in or awareness of). Very few in the private sector or in government predicted that the bursting of the housing bubble would be so severe and would result in the current wave of delinquencies,

foreclosures and credit losses and the eventual collapse of the non-GSE secondary market ... even for high credit quality, full-documentation, jumbo home loans.

It is also important to understand that the rapid rise in housing prices is one of the key culprits in this current housing and mortgage crisis. In modern times, housing prices have declined in certain regions of the country but never on a nationwide basis. As a result of this fact and the important social and economic benefits that are clearly derived from homeownership, the government (first through Indymac 2007 Annual Report 5 FHA/VA programs and then through the GSEs) encouraged a U.S. mortgage market built upon very high leverage, with LTV ratios nearing 100% for first-time homebuyer programs. However, as home prices decline, either regionally or nationally, the leverage in a home loan, combined with the leverage of a financial institution or securitization structure, can result in significant losses for financial institutions, investors and consumers. Add to this mix a housing market that has not had a single regional market decline in over 15 years and, in fact, had a huge boom in prices from 2003 to 2006, and you can begin to understand how home lending was impacted. *Automated risk-based models, on which the entire market relied, replaced portions of traditional underwriting and credit evaluation, and only in retrospect is it now clear that these models did not perform as predicted during a period of severe economic stress. As events unfolded, this proved to be particularly the case with respect to programs such as piggyback loans and high LTV cash-out refinance transactions, including home equity and second mortgages.*

The bottom line of the housing crisis for Indymac and its leadership team. As I said earlier, I take full responsibility for the errors we made at Indymac...

IndyMac 2007 Annual Report, Letter to Shareholders, pp. 1-9 (Emphasis added).

### Certificate Underwriter Lehman Brothers Is the
### Subject of New York Attorney General Investigation

70.    On January 31, 2008, it was reported in The Wall Street Journal that New York Attorney General Andrew Cuomo is pursuing an investigation into whether Wall Street firms, including Lehman Brothers, improperly packaged and sold mortgage securities.    Attorney General Cuomo subpoenaed Lehman Brothers and others investigating the firms for securities law violations under the 1921 Martin Act, in that these firms might have "gloss[ed] over warning signs of bad mortgage loans they packaged into securities."

The New York attorney general's office, pursuing an investigation into whether Wall Street firms improperly packaged and sold mortgage securities, is latching onto a powerful regulatory tool: the 1921 Martin Act.

The state law, considered one of the most potent legal tools in the nation, spells out a broad definition of securities fraud without requiring that prosecutors prove intent to defraud. As a result, the act has become an influential hammer in recent years for New York state prosecutors in cracking down on securities manipulation, improper allocation of initial public Offering of stock and misleading stock research on Wall Street.

*Now the staff of New York Attorney General Andrew Cuomo is looking to use this legal lever as it examines whether firms might have committed securities fraud by glossing over warning signs of bad mortgage loans they packaged into securities,* people familiar with the matter said.

Some officials on Wall Street hadn't expected Mr. Cuomo to employ the aggressive prosecutorial tactics against the financial industry used frequently by his predecessor, Eliot Spitzer. Using the Martin Act will provide an easier road to prosecute mortgage abuses than other investigators examining this area. The act also will allow the New York attorney general to pursue both criminal and civil penalties.

The development comes as the attorney general's office has gained the cooperation of Clayton Holdings Inc., a company that provides due diligence on pools of mortgages for Wall Street firms. *At issue is whether the Wall Street firms failed to disclose adequately the warnings they received from Clayton and other due-diligence providers about "exceptions," or mortgages that didn't meet minimum lending standards.*

Such disclosures could have prompted credit-ratings firms to judge certain mortgage-backed securities as riskier investments, making them more difficult to sell, these people said. *The attorney general is examining, among other things, whether some Wall Street firms concealed information about the exceptions from the credit-rating concerns, these people said, in a bid to bolster ratings of mortgage securities and make them more attractive to buyers, such as pension funds, which often required AAA, or investment grade, ratings on potential investments in securities containing risky mortgages.*

*The attorney general's office has issued Martin Act subpoenas, which don't spell out whether matters are civil or criminal in nature, according to people familiar with the matter. So far, the recipients include* financial firms Bear Stearns Cos., Deutsche Bank AG, Morgan Stanley, Merrill Lynch & Co., and *Lehman Brothers Holdings Inc.,* possibly among others. Representatives of Bear, Deutsche, Morgan, and Lehman declined to comment on the investigation.

A Merrill spokesman said, "We cooperate with regulators when they ask us to," but declined to elaborate.

Meantime, some industry specialists are calling for reforms in the way securities firms package mortgage securities. Among them is making public the due-diligence reports provided by Clayton and its rivals to both ratings firms and the public. "We need to . . . improve the due-diligence process by standardizing it and by disclosing" the results to ratings agencies and investors, said Rod Dubitsky, head of asset-backed securities research at Credit Suisse Group. Another improvement, he said, would be hiring an independent party to "police" or monitor the loan pool, ensuring that mortgages being packaged into new securities for sale had the loan attributes that had been described.

With data provided by Clayton, Mr. Cuomo's office is seeking to gather more information on how Wall Street firms purchased home loans that had been singled out as "exception loans" -- that is, loans that didn't meet the originator's lending standards. Data from Clayton, for instance, indicates that in 2005 and 2006, years in which the mortgage-securitization business was going full throttle, some investment banks acting as underwriters were purchasing large numbers of loans that had been flagged as having exceptions, these people said.

In 2006, according to the data, as much as 30% of the pool of exception loans was purchased by some securities firms, these people said. One likely reason: Flawed loans could be purchased more cheaply than standard loans could be, lowering a firm's costs as it sought to compile enough mortgages for a new security.

(Emphasis added).

71.    In connection with each of the October 2005 Offering, November 2005 Offering, December 2005 Offering, January 2006 Offering, and September 2006 Offering, Lehman Brothers failed to conduct meaningful due diligence, including in connection with the underwriting standards used to originate the Certificate collateral.

## LOSS CAUSATION

72.    As a result of the foregoing disclosures, the value of the Certificates had substantially collapsed. The Carpenters Health Fund's investment in LXST Certificates has declined by approximately 61 percent - from $125,000 at the time of the Offerings to $48,629.56 at the time this action was commenced.

## COUNT I

### Violation of Section 11 of The Securities Act
### (Against All Defendants)

73.    Plaintiff repeats and realleges each and every allegation contained above.

74.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act and asserted on behalf of all other members of the Class who purchased or acquired LXST Certificates on or traceable to the Offerings.

75.    Defendants SASC is the registrant for the Offerings and filed the Registration Statements and Prospectuses as the issuer of the LXST Certificates, as defined in Section 11(a)(1) of the Securities Act.

76.    The Individual Defendants were officers and/or directors of SASC at the time the Registration Statement before the Offerings became effective, and at the time of the Prospectuses, and with their consent were identified as such in the Registration Statements.  The Individual Defendants are liable for the misstatements and omissions in the Registration Statements alleged herein under Section 11(a)(1) of the Securities Act.

77.    Defendant LB served as the Underwriter for the Offerings and qualifies as such according to the definition in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).  As such, LB participated in the solicitation, Offerings, and sale of the LXST Certificates to the investing public pursuant to the Registration Statements and the Prospectuses.

78.    The Registration Statements and the Prospectuses, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statements and the Prospectuses.

79.    The Defendants did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Registration Statements and Prospectuses were true, did not omit any material fact, and were not materially misleading.

80.    Plaintiff and the other Class members did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions contained in the Registration Statements and the Prospectuses.

81.    Plaintiff and other Class members sustained damages as a result of misstatements and omissions in the Registration Statements and the Prospectuses, for which they are entitled to compensation.

82.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offerings.

## COUNT II

### Violation of Section 12(a)(2) of the Securities Act
### (Against SASC, LXST and LB)

83.    Plaintiff repeats and realleges each and every allegation contained above.

84.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all Defendants.

85.    By means of the Registration Statements and Prospectuses, and by using means and instruments of transportation and communication in interstate commerce and of the mails, the Defendants through the Offerings sold LXST Certificates to Plaintiff and other members of the Class.

86.    Defendants SASC, LXST, the Individual Defendants and the Underwriter Defendant each successfully solicited these purchases, motivated at least in part by their own

financial interest.  The Defendants each reviewed and participated in drafting the Prospectuses. Through ensuring the successful completion of the Offerings, the Underwriter Defendant obtained substantial underwriting fees.

87.    The Registration Statements and the Prospectuses, at the time it became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statements and the Prospectuses.

88.    Defendants as "sellers" owed to the purchasers of the LXST Certificates, including Plaintiff and other Class members, the duty to perform due diligence and make a reasonable and diligent investigation of the statements contained in the Registration Statements and the Prospectuses, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

89.    Plaintiff and other members of the Class purchased or otherwise acquired LXST Certificates pursuant to the defective Registration Statements and Prospectuses.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statements and the Prospectuses.

90.    Plaintiff, individually and representatively, hereby offers to tender to Defendants those securities which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.  Class members who have sold their LXST Certificates are entitled to rescissionary damages.

91.   By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold LXST Certificates purchased pursuant and/or traceable to the Offerings have the right to rescind and recover the consideration paid for their LXST Certificates and hereby elect to rescind and tender their LXST Certificates  to the Defendants sued herein.  Plaintiff and Class members who have sold their LXST Certificates are entitled to rescissionary damages.

### COUNT III

### Violation of Section 15 of The Securities Act
### (Against Defendants SASC, LXST and the Individual Defendants)

92.   Plaintiff repeats and realleges each and every allegation contained above.

93.   This claim is brought by Plaintiff pursuant to Section 15 of the Securities Act and asserted on behalf of all Class members who purchased or acquired LXST Certificates in the Offerings.

94.   The Individual Defendants at all relevant times participated in the operation and management of SASC and LXST, and conducted and participated, directly and indirectly, in the conduct of SASC and LXST's business affairs.

95.   As officers and/or directors of SASC, the Individual Defendants had a duty to disseminate accurate and truthful information in the Registration Statements and the Prospectuses.

96.   Defendant SASC is the Parent Corporation and sole owner of LXST, and at all relevant times participated in the operation and management of the LXST, and conducted and participated, directly and indirectly, in the conduct of LXST business affairs.

97.    As set forth above, it is alleged that the Registration Statements and Prospectuses issued in connection with the LXST Offerings contained material misstatements of fact, and omitted facts necessary to make the facts contained therein not misleading, in violation of Sections 11 and 12 of the Securities Act.

98.    Because of their positions of control and authority as senior officers and directors of SASC, the Individual Defendants were able to, and did, control the contents of the Registration Statement and Prospectuses which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.    The Individual Defendants were therefore "controlling persons" of LXST within the meaning of Section 15 of the Securities Act.

99.    In addition, because of its sole ownership of LXST and its control and authority as Parent Corporation, Defendant SASC was able to, and did, control the contents of the Registration Statements and the Prospectus which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.    Defendant SASC was therefore a "controlling person" of LXST within the meaning of Section 15 of the Securities Act.

100.    Plaintiff and other Class members purchased LXST Certificates issued pursuant to the Offerings.    The Offerings was conducted pursuant to the Registration Statements and the Prospectuses.

101.    The Registration Statements and Prospectuses, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.    The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statements and the Prospectuses.

102.    Plaintiff and the Class did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions in the Registration Statements and the Prospectuses.

103.    Plaintiff and the Class have sustained damages as a result of the misstatements and omissions of the Registration Statements and the Prospectuses, for which they are entitled to compensation.

104.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offerings.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under CPLR Article 9;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:    July 23, 2008
New York, New York

Respectfully submitted,

By: _____
Samuel P. Sporn
Joel P. Laitman
Christopher Lometti
Frank R. Schirripa
Daniel B. Rehns
**SCHOENGOLD SPORN LAITMAN & LOMETTI , P.C.**
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile: (212) 267-8137

*Counsel for Plaintiff and
the Proposed Class*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |  |
|---|---|---|
| | X | |
| New Jersey Carpenters Health Fund, On Behalf of Itself and All Others Similarly Situated, | : | Index No. |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **VERIFICATION** |
| Lehman XS Trust Series 2005-5N, Lehman XS Trust Series 2005-7N, Lehman XS Trust Series 2005-9N, Lehman XS Trust Series 2006-2N, Lehman XS Trust Series 2006-16N, Structured Asset Securities Corporation, Mark L. Zusy, Samir Tabet, James J. Sullivan and Lehman Brothers, Inc., | : | |
| | : | |
| Defendants. | : | |
| | X | |

NEW YORK
COUNTY CLERK'S OFFICE

JUL 23 2008

NOT COMPARED
WITH COPY FILE

(STATE OF NEW YORK        )
(CITY OF NEW YORK         )
(COUNTY OF NEW YORK       )

    Daniel B. Rehns, being duly sworn, states that he is one of the attorneys for Plaintiff in this action and that the foregoing complaint is true to his own knowledge, except as to matters therein stated on information and belief and as to those matters he believes to be true; that the ground of his belief as to all matters not stated upon his knowledge are upon review of publicly available information filed with the United States Securities and Exchange Commission, media and newspaper articles and information contained on the internet; and that the reason why the verification is not made by Plaintiff is that Plaintiff ,New Jersey Carpenters Health Fund, is not in the county where Plaintiff's attorney has their office.

                          Daniel B. Rehns, Esq.

Notary Public

JAY P. SALTZMAN
Notary Public, State of New York
No. 02SA5064567
Qualified in Nassau County
Commission Expires September 27,20 _1 0_

Sworn to me before this
23rd day of July , 2008

50

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

———————————————————— X

New Jersey Carpenters Health Fund, On Behalf      :
of Itself and All Others Similarly Situated,       :        Index No.
                                                   :
                       Plaintiff,                  :
                                                   :
              v.                                   :
                                                   :
Lehman XS Trust Series 2005-5N, Lehman XS          :
Trust Series 2005-7N, Lehman XS Trust Series       :
2005-9N, Lehman XS Trust Series 2006-2N,           :
Lehman XS Trust Series 2006-16N, Structured        :
Asset Securities Corporation, Mark L. Zusy,        :
Samir Tabet, James J. Sullivan and Lehman          :
Brothers, Inc.,                                    :
                                                   :
                       Defendants.                 :

———————————————————— X

**NEW YORK**
**COUNTY CLERK'S OFFICE**

**JUL 2 3 2008**

**NOT COMPARED**
**WITH COPY FILE**

---

### VERIFIED COMPLAINT

---

**CERTIFICATION:** I, Daniel B. Rehns, Esq. hereby certify that all of the papers that I have served, filed or submitted to the court in this action are not frivolous as defined in subsection (c) of Section 130-1.1 of the Rules of the Chief Administrator of the Courts.

Dated:      July 23, 2008

Daniel B. Rehns, Esq.
**SCHOENGOLD SPORN LAITMAN &**
**LOMETTI , P.C.**
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile: (212) 267-8137
*Counsel for Plaintiff and*
          *the Proposed Class*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**08 CIV 6762.**

---

x

NEW JERSEY CARPENTERS HEALTH FUND,
On Behalf of Itself and All Others Similarly
Situated,

Plaintiff,

vs.

LEHMAN XS TRUST SERIES 2005-5N, LEHMAN
XS TRUST SERIES 2005-7N, LEHMAN XS TRUST
SERIES 2005-9N, LEHMAN XS TRUST SERIES
2006-2N, LEHMAN XS TRUST SERIES 2006-16N,
STRUCTURED ASSET SECURITIES
CORPORATION, MARK L. ZUSY, SAMIR TABET,
JAMES J. SULLIVAN AND LEHMAN BROTHERS,
INC.,

Defendants.

---

Civil Action No. _____

Removed from:

Supreme Court of the State of
New York, County of New York

No. 602158/08

**NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§1441 and 1446, defendants Lehman Brothers Inc. and

Structured Asset Securities Corporation ("Removing Defendants") hereby remove the above-

captioned civil action, and all claims and causes of action therein, from the Supreme Court of the

State of New York, County of New York to the United States District Court for the Southern

District of New York.[1] This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332,

as amended by the Class Action Fairness Act of 2005, and the claims may be removed to this

Court under 28 U.S.C. § 1453.

As grounds for removal, Removing Defendants state as follows:

---

[1]  By removing this matter, Removing Defendants do not waive, and expressly preserve,
any and all defenses that they may have including, but not limited to, lack of personal
jurisdiction and service of process.

1

1.     On or about July 23, 2008, plaintiff New Jersey Carpenters Health Fund filed this

putative class action in the Supreme Court of the State of New York, County of New York, on

behalf of all purchasers of certain Mortgage Pass-Through Certificates (the "Certificates"). This

case was assigned an index number of 602158/08. The complaint was received by Removing

Defendants on July 24, 2008.

2.     The complaint alleges, among other things, that certain registration statements and

prospectuses filed in connection with the Certificates contained misstatements and omissions in

violation of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k,

77l(a)(2) and 77o.

3.     Pursuant to 28 U.S.C. § 1446(a) and (b), this Notice of Removal is being filed in

the United States District Court for the Southern District of New York within thirty days after

July 24, 2008 (the date that Removing Defendants received a copy of the summons and

complaint).

**Class Action Fairness Act of 2005 ("CAFA")**

4.     Pursuant to CAFA, 28 U.S.C. §§1332(d)(2) and 1453, a putative "class action"

commenced after February 18, 2005 may be removed to the appropriate United States District

Court if: (a) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of

interests and costs; and (b) any member of the putative class is a citizen of a state different from

any defendant. 28 U.S.C. § 1332(d)(2)(A).

5.     CAFA applies because the state court action was commenced on or about July 23,

2008, *i.e.*, after the effective date of CAFA. 28 U.S.C. §§ 1332, 1453.

6.     The state court action is a "class action" within the meaning of CAFA because

Plaintiff seeks to represent a class of persons in a "civil action filed under" Article 9 of the New

2

York Civil Practice Law and Rules, *i.e.*, a "State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. §§ 1332(d)(1)(B), 1453(a).

7.    The state court action satisfies CAFA's amount in controversy requirement. Under 28 U.S.C. § 1332(d)(6), the amount in controversy in a putative class action is determined by aggregating the amount at issue in the claims of all members of the putative class.  Here, the complaint alleges that Defendants made false and misleading statements in connection with the issuance of several billions of dollars worth of Certificates, and alleges that the value of these Certificates has declined by 61%. *See* Complaint ¶¶ 1, 3.  While Removing Defendants deny that Plaintiff or any putative class member is entitled to recover any amount, or to any other relief, these allegations suffice to show that the aggregate amount in controversy is more than $5,000,000, exclusive of interest and costs.  28 U.S.C. § 1332(d)(2).

8.    The state court action also satisfies CAFA's diversity of citizenship requirement. To establish diversity jurisdiction under CAFA, it is sufficient that any one member of the putative class is a citizen of a state different from any one defendant.  28 U.S.C. § 1332(d)(2)(A). As stated in the Summons, New Jersey Carpenters Health Fund resides in Edison, New Jersey. Defendant Lehman Brothers Inc. is a Delaware corporation with its headquarters located in New York, New York.  Defendant Structured Asset Securities Corporation is a Delaware corporation with its principal office located in New York, New York.

9.    No exceptions to CAFA's applicability are relevant here.

**Other Procedural Requirements**

10.     In accordance with 28 U.S.C. § 1446(a), attached hereto as <u>Exhibit A</u> are file-stamped copies of all process, pleadings and orders served upon Removing Defendants in the state court action, namely the summons and complaint.

11.     Removing Defendants will promptly serve a copy of the Notice of Removal on Plaintiff's counsel and file with the Clerk of the Supreme Court of the State of New York, County of New York, a Notice of Filing of Notice of Removal pursuant to 28 U.S.C. § 1446(d).

12.     This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11. *See* 28 U.S.C. § 1446(a).

WHEREFORE, this action should proceed in the United States District Court for the Southern District of New York, as an action properly removed thereto.

Dated:  New York, New York
       July 29, 2008

SIMPSON THACHER & BARTLETT LLP

By _____
     Michael J. Chepiga
     mchepiga@stblaw.com
     Paul C. Curnin
     pcurnin@stblaw.com
     Eric M. Albert
     ealbert@stblaw.com
     425 Lexington Avenue
     New York, N.Y. 10017-3954
     Telephone: (212) 455-2000
     Facsimile: 212-455-2502

     *Attorneys for Defendants Lehman Brothers Inc.*
     *and Structured Asset Securities Corporation*

4

To:

Daniel B. Rehns, Esq.
Schoengold Sporn Laitman & Lometti, PC
19 Fulton Street, Suite 406
New York, NY 10036

*Attorneys for Plaintiff*