UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                            :

In re:                      :        09 MD 2017 (LAK)

LEHMAN BROTHERS SECURITIES AND  :
ERISA LITIGATION              :        **CONSOLIDATED SECURITIES**
                          :        **CLASS ACTION COMPLAINT**

This Document Applies to:      :

*In re Lehman Brothers Mortgage-Backed*  :
*Securities Litigation, No 08-CV-6762.*  :

-------------------------------------------------------X



# I.

## SUMMARY OF THE ACTION

1.    This Consolidated Complaint, which is alleged upon personal knowledge with respect to Plaintiffs, and upon information and belief with respect to all other matters, is brought pursuant to the Securities Act of 1933 (the "Securities Act") by: (i) Court Appointed Lead Plaintiff Locals 302 and 612 of the International Union of Operating Engineers – Employers Construction Industry Retirement Trust (the "Operating Engineers" or "Lead Plaintiff"); (ii) Plaintiff New Jersey Carpenters Health Fund (the "New Jersey Carpenters") and (iii) Plaintiff Boilermakers-Blacksmith National Pension Trust (the "Boilermakers") (collectively, "Plaintiffs"), on their own behalf and as a class action on behalf of all persons and entities who purchased or otherwise acquired interests in the Issuing Trusts (as set forth in ¶ 32, *infra*) ("Issuing Trusts" or "Defendant Trusts") pursuant or traceable to the two Registration Statements with accompanying Prospectuses filed with the Securities and Exchange Commission ("SEC") by Structured Asset Securities Corporation ("SASCo") on September 16, 2005 (the "2005 Registration Statement") and August 8, 2006 (the "2006 Registration Statement") (collectively referred to herein as the "Registration Statements").

2.    Pursuant to the Registration Statements, accompanying Prospectuses and later-filed Prospectus Supplements (the "Prospectus Supplements" with the Registration Statements collectively referred to herein as the "Offering Documents") incorporated into the Registration Statements, Lehman Brothers, Inc. ("LBI" or the "Underwriter") underwrote the issuance of $93.24 billion of Mortgage Pass-Through Certificates (the "Certificates") sold to the Plaintiffs and the Class in ninety-four (94) separate offerings between September 29, 2005 and July 28, 2007 (the "Offerings", as identified herein at ¶¶ 30-31).

3.      As set forth below, the Offering Documents contained material misstatements and omitted material information in violation of Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Defendants are strictly liable for these material misstatements and omissions under the Securities Act.  The Complaint asserts no allegations or claims sounding in fraud.

4.      Plaintiffs seek redress against the Defendant Issuing Trusts, which issued the Certificates purchased by Plaintiffs and the Class; the individual signatories to the Registration Statements, Defendants Mark L. Zusy ("Zusy"), Samir Tabet ("Tabet"), James J. Sullivan ("Sullivan"), Lana Franks ("Franks"), Edward Grieb ("Grieb"), Kristine Smith ("Smith") and Richard McKinney ("McKinney"); and Defendant Moody's Corp., as a result of the activities of its division Moody's Investor Service, Inc. ("Moody's") and Defendant The McGraw-Hill Companies, Inc., as a result of the activities of its Standard & Poor's division ("S&P" with Moody's collectively referred to herein as the "Ratings Agencies" or "Ratings Agency Underwriters").  LBI, as underwriter for each of the Offerings, is liable under Sections 11 and 12 of the Securities Act, but is not named as a defendant because on September 15, 2008, its parent company, Lehman Brothers Holdings, Inc. ("LBHI"), filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code, and in conjunction therewith, the Securities Investor Protection Corporation commenced proceedings to liquidate LBI.  SASCo, as issuer of the Registration Statements and Depositor for each of the Certificate Offerings is also not named as a defendant herein because on February 9, 2009, SASCo filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code.  LBHI, LBI and SASCo, along with their affiliates and subsidiaries are referred to collectively herein as "Lehman."

5.     This action arises from the role of LBHI, its affiliates and subsidiaries, as well as Moody's and S&P, in the "assembly line" conversion of hundreds of thousands of primarily subprime and Alt-A residential mortgages[1] into $93.24 billion of purportedly "investment grade" residential mortgage-backed securities ("RMBS" or "MBS"), which were then sold to Plaintiffs and the Class in the Offerings pursuant to the Offering Documents.  Lehman completed a total of ninety-four (94) Offerings in 21 months – averaging five (5) $1 billion Offerings per month and typically completing each securitization and underwriting within twenty-one (21) days from the date of purchase by Lehman of the mortgage loans from the originators.

6.     Lehman controlled every aspect of the securitization and underwriting process. Acting as "Sponsor," LBHI acquired the mortgage loans either from Lehman's own loan origination affiliates and subsidiaries, Aurora Loan Services ("Aurora") and BNC Mortgage ("BNC"), or in direct purchases (including in auctions) from third-party loan originators, principally GreenPoint Mortgage ("GreenPoint"), Countrywide Home Loans, Inc. ("Countrywide"), IndyMac Bank, F.S.B. ("IndyMac"), Wells Fargo Bank ("Wells Fargo"), First Franklin Financial Corporation ("First Franklin"), EquiFirst Mortgage ("EquiFirst") and Aegis Mortgage ("Aegis") (collectively referred to herein as the "Originators").  SASCo, another LBHI subsidiary, served as "Depositor," acquiring the loans from LBHI and conveying them to the

---

[1]     The Registration Statements define **subprime** loans as loans typically made to borrowers who are perceived as deficient in either or both credit history and capacity to repay their loans. The borrowers may have imperfect credit histories, ranging from minor delinquencies to bankruptcy, or relatively high ratios of monthly mortgage payments to income or relatively high ratios of total monthly credit payments to income. SASCo Form S-3/A Registration Statement, September 16, 2005 at 3; *see also,* SASCo Form S-3/A Registration Statement, July 19, 2006 at 10.

The Registration Statements define **Alt-A** loans as loans "typically made to borrowers who have a strong credit history and can demonstrate a capacity to repay their loans, Alt-A mortgage loans may have some of the characteristics and risks of subprime mortgage loans…"  SASCo Form S-3/A Registration Statement, September 16, 2005 at 6; *see also,* SASCo Form S-3/A Registration Statement, July 19, 2006 at 11.

Issuing Trusts where LBHI securitized the cash-flows from the mortgage loans into the Certificates. LBI, another LBHI-related entity, then served as underwriter on all the Offerings.

7.     At the time the Certificates were issued, S&P and Moody's assigned their highest investment grade rating of "AAA" for S&P and "Aaa," for Moody's (herein "AAA") to 89%, or $85.3 billion, and 76%, or $75.95 billion, respectively, of the total $93.24 billion of Certificates issued. The ratings reflected the risk or probability of default by the borrower. None of the Certificates were rated below "investment grade," which was "BBB" for S&P and "Baa" for Moody's.

8.     As of the date of the filing of the Complaint, the Certificates have collapsed in value, with Plaintiffs' holdings having lost, cumulatively, 44% of their total initial value. (¶¶ 22-24). Further, the delinquency and foreclosure rates of the Certificates' underlying mortgage loan collateral have skyrocketed. The underlying mortgages' sixty-day delinquency rates now range from between 24.93% to 48.84%, while the Certificates' underlying property foreclosure rates range from 4.0% to 24.57%. (¶¶ 74-146). Further, S&P and Moody's have downgraded 71% and 79% of the Certificate classes; with 58% and 65%, respectively, now rated as speculative "junk bond" investments. (*Id.*)

9.     The Certificates provided that principal and interest payments due to investors were secured and derived from cash flows from underlying mortgage loans. As the original borrowers on each of the underlying loans paid their mortgages, distributions were made to investors through the Issuing Trusts in accordance with the terms of the Offering Documents governing the issuance of the Certificates. If borrowers failed to pay back their mortgages, defaulted, or were forced into foreclosure, the resulting losses flowed to the Certificate investors. As set forth in the Prospectus Supplements, the Certificates were divided into a structure of

classes, or "tranches," reflecting different priorities of seniority, payment, exposure to risk and default, and interest payments.

10.    Given the Certificate investors' dependence on the creditworthiness of the mortgage loan borrower (and an accurate appraisal of the mortgaged property) for payment of interest and principal, the standards or guidelines described in the Offering Documents which the Originators used in underwriting the mortgage loans were highly material to Certificate investors. The Registration Statements described general underwriting guidelines and then each Prospectus Supplement described the underwriting guidelines used by the principal originators of the loan pool securitized in that offering. These guidelines required an assessment of borrower creditworthiness and a valuation of the mortgaged property pursuant to standard appraisal procedures. The Offering Documents explained that where loans were issued to subprime borrowers with weak credit histories, countervailing considerations, such as the value of the mortgaged property, was the prevailing basis for issuing the loan. (¶¶ 112, 190-267). It was also generally explained that loans were only to be issued with no or limited borrower documentation (later to be dubbed "liar loans") where the borrower evidenced a strong credit history (so-called "Alt-A" loans). (¶¶ 196, 206, 232, 265).

11.    As set forth below, the description of the mortgage loan underwriting guidelines in the Offering Documents contained misstatements and omissions of material fact. As was only revealed well after issuance of the Certificates, the Certificate Originators, who were among the largest subprime lenders in the United States, systematically disregarded the mortgage loan underwriting guidelines described in the Offering Documents. (¶¶ 69-150).

12.    While compliance with those loan underwriting guidelines was highly material to Certificate investors, who were dependent on the creditworthiness of the borrowers for interest

and principal payments, LBHI had no such similar financial interest. Lehman conducted inadequate due diligence with respect to whether the loans were originated in conformity with the underwriting guidelines stated in the Offering Documents. Lehman's "due diligence" principally occurred not during the underwriting phase of the Offering, but while Lehman was inspecting smaller bulk loans for possible purchase from third-party loan originators after successfully bidding on the loans at auction. (¶ 55). At that stage, there was a disincentive for Lehman to reject, or "kick-back," loans as non-compliant with stated guidelines since the Originator would be less likely to select Lehman as the winning bidder in future auctions. Further, the motto among Lehman's residential mortgage-backed securities origination sales group became "there are no bad loans only badly priced loans" – meaning loans found not to comply with underwriting guidelines were generally not rejected, but simply negotiated to be purchased more cheaply. Lehman's "due diligence" was limited, inadequate and defective. (¶ 63). Lehman was forced to review loans on an expedited basis and unable to commit to a full review of the loan pools. Moreover, Lehman did not have a mechanism in place to prevent previously "kicked-back" loans from being resubmitted as part of later pools by an originator.

13. Lehman contracted out the inspection of loans for compliance with the Originator's underwriting guidelines to outside firms – Clayton Holdings, Inc. ("Clayton") and The Bohan Group ("Bohan"), and then conducted limited oversight of these sub-contractor's activities. As disclosed as part of the New York Attorney General's ongoing investigation of investment banking misconduct in underwriting MBS, Clayton and Bohan routinely provided investment banks with detailed reports of loans non-compliant with underwriting guidelines, but the investment banks routinely overrode exclusion of those loans from purchase and securitization. (¶ 154-155). Further, the President of The Bohan Group stated that by the time

the Offerings of the Certificates took place, investment banks were requiring a review of only 10% of the entire loan pools. (¶ 158).

14.     Instead of compliance with underwriting guidelines, Lehman's focus was on ensuring that the loans it securitized were substantially assigned the Ratings Agencies' highest investment grade.[2]   The reason was simple.  Without the AAA rating, the Certificates had no market – they could not be sold to either pension funds or insurance companies, who were required to purchase only such highly rated investment grade securities.

15.     The Offering Documents also described that it was LBHI that bought and securitized the loans and then structured the Certificates (with attendant investor protections or "credit enhancements")[3] and that the Ratings Agencies then rated the Certificates.  (¶¶ 172-73). These descriptions contained material misstatements and omissions since, in fact, the determination of which loans to be included in the securitization, the amount and form of credit enhancement for each Certificate and the Certificate structure were largely determined by the Ratings Agencies before they were actually "engaged" by Lehman and before the securitization was completed.  This was done so that Lehman would be assured that substantially all the Certificates could be sold to investors as AAA rated securities.

---

[2]      As former head of MBS at Moody's Brian Clarkson stated in an October 17, 2008 article in the *Financial Times*, in structured finance, including mortgage backed securities "[y]ou start with a rating and build a deal around a rating." (¶ 176).

[3]      **"Credit Enhancement,"** as was set forth in the Offering Documents, was limited investor protection against losses from borrower default provided to senior Certificate classes.  The Certificate Credit Enhancement was specifically described in Prospectus Supplements and assumed a number of forms.   The most prevalent forms of credit enhancement  included the creation of  subordinate classes which would absorb losses first, before the senior classes **("subordination")**; the inclusion of greater amounts of mortgage loans than the principal bond amount owed to investors **("overcollateralization")** or the creation of a fund from  borrower interest amounts in excess of expenses and  amounts paid  to Certificate investors **("excess cash")** which was then paid to senior classes as set forth in the Supplemental Prospectuses.  As a general rule, the greater the required credit enhancement, the less profitable the Offering was for Lehman.

16.    Further, the Offering Documents failed to disclose that the amount of credit enhancement provided was insufficient for the Certificates to be assigned AAA and investment grade ratings; and that the Ratings Agencies caused this understatement by failing to timely and adequately update the models employed to make those assessments.  As was only disclosed only well after the issuance of the Certificates, S&P's models had not been materially updated since 1999; while Moody's models had not been materially updated since 2002. Since these models used statistical assumptions based on the performance of mortgage loans issued in or before 2002 – they failed to accurately reflect the performance of the Certificate collateral which included substantial portions of the type of loans which only began to be originated en masse after 2002 – *i.e.,* subprime and Alt-A loans, non traditional adjustable mortgages; interest only and negative amortization loans,[4] as well as loans issued with limited borrower documentation or employment verification.  (¶¶ 17, 269, 271).

17.    The Offering Documents also failed to disclose material financial conflicts of interest between the Ratings Agencies and Lehman, including Lehman's engagement of the Ratings Agencies through "rating shopping."  These conflicts of interest were detailed in a report released by the SEC in July 2008 (the "SEC Report"), after a year-long investigation into the Ratings Agencies' activities relating to the issuance of RMBS in the period spanning 2005

---

[4]    As discussed below, originations of non-traditional adjustable mortgages, interest only and negative amortization loans increased dramatically between 2004 and 2006.  (¶ 52).  These types of loans presented the greatest potential for **"payment shock"** to the borrower since they both provide small initial fixed rates for a limited period of time which then reset thereafter to much higher monthly payment amounts.

The Registration Statements define **"Interest Only"** loans as mortgage loans which provide for payment of interest at the related mortgage interest rate, but no payment of principal, for the period specified in the related mortgage note; thereafter, the monthly payment is increased to an amount sufficient to amortize the principal balance of the mortgage loan over the remaining term and to pay interest at the applicable mortgage interest rate. Moreover, a **"Negative Amortization"** loan is defined in the Registration Statements as mortgage loans which may have a low introductory interest rate, and thereafter have a mortgage interest rate which adjusts periodically based on the related index; however, the borrower is only required to make a minimum monthly payment which may not be sufficient to pay the monthly interest due, resulting in an increase to the principal balance of the mortgage loan by the amount of unpaid interest.  SASCo Form S-3/A Registration Statement, September 16, 2005 at 7.

through 2007.  The SEC Report disclosed that the Ratings Agencies were typically engaged by way of  "ratings shopping" whereby the Ratings Agency that was ultimately engaged was the one which provided the most profitable rating to the investment bank in "bidding" for the engagement.  The SEC Report also explained that the Ratings Agencies were incentivized, due to the highly profitable nature of these RMBS engagements and the concentration of business in the hands of a relatively small group of investment banks, to not update their models lest they become unable to provide to the investment bank the most profitable credit enhancement and rating structure for the mortgage backed securities transaction. (¶¶ 67, 168, 178-81).

18.    As set forth herein, the Offering Documents contained material misstatements and omissions of material facts in violation of Section 11 and 12 of the Securities Act, including the failure to disclose that: i) the Originators of the underlying Certificate loans failed to comply with the general loan underwriting guidelines in the Registration Statements, including an examination of borrower creditworthiness and performance and review of standardized appraisals  of the mortgaged properties (¶¶ 157-246); ii) Lehman failed to conduct adequate due diligence with respect to the Originators' compliance with the stated underwriting guidelines (¶¶ 63-65, 151-67); iii) the Ratings Agencies – and not LBHI as stated in the Offering Documents – largely determined the composition of the securitized pool of loans, the amount and form of the Certificates' levels of credit enhancement before the Certificates were created and the Ratings Agencies were "engaged" to rate the securities (¶¶ 168-178); iv) there were material undisclosed conflicts of interest between Lehman and the Ratings Agencies, including as reflected in the undisclosed rating shopping practices, which incentivized the Ratings Agencies to  understate the appropriate Certificate credit enhancement and inflate the Certificate ratings; v) the amount of credit  enhancement  provided  to  the  Certificates  was  inadequate  to  support  the  AAA  and

investment grade ratings because those amounts were determined primarily by Ratings Agencies' models which had not been updated in a timely manner. (¶¶ 16, 53, 58, 159-67, 269).

19.    As a result of these material misstatements and omissions of material fact Plaintiffs and the Class have suffered damages for which defendants are liable pursuant to Sections 11, 12 and 15 of the Securities Act.

## II.

## JURISDICTION AND VENUE

20.    The claims alleged herein arise under §§ 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. Jurisdiction is conferred by § 22 of the Securities Act and venue is proper pursuant to § 22 of the Securities Act.

21.    The violations of law complained of herein occurred in this County, including the dissemination of materially false and misleading statements complained of herein into this County. SASCo, LBI, LBHI and the Ratings Agencies conduct or conducted business in this County.

## III.

## PARTIES AND RELEVANT NON-PARTIES

22.    Court Appointed Lead Plaintiff Operating Engineers is a Taft-Hartley Pension Fund. As reflected in the certification filed herein, the Operating Engineers purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements and has been damaged thereby.

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) | Value as of the Date of Filing of Complaint (Per Unit) |
| --- | --- | --- | --- |
| Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-5N, Class 1A1 | 1,500,000 | $1.00 | $0.47032 |

| | | | |
|---|---|---|---|
| Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-7N, Class 1A1B | 760,000 | $1.00 | $0.29973 |
| Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-2N, Class 1A1 | 1,500,000 | $1.00 | $0.42453 |
| Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-GP2, Class 1A1A | 1,500,000 | $1.00 | $0.93355 |
| GreenPoint Mortgage Funding Trust, Mortgage Pass-Through Certificates, Series 2006-AR4, Class A1A | 1,500,000 | $0.99984 | $0.77450 |
| GreenPoint Mortgage Funding Trust, Mortgage Pass-Through Certificates, Series 2006-AR5, Class AlA | 1,500,000 | $0.99992 | $0.83314 |

23.    Plaintiff New Jersey Carpenters is a Taft-Hartley Pension Fund.  As reflected in the attached certification, the New Jersey Carpenters purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements and has been damaged by the following amounts as of the date of filing:

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) | Value as of Filing of Complaint (Per Unit) |
|---|---|---|---|
| Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-5N, Class 1A1 | 125,000 | $1.00625 | $0.07810 |
| Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-6, Class 1A1 | 255,000 | $0.97960 | $0.38950 |

24.     Plaintiff Boilermakers is a Taft-Hartley Pension Fund. As reflected in the attached certification, the Boilermakers purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements and has been damaged by the following amounts as of the date of filing:

| Certificates Purchased | Amount of Units Purchased | Amount Paid (Per Unit) | Value as of Filing of Complaint (Per Unit) |
|---|---|---|---|
| Structured Adjustable Rate Mortgage Loan, Mortgage Pass-Through Certificates, Series 2006-1, Class 7A4 | 1,385,000 | $1.0040 | $0.41380 |
| Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-14N, Class 1A1B | 1,928,417.58 | $0.9473 | $0.39961 |
| Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-7N, Class 1A1B | 1,150,279.25 | $0.9303 | $0.29790 |

25.     SASCo was incorporated in the State of Delaware on January 2, 1987.  SASCo is a Delaware "special purpose" corporation formed for the purpose of securitizing assets.  SASCo is a wholly-owned, direct subsidiary of Lehman Commercial Paper, Inc. ("LCPI").  LCPI is a wholly-owned, direct subsidiary of LBHI.  LBI is also a wholly-owned, direct subsidiary of LBHI, which filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on September 15, 2008.  SASCo filed for bankruptcy on February 9, 2009.  SASCo filed the following Registration Statements filed with the SEC on Form S-3, as subsequently amended on Form S-3/A as follows:

**2005 Registration Statement: Registration No. 333-127589**

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| August 16, 2005 | S-3 Registration Statement | $1,000,000.00 |
| September 16, 2005 | S-3/A Amended Registration Statement | $75,000,000,000.00 |

**2006 Registration Statement: Registration No. 333-127589**

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| May 10, 2006 | S-3 Registration Statement | $1,000,000.00 |
| July 19, 2006 | S-3/A Amended Registration Statement | $1,000,000.00 |
| August 4, 2006 | S-3/A Amended Registration Statement | $105,992,402,127.00 |
| August 8, 2006 | S-3/A Amended Registration Statement | $105,992,402,127.00 |

26.    SASCo acted as the Depositor for the Certificates issued pursuant to the Registration Statements.  As Depositor, SASCo acquired the mortgage assets from the Sponsor LBHI.  SASCo made certain representations and warranties in connection with the loan pools collateralizing the Certificates. (¶¶ 172, 185, 187, 268, 272).  SASCo then conveyed the mortgages to the Issuing Trusts which issued the Certificates supported by the cash flows from the loan assets and secured by those assets.  SASCo's principal office is located at 745 Seventh Avenue, New York, New York.

27.    LBHI is a Delaware corporation with its headquarters located at 145 Seventh Avenue, New York, New York.  LBHI filed for Chapter 11 bankruptcy protection on September 15, 2008.  Since 1987 and at all relevant times herein, LBHI was engaged in the business of securitizing assets.  LBHI was long considered to be a market leader in mortgage and asset-backed securities.  During 2004 and 2005, LBHI and its affiliates securitized approximately $152 billion and $120 billion, respectively, of financial assets, including $133 and $101 billion, respectively, of residential mortgages, $13 and $8 billion, respectively, of commercial mortgages and $6 billion and $11 billion, respectively, of municipal and other asset-backed securities.  LBHI and its affiliates, including Aurora and Lehman Brothers Bank, F.S.B. ("LBB"), originated residential and commercial loans as an extension of LBHI's securitization activities.

28.    LBHI served as the Sponsor in connection with all the Certificate offerings.  As such, LBHI originated or acquired the assets which underlie the Certificates from loan

originators, including Aurora and LBB, among others, as set forth in ¶ 6, *infra*, and then transferred those assets to SASCo.

29.     LBI was a wholly-owned subsidiary of LBHI, and was a registered broker-dealer. LBI was based in New York, New York. LBI acted as the underwriter for all of the Certificate Offerings made pursuant to the Registration Statements. (¶¶ 4, 6, 30, 31).  LBI was a leading underwriter of and market maker in residential and commercial mortgages and asset-backed securities.

30.     The Mortgage Pass-Through Certificate ("MPTC") Offerings underwritten by LBI pursuant to the 2005 Registration Statement were as follows:

| Trust | Approximate Principal Amount | Approx. Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
|---|---|---|---|---|---|
| First Franklin Mortgage Loan Trust, Series 2006-FF2 | $   754,000,000 | February 23, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Investment Loan Trust, Series 2006-BNC1 | $ 1,154,000,000 | February 24, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Investment Loan Trust, Series 2006-2 | $ 1,320,000,000 | March 24, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2006-2 | $ 1,315,000,000 | February 27, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2006-3 | $   821,500,000 | March 29, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2006-4 | $ 1,820,505,100 | April 27, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006- | $   423,500,000 | February 23, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |

S1

| | | | | | |
|---|---|---|---|---|---|
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-WF1 | $ 846,700,000 | March 21, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-BC1 | $ 1,063,000,000 | April 26, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2005-4 | $ 837,300,000 | September 29, 2005 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2005-5N | $ 2,700,000,000 | October 28, 2005 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2005-6 | $ 936,700,000 | October 28, 2005 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2005-7N | $ 2,391,000,000 | November 29, 2005 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2005-8 | $ 801,900,000 | November 29, 2005 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2005-9N | $ 1,629,000,000 | December 29, 2005 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2005-10 | $ 594,400,000 | December 28, 2005 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-1 | $ 1,009,000,000 | January 30, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-2N | $ 2,131,000,000 | January 30, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-3 | $ 821,900,000 | February 24, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |

| Lehman XS Trust, Series 2006-4N | $ 1,358,000,000 | March 30, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-5 | $ 1,037,000,000 | March 29, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-GP1 | $ 870,700,000 | April 29, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-GP2 | $ 1,123,000,000 | May 30, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-11 | $ 913,200,000 | July 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman Mortgage Trust, Series 2006-2 | $ 324,200,000 | March 29, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |

31.    The MPTC Offerings underwritten by LBI pursuant to the 2006 Registration Statement were as follows:

| Trust | Approximate Principal Amount | Approx. Offering Date | Underwriter(s) | Depositor | Sponsor |
| --- | --- | --- | --- | --- | --- |
| First Franklin Mortgage Loan Trust, Series 2006-FF12 | $ 1,027,081,000 | August 18, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| First Franklin Mortgage Loan Trust, Series 2006-FFA | $ 763,053,000 | October 27, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| First Franklin Mortgage Loan Trust, Series 2006-FFB | $ 619,773,000 | November 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| GreenPoint Mortgage Funding Trust, Series 2006-AR4 | $ 1,280,641,000 | August 30, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| GreenPoint Mortgage Funding Trust, Series 2006-AR5 | $ 1,270,856,000 | September 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| GreenPoint Mortgage Funding Trust, Series 2006-AR6 | $ 1,069,502,000 | October 27, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| GreenPoint Mortgage Funding Trust, Series 2006-AR7 | $ 1,175,972,000 | November 26, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |

| | | | | | |
|---|---|---|---|---|---|
| GreenPoint Mortgage Funding Trust, Series 2006-AR8 | $ 724,924,000 | December 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| GreenPoint Mortgage Funding Trust, Series 2006-HE1 | $ 1,831,838,000 | August 25, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| GreenPoint Mortgage Funding Trust, Series 2007-AR1 | $ 1,454,467,000 | February 27, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| GreenPoint Mortgage Funding Trust, Series 2007-AR2 | $ 1,279,245,000 | April 27, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| GreenPoint Mortgage Funding Trust, Series 2007-AR3 | $ 494,611,000 | May 30, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| BNC Mortgage Loan Trust, Series 2006-1 | $ 835,639,000 | September 27, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| BNC Mortgage Loan Trust, Series 2006-2 | $ 773,981,000 | October 26, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Investment Loan Trust, Series 2006-BNC3 | $ 1,992,336,000 | August 23, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2006-8 | $ 1,127,697,100 | August 30, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2006-9 | $ 650,553,100 | September 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2006-10 | $ 481,697,100 | October 30, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2006-11 | $ 540,146,100 | November 29, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2006-12 | $ 562,820,100 | December 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2007-1 | $ 488,231,100 | January 30, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2007-2 | $ 551,986,100 | February 27, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |

| | | | | | |
|---|---|---|---|---|---|
| Structured Adjustable Rate Mortgage Loan Trust, Series 2007-3 | $ 1,144,145,200 | March 29, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2007-4 | $ 539,008,000 | April 27, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2007-5 | $ 673,953,100 | May 30, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Adjustable Rate Mortgage Loan Trust, Series 2007-6 | $ 696,885,100 | June 28, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-BC2 | $ 1,127,610,000 | August 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-BC3 | $ 1,279,891,000 | October 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-BC4 | $ 1,529,320,000 | November 22, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-BC5 | $ 767,746,000 | November 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-BC6 | $ 1,241,967,000 | December 26, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-S3 | $ 424,243,000 | August 15, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-S4 | $ 493,307,000 | December 21, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |

| | | | | | |
|---|---|---|---|---|---|
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-WF3 | $ 1,364,066,000 | September 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2007-BC1 | $ 619,137,000 | February 26, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2007-BC2 | $ 619,137,000 | February 26, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2007-BC3 | $ 788,341,000 | May 30, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2007-EQ1 | $ 619,036,000 | April 20, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2007-OSI | $ 805,847,000 | May 25, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Structured Asset Securities Corporation Mortgage Loan Trust, Series 2007-WF1 | $ 816,129,000 | March 26, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-13 | $ 1,014,999,000 | August 30, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-14N | $ 888,223,000 | August 30, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-15 | $ 864,436,000 | September 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-16N | $ 2,191,599,000 | September 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |

| | | | | | |
|---|---|---|---|---|---|
| Lehman XS Trust, Series 2006-17 | $ 1,307,826,000 | October 30, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-18N | $ 101,043,000 | November 29, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-19 | $ 873,389,000 | November 29, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2006-20 | $ 721,081,000 | December 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2007-1 | $ 947,710,000 | January 30, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2007-2N | $ 1,319,614,000 | January 30, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2007-4N | $ 2,121,137,000 | March 29, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2007-5H | $ 893,247,000 | April 27, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2007-6 | $ 1,612,084,000 | May 10, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2007-7N | $ 2,167,194,000 | May 30, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2007-9 | $ 653,481,000 | May 29, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2007-10H | $ 964,341,000 | June 28, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2007-11 | $ 498,396,000 | June 28, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman XS Trust, Series 2007-12N | $ 1,304,325,000 | June 28, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman Mortgage Trust, Series 2006-5 | $ 323,520,948 | August 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |

| | | | | | |
|---|---|---|---|---|---|
| Lehman Mortgage Trust, Series 2006-6 | $ 688,682,387 | September 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman Mortgage Trust, Series 2006-7 | $ 746,053,996 | October 27, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman Mortgage Trust, Series 2006-8 | $ 526,527,293 | November 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman Mortgage Trust, Series 2006-9 | $ 624,554,370 | December 28, 2006 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman Mortgage Trust, Series 2007-1 | $ 543,767,100 | January 26, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman Mortgage Trust, Series 2007-2 | $ 312,448,100 | February 26, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman Mortgage Trust, Series 2007-3 | $ 248,584,100 | March 29, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman Mortgage Trust, Series 2007-4 | $ 656,527,384 | April 27, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman Mortgage Trust, Series 2007-5 | $ 1,335,302,283 | May 29, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |
| Lehman Mortgage Trust, Series 2007-6 | $ 297,870,544 | June 27, 2007 | Lehman Brothers, Inc. | Structured Asset Securities Corporation | Lehman Brothers Holdings, Inc. |

32.    The Defendant Issuers of the various Certificates are each New York or Delaware common law trusts.    Each of these Trusts issued hundreds of millions of dollars worth of Certificates pursuant to a Prospectus Supplement which listed numerous classes of the Certificates.  The Defendant Issuers are:

| | | |
|---|---|---|
| First Franklin Mortgage Loan Trust 2006-FF2 | Structured Asset Securities Corporation Mortgage Loan Trust 2006-S1 | Lehman XS Trust 2006-11 |
| First Franklin Mortgage Loan Trust 2006-FF12 | Structured Asset Securities Corporation Mortgage Loan Trust 2006-WF1 | Lehman XS Trust 2006-13 |
| First Franklin Mortgage Loan Trust 2006-FFA | Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC1 | Lehman XS Trust 2006-14N |
| First Franklin Mortgage Loan Trust 2006-FFB | Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC2 | Lehman XS Trust 2006-15 |

| | | |
|---|---|---|
| Structured Asset Investment Loan Trust 2006-BNC1 | Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC3 | Lehman XS Trust 2006-16N |
| Structured Asset Investment Loan Trust 2006-2 | Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC4 | Lehman XS Trust 2006-17 |
| Structured Asset Investment Loan Trust 2006-BNC3 | Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC5 | Lehman XS Trust 2006-18N |
| BNC Mortgage Loan Trust 2006-1 | Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC6 | Lehman XS Trust 2006-19 |
| BNC Mortgage Loan Trust 2006-2 | Structured Asset Securities Corporation Mortgage Loan Trust 2006-S3 | Lehman XS Trust 2006-20 |
| GreenPoint Mortgage Funding Trust, Series 2006-AR4 | Structured Asset Securities Corporation Mortgage Loan Trust 2006-S4 | Lehman XS Trust 2007-1 |
| GreenPoint Mortgage Funding Trust, Series 2006-AR5 | Structured Asset Securities Corporation Mortgage Loan Trust 2006-WF3 | Lehman XS Trust 2007-2N |
| GreenPoint Mortgage Funding Trust, Series 2006-AR6 | Structured Asset Securities Corporation Mortgage Loan Trust 2007-BC1 | Lehman XS Trust 2007-4N |
| GreenPoint Mortgage Funding Trust, Series 2006-AR7 | Structured Asset Securities Corporation Mortgage Loan Trust 2007-BC2 | Lehman XS Trust 2007-5H |
| GreenPoint Mortgage Funding Trust, Series 2006-AR8 | Structured Asset Securities Corporation Mortgage Loan Trust 2007-BC3 | Lehman XS Trust 2007-6 |
| GreenPoint Mortgage Funding Trust, Series 2006-HE1 | Structured Asset Securities Corporation Mortgage Loan Trust 2007-EQ1 | Lehman XS Trust 2007-7N |
| GreenPoint Mortgage Funding Trust, Series 2007-AR1 | Structured Asset Securities Corporation Mortgage Loan Trust 2007-OSI | Lehman XS Trust 2007-9 |
| GreenPoint Mortgage Funding Trust, Series 2007-AR2 | Structured Asset Securities Corporation Mortgage Loan Trust 2007-WF1 | Lehman XS Trust 2007-10H |
| GreenPoint Mortgage Funding Trust, Series 2007-AR3 | Lehman XS Trust 2005-4 | Lehman XS Trust 2007-11 |
| Structured Adjustable Rate Mortgage Loan Trust 2006-2 | Lehman XS Trust 2005-5N | Lehman XS Trust 2007-12N |
| Structured Adjustable Rate Mortgage Loan Trust 2006-3 | Lehman XS Trust 2005-6 | Lehman Mortgage Trust 2006-2 |
| Structured Adjustable Rate Mortgage Loan Trust 2006-4 | Lehman XS Trust 2005-7N | Lehman Mortgage Trust 2006-5 |
| Structured Adjustable Rate Mortgage Loan Trust 2006-8 | Lehman XS Trust 2005-8 | Lehman Mortgage Trust 2006-6 |
| Structured Adjustable Rate Mortgage Loan Trust 2006-9 | Lehman XS Trust 2005-9N | Lehman Mortgage Trust 2006-7 |
| Structured Adjustable Rate Mortgage Loan Trust 2006-10 | Lehman XS Trust 2005-10 | Lehman Mortgage Trust 2006-8 |

| | | |
|---|---|---|
| Structured Adjustable Rate Mortgage Loan Trust 2006-11 | Lehman XS Trust 2006-1 | Lehman Mortgage Trust 2006-9 |
| Structured Adjustable Rate Mortgage Loan Trust 2006-12 | Lehman XS Trust 2006-2N | Lehman Mortgage Trust 2007-1 |
| Structured Adjustable Rate Mortgage Loan Trust 2007-1 | Lehman XS Trust 2006-3 | Lehman Mortgage Trust 2007-2 |
| Structured Adjustable Rate Mortgage Loan Trust 2007-2 | Lehman XS Trust 2006-4N | Lehman Mortgage Trust 2007-3 |
| Structured Adjustable Rate Mortgage Loan Trust 2007-3 | Lehman XS Trust 2006-5 | Lehman Mortgage Trust 2007-4 |
| Structured Adjustable Rate Mortgage Loan Trust 2007-4 | Lehman XS Trust 2006-GP1 | Lehman Mortgage Trust 2007-5 |
| Structured Adjustable Rate Mortgage Loan Trust 2007-5 | Lehman XS Trust 2006-GP2 | Lehman Mortgage Trust 2007-6 |
| Structured Adjustable Rate Mortgage Loan Trust 2007-6 | | |

33.    Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill") is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020, and several offices located in the state of California.    Standards & Poor's ("S&P," as defined previously), a division of the McGraw-Hill Companies, provides credit ratings, risk evaluation, investment research and data to investors.    S&P acted as an "Underwriter" of the Certificates herein within the meaning of the Securities Act, 15 U.S.C § 77b(a)(11).    S&P participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.    In addition, S&P worked with LBHI, loan sellers and servicers in forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

34.    Defendant Moody's Corp. is a Delaware corporation with its principal place of business located at 250 Greenwich Street, New York, New York 10007.    Moody's Investor

Service, Inc. ("Moody's," as defined previously), a division of Moody's Corp., provides credit ratings, risk evaluation, investment research and data to investors.  Moody's acted as an "Underwriter" of the Certificates herein within the meaning of the Securities Act, 15 U.S.C § 77b(a)(11).    Moody's participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. In addition, Moody's worked with LBHI, loan sellers and servicers in forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

35.    McGraw-Hill, inclusive of S&P, and Moody's Corp., inclusive of Moody's, are collectively referred to hereinafter as the "Ratings Agency Underwriters."

36.    The Ratings Agency Underwriters are not being sued herein pursuant to Section 11(a)(4) as persons who prepared or certified the ratings portion of the Registration Statements since, pursuant to Securities Act Rule 436(g), the ratings assigned to a class of debt securities shall not be considered part of the Registration Statement  "prepared or certified by a person within the meaning of Section 11 of the Securities Act."  Instead, they are being sued on the basis of their roles, as alleged in detail, infra, as underwriters and control persons within the meaning of Sections 12 and 15 of the Securities Act, including their activities both before and after their engagement to "rate" the Certificates in determining which mortgage loans to be included and excluded from the underlying collateral and composition of the Certificate credit enhancement needed in order to sell the Certificates with AAA ratings.

37.    Defendant Mark L. Zusy ("Zusy") was, at all relevant times, Chairman, President and Managing Director of SASCo.  Zusy signed the 2005 Registration Statement and the 2006 Registration Statement as Chairman, President and Managing Director of SASCo.

38.    Defendant Samir Tabat ("Tabat") was a Managing Director of SASCo.   Tabat signed the 2005 Registration Statement.

39.    Defendant James J. Sullivan ("Sullivan") was a director of SASCo during the relevant time period.  Sullivan signed the 2005 and 2006 Registration Statements.

40.    Defendant Lana Franks ("Franks''") was Principal Executive Officer, President, a director and Chairman of the Board of Directors of SASCo during the relevant time period. Franks signed the 2006 Registration Statement.

41.    Defendant Edward Grieb ("Grieb") was Chief Financial Officer ("CFO") of SASCo during the relevant time period.  Grieb signed the 2006 Registration Statement.

42.    Defendant Kristine Smith ("Smith") was Controller and Principal Accounting Officer of SASCo during the relevant time period.   Smith signed the 2006 Registration Statement.

43.    Defendant Richard McKinney ("McKinney") was a director of SASCo during the relevant time period.  McKinney signed the 2006 Registration Statement.

44.    The Defendants identified in ¶¶ 37-42 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors to the Issuing Trusts as they were directors to SASCo and signed the Registration Statement for the registration of the securities issued by the Trusts.

45.    The Individual Defendants participated with and/or conspired with the remaining Defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

**IV.**

**BACKGROUND**

A.    **Lehman Becomes One of The Largest Producers of Mortgage-
      Backed Securities As Non-Governmental Securitizations
      Increase Along With Subprime And Alt-A Lending**

46.    As illustrated below, a mortgage securitization is where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.



47.    The securitization of loans fundamentally shifts the risk of loss from the mortgage loan originator to the investor who purchased an interest in the securitized pool of loans.  When the originator holds the mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss if the borrower defaults and the property value is not sufficient to repay the loan.  As a result, traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans.  In securitizations where the originator immediately sells the loan to an investment bank, it does not

have the same economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan origination process.

48.    In the 1980s and 1990s, securitizations were generally within the domain of Government Sponsored Enterprises ("GSE"), *i.e.,* the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which would purchase loans from originators.  Investors in these early GSE securitizations were provided protections since the underlying loans were originated pursuant to strict underwriting guidelines.

49.    Between 2001 and 2006, however, there was dramatic growth in both non-GSE loan originations and securitizations, for which there were no such underwriting limitations. That growth resulted in a commensurate increase in subprime and Alt-A originations and securitizations.  According to *Inside Mortgage Finance* (2007), in 2001, agency originations were $1.433 trillion and securitizations were $1.087 trillion – far outpacing non-agency originations of $680 billion and securitizations of $240 billion.  In 2006, agency originations grew to $1.040 trillion while securitizations declined to $904 million.  However, in that same period, non-agency originations had grown by 100% to $1.480 trillion, and non agency securitizations had grown by 330% to $1.033 trillion in 2006.  Further, non-agency origination of subprime loans grew by 315% – from $190 billion in 2001 to $600 billion in 2006; and non-agency Alt-A origination grew by 566% – from $60 billion in 2001 to $400 billion in 2006.  Non-agency securitizations of subprime and Alt-A had also grown exponentially during this period.  Non-agency subprime securitizations grew by 415% – from $87.1 billion in 2001 to $448 billion in 2006; while Alt-A securitization grew exponentially by 3,107% – from $11.4 billion in 2001 to $365.7 billion in 2006.

50.     Lehman led the way in this dramatic growth in non-agency securitizations of subprime and Alt-A loans.  Indeed, it had acquired interests and control of Aurora and BNC precisely so that it would own origination businesses which would provide a continuous and captive source of Alt-A (in the case of Aurora) and subprime (in the case of BNC) loan originations to meet at least part of Lehman's massive securitization needs.

51.     According to *Inside Mortgage Finance*, by the end of 2005, Lehman had become the second largest producer or issuer of non-agency MBS (after Countrywide), producing $87 billion of total MBS in 2005, and had become the second largest non-agency underwriter of MBS (after Bear Stearns), having underwritten $130.8 billion in MBS (including $65.6 billion of Alt-A MBS) in that same year.  The Certificate Offerings reflected a substantial portion of Lehman's securitizations between 2005 and 2007 and encompassed significant subprime (*e.g.,* BNC Mortgage Trust) and Alt-A securitizations (*e.g.*, Lehman XS Trust).

52.     Concurrent with the boom in subprime and Alt-A loan originations and securitizations was also the growth in the market for adjustable rate mortgages ("ARMs") including interest only and negative amortization loans.  Issuance of ARMs increased from $355 billion in 2001 to $1.3 trillion in 2006 (Mortgage Market Statistical Annual, 2007, Vol. 1 p.4).  Such growth coincided with the increase in popularity of so called "exotic" or non-traditional ARMs which had a fixed interest rate for a limited period and before it "reset" during the life of the loan to significantly higher adjustable rates.  These non-traditional ARMs included "2/28 or 3/27 ARMs" (many with below-market teaser rates for two or three years and then conversion to the fully-indexed rate); interest-only ARMs (permitting interest only payments for a set period of time during which the rate may fluctuate, resulting in negative amortization and rising principal); option payment ARMs (offering up to four payment options, including minimum and interest

[5] Origination of non-traditional ARMs increased by 278% between 2004 and 2006 – from $205 billion in 2004 to $775 billion in 2006.[6]

53.    These adjustable ARM loans represented a significant portion of the Certificate collateral. As set forth below, however, the models the Ratings Agencies used to determine the requisite credit enhancement required for the Certificates to be substantially rated AAA had not been sufficiently updated by S&P since 1999 or by Moody's since 2002.  This led to an understatement of required credit enhancement since the models did not include sufficient quantities of loans reflective of the Certificate collateral – no documentation Alt-A or subprime loans; adjustable interest only or negative amortization loans – and tested pursuant to economic stresses attendant to such loans.

**B.    Lehman's Securitization and Underwriting Operations**

54.    In 2005 and 2006, LBHI's RMBS operations were run primarily out of its offices on 745 Seventh Avenue in New York City.  Lehman's RMBS trading desk was considered the largest on Wall Street in 2005 and 2006, followed closely by Bear Stearns.  David Sheer ("Sheer") was head of All Securitized Products, with Managing Directors McKinney and Franks

---

[5]    McCoy, Patricia, <u>The Legal Infrastructure of Subprime and Nontraditional Home Mortgages</u>, The Institutional Center for Housing Studies, Harvard University, p. 17 (February 2008) ("Harvard Study").  These nontraditional ARMs were included in some of the Certificate pools and were viewed by one commentator to be "so complex that even savvy borrowers have difficulty understanding the risks that they present.  Worse yet, subprime lenders peddled many of these loans to borrowers who not only did not understand them, but had little chance of avoiding default. These nontraditional mortgages were offered "by more lenders to a wider spectrum of borrowers who [might] not otherwise qualify for more traditional mortgage loans and [might] not fully understand the associated risks." Many of these products were underwritten with less stringent income and asset verification requirements ("reduced documentation") and often were combined with simultaneous second-lien loans, leaving borrowers with little or no equity, these controversial "exotic" ARMs exploded in the last three years, with dollar volume rising."  Harvard Study, at 17.

[6]    Mortgage Market Statistical Annual (2007, Vol. I, p. 6).

reporting to Sheer. McKinney had overall responsibility for of all Prime and Alt-A securitizations; while Franks had overall responsibility for subprime securitizations. Franks and McKinney had approximately 15 to 20 traders reporting to them.

1. **Lehman's Bulk-Loan Purchases From Third-Party Originators**

55. Before securitization could begin, Lehman had to acquire the underlying mortgage loans. This was accomplished in two ways. Throughout the course of a month, LBHI made substantial bulk loan purchases from third-party originators through silent auctions. LBHI had a specific sales team assigned to bulk loan purchases from third-party originators. Originators, such as Countrywide and IndyMac, for example, would set a date and time for bids to be submitted by competing investment banks to purchase a block of mortgage loans. In advance of the auction, the Originator would send to each bidding investment bank a "Loan Level File" in the form of a spreadsheet, which contained numerous fields of non-borrower sensitive information regarding the loans to be auctioned. The spreadsheet would include information such as borrower FICO scores, LTV, property location and the level of documentation supporting the loan, and many other loan characteristics. Lehman's Collateral Group would scrub the loan data for errors and then analyze the underlying loan characteristics through Lehman's Collateral Analysis System ("CAS").

2. **S&P's And Moody's Roles In Lehman's Bid On Loans Purchased At Auction**

56. Lehman traders had, on their desktop computers, S&P's LEVELS Model and Moody's M-3 Model, which they used to determine the amount of credit enhancement needed for certain Certificates, based upon a specific pool of loans, to be rated AAA. Nevertheless, Lehman would also send the "Loan Level File" to the Ratings Agencies in advance of the auction in order for them to participate and advise on Lehman's determination of the appropriate

price to pay for the loans at auction.  S&P would run the loan tape through both its "LEVELS" and "SPIRE" Models.  Moody's would run the loan tape through its M-3 Model. The LEVELS and M-3 Models analyzed and indicated if there were loans that failed to have necessary information or support so that they should be excluded from Lehman's purchase.  Further, these Models analyzed 50-80 loan characteristics (*e.g.,* borrower FICO score, LTV, property location, etc.), in order to estimate the number of loans that were likely to default and the corresponding dollar amount of the loss which would result from such default.  The estimates were based on the performance of undisclosed data based on loans tested under undisclosed economic stresses.  By determining these two factors, the LEVELS Model calculated the amount of "credit enhancement" required to offer a specific pool of loans with ratings of "AAA."  The LEVELS Model might show a certain pool of loans required 20% credit enhancement in order for 80% of the loan pool to be rated AAA.  Credit enhancement was a highly material issue for investors.  It represented the amount of "cushion" or protection the Certificate structure provided to the senior classes of the Certificates.   There were multiple forms of credit enhancement, including subordination; overcollateralization and excess spread. (¶¶ 15-18, *supra*).

57.    Lehman attempted to obtain as many classes of AAA rated Certificates as possible since they were more easily sold and significantly more profitable to Lehman than lower-rated Certificates.  At the same time, Lehman also attempted to limit the number of subordinate classes because they were more difficult to sell and more costly to Lehman in general.  This was a constant point of negotiation, with Lehman pressing the Ratings Agencies for more AAA rated classes and less credit enhancement.  It was the level of credit enhancement described in the Offering Documents which provided the justification to investors of an award of an AAA rating to mortgage loans comprised in part of subprime and Alt-A borrowers.  The

Offering Documents described the credit enhancement in the form of subordination or overcollateralization, or even limited bond insurance, which appeared to justify the ratings.

58.     The materially omitted fact that was not disclosed until well after the Certificates were issued was that the Ratings Agencies' models fundamentally rested on the performance of a specific data set of loans, and as the market for MBS evolved, those models were never materially expanded or adjusted to test the new economic stresses.  The S&P model was not updated since 1999, and Moody's was not updated since 2002. (¶ 16).  However, it was after these dates that there had been a substantial expansion in subprime Alt-A, no documentation, non-traditional ARMS, interest only and negative amortization loans.

59.     S&P would also run the loan data through its "SPIRE" Model, which would apply timing assumptions to the specific loan pool.  The SPIRE Model considered default curves, prepayment and interest rate stresses which occur over time.  The end result of the Spire Model would be an assessment of specific subordination structure for the MBS deal, specifically the excess spread and over-collateralization required.

60.     The information derived from the LEVELS Model was then provided to LBHI, and was a critical factor in determining the price Lehman would bid for the loans at auction.

61.     All of this work by S&P and Moody's, referred to at S&P as "bid package" work, was performed without any compensation from Lehman in an effort to engender goodwill so that Lehman would ultimately engage either Ratings Agency to rate the loans at the underwriting stage.

62.     If Lehman's bid was accepted by the Originator, Lehman would have a short period before the Originator was paid in cash for Lehman to examine the loans more closely.

### 3. Lehman's Loan File "Due Diligence" Between Acceptance of Bid At Auction And Settlement Date

63. Between the date of the auction where Lehman's bid was accepted and the settlement date when Lehman paid the Originator in cash for the loans purchased, a limited review was conducted. The ostensible purpose of this review was to determine principally whether the loans contained the requisite legal documentation as reflected in the loan tape provided before the auction and whether the loans were originated in accordance with the Originators loan underwriting guidelines. Lehman contracted this "due diligence" work to outside firms, principally Bohan and Clayton, who, in turn, hired outside contractors to review the loan files of 5-10% of the total amount of loans included in the pool. Lehman's Due Diligence Team (defined herein as the "DDT"), which was made up of approximately 4-5 individuals (for all of the numerous ongoing Offerings), was responsible for overseeing the work performed by Clayton and Bohan. These workers were supposed to be looking to see if the loans conformed to the Originators' underwriting guidelines and if the loan files contained the requisite legal documentation. Each loan reviewed would be rated either category "1," "2" or "3". The loans rated category "3" loans were found to be defective or fraudulent and recommended by the reviewer to be excluded while those rated category "2" were deemed to be questionable. The rating of the audit loans was provided to Lehman's DDT on a Microsoft Excel spreadsheet, and they determined whether the loans should be "kicked" out of the loan pool or rejected. Lehman's DDT exercised its discretion to rarely exclude either category "2" or "3" rated loans. Lehman was incentivized not to "kick-out" loans even if they were designated category "3," since if Lehman rejected any significant portion of the loans, the originator from which those loans were purchased would likely not sell Lehman loans at auction in the future, for fear of too many "kicked-out" loans. In addition, Lehman knew it was able to securitize even

loans designated category "3" and so at most, Lehman would generally use the evidence of non conforming loans to negotiate a cheaper price.

        **4.**      **Lehman's "Flow" Loan Acquisition from Aurora and BNC**

      64.      Lehman also acquired loans directly from its own affiliate Aurora and subsidiary BNC. Aurora was a major originator of prime and Alt-A loans, while BNC was a significant producer of subprime loans. Lehman had a "flow" agreement with its affiliates. This meant the loans were purchased on an ongoing basis with the purchase price based on a market price determined principally by Lehman. The Aurora and BNC-originated deals were much more profitable than the deals where the loans were acquired at auction.

        **5.**      **"We Are a Supply Company, Not a Storage Company"**

      65.      Once the loans were acquired, either in auction or directly from Aurora and BNC, the loans were segregated into three groups by loan type in terms of borrower classification: Prime/Alt-A (including Alt-B), subprime and deep subprime defective loans (so called "Scratch and Dent loans") as well as by loan type: hybrid and negative amortization loans. The loans were recorded by Lehman in separate "Trading Ledgers": *e.g.,* a "Prime/Alt-A Ledger," a "Subprime Ledger" and a "Scratch and Dent Ledger." Senior Lehman traders were responsible for the securitization by the end of a given month of all the loans in their respective ledgers at the start of that month. This meant that the entire underwriting process was typically completed in twenty-one days or less. In fact, the "motto" of Lehman's RMBS trading desk was "we are a supply company, not a storage company" – meaning Lehman's goal was to move product swiftly from securitization through the sale to investors.

### 6.    Lehman's "Ratings Shopping" Practices

66.    Lehman ultimately engaged the Ratings Agencies through a "ratings shopping" process, whereby Lehman would send the detailed Loan Level File of the pool of loans to be securitized and the Ratings Agencies would run the data through their models and provide the results as part of the bidding process for the engagement.  S&P, for example, would run the loan tape through both its LEVELS and SPIRE Models again and provide Lehman with the results in an effort to obtain the ratings engagement.  Through the LEVELS Model, S&P would advise Lehman, for example, that 94.25% of the Certificates would be rated AAA as long as 5.75% of the total collateral balance supporting those Certificates were subordinate.  This 5.75% was the amount of loss coverage required.  Lehman would then again "negotiate" with the Ratings Agencies before they were hired, in order to get them to agree to the least amount of loss coverage and credit enhancement, and the highest percentage of AAA designated Certificates.

67.    S&P would also again run the loan tape through its SPIRE Model in order to provide a projected subordination or overcollateralization structure.  Lehman relied on this "ratings shopping" process to obtain the most profitable structure on the Offerings.  As set forth below, rating shopping was disclosed in detail in the SEC Report released in July 2008 (¶ 17) and in testimony by former Moody's and S&P managers in October 2008. (¶¶ 164-67, 170).  The practice was effectively ended by way of an agreement entered into between the Ratings Agencies and New York Attorney General in 2008.  (¶ 169).

### 7.    Lehman Securitizing Loans In Separate Trust "Shelves": SARM, SASC, SAIL, LXS and LMT

68.    With the securitization structure in place, the Certificates were then issued through Lehman Trusts or "Shelf" names.  The different shelf names reflected the different types of loans included in the specific Offerings.  The underlying mortgages in the Securities Asset

Income Trust Certificates ("SAIL") were subprime residential mortgages. The underlying mortgages in Structured Adjustable Rate Mortgage Loan Trust Certificates ("SARM") were *adjustable* prime or Alt-A mortgages; the underlying mortgages in Structure Asset Securities Corporation Mortgage Loan Trust Certificates ("SASC") were *fixed* prime or Alt-A mortgages. The underlying mortgages in Lehman Mortgage Trust Certificates ("LMT") were prime fixed and adjustable loans. Lehman used the "Lehman XS Trust" ("LXS") shelf for the securitization of Alt-A, Alt-B and negative amortization loans. Negative Amortization offerings were designated with an N designation. Lehman completed three (3) SAIL, fourteen (14) SARM, seventeen (17) SASC, twelve (12) LMT, and thirty-three (33) LXS Trust Offerings pursuant to the Registration Statements.[7]

## V.

### DEFENDANTS' OMISSIONS OF MATERIAL FACT FROM THE OFFERING DOCUMENTS UNDER THE SECURITIES ACT

**A.    The Principal Originators Systematically Disregarded Mortgage Loan Underwriting Guidelines**

69.    In August 2007, following reports of defaults in mortgage loans underlying various MBS, downgrades of such MBS and potential downgrades of additional MBS in the future, and the resulting illiquidity in the credit markets, the President of the United States commissioned the Secretary of the Treasury, the SEC and the Commodities Futures Trading Commission ("CFTC") (hereinafter referred to as the "President's Working Group" or the "PWG") to investigate the causes of the market turmoil. After a seven-month investigation, the PWG issued its report on March 13, 2008. The PWG found as follows :

---

[7]    Lehman also engaged in so called "third-party securitizations" were the deals where Lehman only served as underwriter and did not purchase the loans through auctions, but instead purchased directly from third-parties such as GreenPoint and First Franklin. As a result, Lehman did not "due diligence" (through Bohan and Clayton) the loans prior to securitization or even attempt to obtain independent verification of the underlying originator's compliance with stated underwriting guidelines.

- A significant erosion of market discipline by those involved in the securitization process, including ***originators, underwriters, credit rating agencies, and global investors,*** related in part to failures to provide or obtain adequate risk disclosures;

- The turmoil in financial markets clearly was triggered by a ***dramatic weakening of underwriting standards for U.S. subprime mortgages***…

(Emphasis added).

70.     Further, as noted, relatively soon after issuance, the delinquency and foreclosure rates of the Certificate collateral began to increase. (¶¶ 75, 83, 90, 105, 119, 128, 139, 143, 146). This performance was an indication to S&P of pervasive underwriting failures in the origination of the collateral which ultimately led to widespread and deep downgrades of most of the Certificate classes.   On or about July 10, 2007, S&P publicly announced it was revising the methodologies used to rate numerous RMBS Certificates (*i.e.,* LXS Trust Certificates, SASC Trust Certificates, etc.) because the performance of the underlying collateral "called into question" the accuracy of the loan data.   This announcement triggered several governmental investigations which only began reporting their findings in 2008. (¶¶ 169, 177).

71.     S&P announced that it was revising its methodology assumption to require increased "credit protection" for rated transactions.  S&P reiterated that it would also seek in the future to review and minimize the incidence of potential underwriting abuse given "the level of *loosened underwriting* at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."

72.     One day later, on July 11, 2007, Moody's announced it was also revising its methodology used to rate the Certificates, and anticipated Certificate downgrades in the future. Moody's did in fact significantly downgrade most of the Certificate classes, noting "aggressive underwriting" used in the origination of the collateral.

73.    Further, as set forth more fully below, disclosures emerged well after the issuance of the Certificates with respect to each of the Originators which further evidenced that they had engaged in loan underwriting practices which were wholly inconsistent with the guidelines set forth in the Registration Statements and Prospectus Supplements.  (¶¶ 189-267).

## 1.    Subsequent Disclosures Reflected Aurora And LBB Systematically Disregarded Mortgage Loan Underwriting Guidelines

74.    According to its 2007 Form 10-K, Lehman originated approximately $60 billion in residential mortgages during 2006 and $47 billion during 2007.  Twenty-five percent of the loans Lehman originated through its subsidiaries were subprime loans.

75.    Following issuance of the Certificates collateralized by mortgages principally originated by Aurora and LBB, the delinquency rates on those underlying loans skyrocketed to 25.46% and 24.93%, respectively, as of the filing of this Complaint.  Moreover, the foreclosure rates on those loans increased to 12.45% and 11.38%, respectively, as of the filing of this Complaint. The large increases in delinquency and foreclosure rates, accompanied by increased loss severity, resulted in substantial downgrades of the Certificates by Moody's and S&P beginning in 2007 through 2009.  In making these substantial downgrades, the Ratings Agencies cited, in part, "aggressive underwriting practices."

76.    LBHI first acquired a stake in Aurora in 1998, and acquired a controlling interest in 2003.  Aurora predominantly originated Alt-A loans for Lehman "securitizations."  As stated in the Registration Statements, Alt-A loans were purportedly loans issued to borrowers with "strong credit histories."

77.    However, as set forth in the Amended Class Action Complaint in *Operative Plasterers and Cement Masons International Association Local 262 Annuity Fund v. Fuld*, No. 08-CV-5523 (LAK), filed in the United States District Court for the Southern District of New

York on October 27, 2008 ("the "Lehman Common Stock Complaint" or the "LCS Complaint"),
these Alt-A Aurora loans were, in fact, indistinguishable from subprime loans.  (LCS Complaint
¶ 163).

78.     As Lehman reported in its Form 10-Q filed with the SEC on July 15, 2003, the
acquisition of Aurora "add[ed] long-term value to [Lehman's] mortgage franchise by allowing
further integration of the business platform.  The mortgage loans originated by [Aurora] are
expected to provide a source of loan product for our securitization pipeline."

79.     All of Aurora's production went to Lehman, with Aurora acquiring loans in the
name of its subsidiary LBB.  After Lehman obtained loans through Aurora, Lehman handled all
secondary transactions and handled all pricing out of New York.  Lehman dictated what loans
Aurora was buying and had to approve Aurora's guidelines.

80.     Aurora purchased pools of closed loans on behalf of Lehman for securitization
deals.  Lehman also purchased pools of loans from subprime originators such as Countrywide.
Aurora was the eighth-largest wholesaler, with $37.2 billion of production.  Mortgages acquired
from correspondent brokers accounted for 71% of Aurora's wholesale activity, ranking it the
eleventh-largest correspondent lender.  Aurora purchased mortgages from about 10,000 brokers
and originators around the country.

81.     According to a December 22, 2008 article in the Canadian publication, *The Globe
and Mail* entitled "Lehman's Rise and Fall," court filings indicate that Lehman auditors analyzed
some of Aurora's loans and discovered that up to 50% contained material misrepresentations.  In
addition, *The Globe and Mail* also reported that, at one point, an Aurora manager was seen
storming out of a meeting in the spring of 2006 yelling at a lead auditor, "your people find too
much fraud."

82.    In January 2008, LBHI announced a reduction in resources and the capacity of its U.S. residential mortgage originations platform.  As a result, LBHI suspended its wholesale and correspondent lending programs.

2.    **Subsequent Disclosures Reflected BNC Systematically Disregarded Mortgage Loan Underwriting Guidelines**

83.    Following issuance of the Certificates collateralized by mortgages originated by BNC, delinquency rates on the underlying loans skyrocketed to 41.13%.  Moreover, the foreclosure rates on these loans increased to 19.36%.  The large increases in delinquency and foreclosure rates resulted in substantial downgrades of the Certificates by Moody's and S&P beginning in 2007 through 2009.  In making these substantial downgrades, the Ratings Agencies cited, in part, "aggressive underwriting practices."

84.    As set forth below, BNC was a principal originator for a number of the Certificate Offerings.  (¶ 198). In those Offerings, the Prospectus Supplements purported to describe BNC guidelines as designed to evaluate credit risk and that "exceptions" to borrower documentation requirements would only be granted where compensatory factors were present.  The Prospectus Supplements purported to describe BNC's mortgage origination and underwriting guidelines.

85.    Lehman acquired a stake in BNC in 2000 after helping BNC management take the company private, and it acquired BNC as an indirect wholly-owned subsidiary in 2004.  During the Class Period, Lehman described BNC as its "subprime origination platform."  BNC assisted in originating $24 billion in subprime home loans in 2005, up from $3 billion in 2001, according to a June 27, 2007 article in *The Wall Street Journal*.  BNC focused on subprime originations until it closed in August 2007.  Numerous former employees stated that BNC sold roughly 75% of its production to Lehman, and as 2007 progressed and the market for non-prime loans deteriorated, Lehman purchased an even higher percentage of BNC's loans.

86.    Weak underwriting standards at BNC caused Lehman to acquire poor quality loans that Lehman held in its portfolio.  In processing mortgages, BNC had poor underwriting standards and inappropriate authority.    Former employees described BNC's sales and underwriting practices as "some of the things that were most egregious in terms of the mistakes the sub-prime mortgage industry made." (Lehman Common Stock ("LCS") Complaint, ¶ 118). With regard to BNC's inappropriate level of authority, the company's sales organization held a substantial amount of control over the processing of mortgages and underwriting decisions.  For example, much of the processing of these mortgages was significantly and inappropriately influenced by BNC's salespersons.  A confidential witness referred to in the LCS Complaint indicated that, even before viewing tangible indicators, s/he knew that the approach at BNC was flawed because s/he had seen the same problems while working at other lenders.  (*Id.*)

87.    BNC's poor underwriting and loan processing practices led to first-payment defaults, which occur when a borrower fails to pay the first mortgage payment on time or within the grace period.  Throughout 2006 and into 2007, BNC experienced an increase in first-payment defaults – which is the best and "early indicator of defaults to come."  (LCS Complaint ¶ 119).

88.    On June 27, 2007, *The Wall Street Journal* reported that borrowers and former employees alike had made several claims that the investment bank's in-house lending outlets used improper tactics during the mortgage boom to put borrowers into loans they could not afford.

> Twenty-five former employees said in interviews that front-line workers and managers exaggerated borrowers' creditworthiness by falsifying tax forms, pay stubs and other information, or by ignoring inaccurate data submitted by independent mortgage brokers.  In some instances several ex-employees said, brokers or in-house employees altered documents with the help of scissors, tape and White-Out.

"Anything to make the deal work," says Coleen Columbo, a former mortgage underwriter in California for Lehman's BNC unit. …

\*        \*        \*

Dena Ivezic, a mortgage underwriter for [BNC and Aurora] in Downers Grove, Ill., in late 2005 and early 2006, says some staffers at her branch used "cut and paste" techniques to fabricate documents they needed to get loans approved. Some workers tried "to take a stand" against such practices, she says, but "they were reprimanded for not being cooperative not wanting to be creative about making deals work. … Everybody else just kind of bottled up and just never said anything, because you needed a job."

89.    In August 2007, Lehman was forced to shut down BNC, taking a $52 million charge-off and terminating 1,200 employees.

### 3.    Subsequent Disclosures Reflected Countrywide Systematically Disregarded Mortgage Loan Underwriting Guidelines

90.    Following the issuance of the Certificates collateralized by mortgages originated by Countrywide, delinquency and foreclosure rates on the underlying loans skyrocketed to 26.72% and 12.11%, respectively.  The large increases in delinquency and foreclosure rates resulted in substantial downgrades of the Certificates by Moody's and S&P beginning in 2007 through 2009.  In making these substantial downgrades, the Ratings Agencies cited, in part, "aggressive underwriting practices."

91.    Following the issuance of the Certificates, Countrywide was subject to a number of fraud investigations relating to the company's underwriting practices.  Countrywide is currently under investigation by a panel of the United States Senate for predatory lending – a practice whereby a lender deceptively convinces a borrower to agree to unfair and abusive loan terms, including interest and fees that are unreasonably high.  Countrywide's increased risk of not being able to collect on these predatory mortgage loans puts the Certificates underlying mortgage collateral at risk, thereby further increasing the risk to Plaintiff and the Class.

92.    During an August 29, 2007 press conference reported in *The Wall Street Journal*, Senator Charles Schumer, chairman of the Senate panel investigating Countrywide's predatory lending practices, stated:

> Countrywide's most lucrative brokers are those that make bad loans that are largely designed to fail the borrower …. [Countrywide's] brokers can earn an extra 1 percent of the loan value in commission by adding a three-year prepayment penalty to loans.

93.    On or about March 10, 2008, the Federal Bureau of Investigation (the "FBI") disclosed that it had initiated a probe into the fraudulent mortgage practices engaged in by Countrywide, including manipulation of the subprime and non-traditional loan markets, knowledge of and disregard for underwriting inaccuracies and misrepresentations, and specific instructions to underwriters by Countrywide not to scrutinize certain types of loans it issued. Subsequently, on April 2, 2008, a Federal Bankruptcy Judge overseeing the proceedings of more than 300 Countrywide-related bankruptcies ordered a further inquiry into the misconduct, and specifically, the illegal inflation of fees throughout the loan process that had been occurring at Countrywide.

94.    On April 11, 2008, a detailed amended complaint for violations of the federal securities laws was filed in federal court in the Central District of California against Countrywide.   In a decision dated December 1, 2008 (the "Countrywide Decision" or "Countrywide Dec."), Judge Mariana Pfaelzer of the U.S. District Court of the Central District of California upheld the bulk of that 416-page securities class action complaint, which detailed a massive fraud involving Countrywide.   Highlights of the Countrywide Decision include the following:

> "From mid-2003 onward, Countrywide continually loosened its underwriting guidelines to the point of nearly abandoning them by 2006."  (Countrywide Dec., p. 7.)

In December 2007, Countrywide revealed that 89% ($64 bn.) of it's 2006 pay-option ARMs would not have been approved under its original underwriting guidelines, nor would 83% ($74 bn.) of its 2005 pay-option ARMs. (Countrywide Dec., p. 8.)

During the Class Period,[8] Countrywide "employed an internal, misleading definition of 'subprime,'" using a FICO score of 620 to delineate between prime and sub-prime instead of an industry-wide standard of 660. (Countrywide Dec., p. 10.)

"Countrywide often waived its weakened standards, routinely approving loans that fell well outside its guidelines … It's goal was to [a]pprove virtually every borrower and loan profile…" (Countrywide Dec., p. 11.)

Throughout the Class Period, appraisals were inflated (Countrywide Dec., pp. 13-14), salaries for no-doc loan applications were inflated (Countrywide Dec., pp. 14-15), and loan-to-value ratios were understated (Countrywide Dec., p. 16), all unbeknownst to the public.

Citing a "Price Any Loan system" of underwriting and "Countrywide's internal documents that systematically encouraged approving virtually any loan with additional 'add-on' fees," the court rejected motions to dismiss the fraud claims against senior Countrywide officers. (Countrywide Dec., p. 89.)

"Plaintiffs describe a unified course of abandoning sound [loan] underwriting practices." (Countrywide Dec., p.38).

Plaintiffs persuasively alleged a pattern of "systematically lowering, avoiding and undermining guidelines while approving low-quality mortgages as 'prime'". (Countrywide Dec. p. 85.)

95.    Summarizing the complaint's allegations regarding Countrywide's core

mortgage-related operations, the court observed:

Plaintiffs have created a cogent and compelling inference of a company obsessed with loan production and market share with little regard for the attendant risks, despite the company's **repeated assurances to the market**. With respect to loan origination practices, they raise strong inferences that (1) borrower requirements were progressively loosened over the Class Period; (2) in many instances, the actual loan quality was lower than the borrower's FICO score and LTV ratio suggested because Countrywide misrepresented how lax its verification practices became; and (3) Countrywide management routinely circumvented the normal

---

[8]    The Class Period in the Countrywide action is March 12, 2004 through March 7, 2008.

underwriting process by approving highly risky loans for sale into the secondary market.

Countrywide Decision, at 78 (emphasis added).

96.     The Countrywide securities fraud complaint identified specific deviations for Countrywide's stated underwriting guidelines.  For example, in connection with the "No Income/No Asset Documentation Program," Countrywide represented that "[t]his program is limited to borrowers with excellent credit histories."  However, Countrywide routinely extended these loans to borrowers with weak credit, and knew that such "low doc" or "no doc" loans, particularly when coupled with nontraditional products like ARMs, were highly likely to contain misinformation from the borrower, such as overstated incomes, that might result in increased defaults.  Because borrowers were advised that their representations on loan applications would not be verified, Countrywide employees referred to these products as "liar loans."

97.     On April 30, 2008, *The Wall Street Journal* reported on a federal probe of Countrywide that uncovered evidence of executives deliberately overlooking inflated income figures for many borrowers.  Indeed, Countrywide's "Fast and Easy" mortgage program, in which borrowers were asked to provide little or no documentation of their finances, was particularly prone to abuse by loan offices and outside mortgage brokers.  *See* "Countrywide Loss Focuses Attention on Underwriting – Evidence of Abuses By Outside Brokers; A Fraud in Alaska," *The Wall Street Journal*, April 30, 2008.

98.     On May 7, 2008, *The New York Times* published a tongue-in-cheek article entitled "A Little Pity, Please, for Lenders," that shifted the onus to borrowers for the current residential mortgage crisis.  In particular, the article noted that low documentation and stated documentation loans – *e.g.*, Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program – have "became known within the mortgage industry as "liar loans" because many of

46

the borrowers falsified their income." However, these relaxed loan programs were created and promoted by aggressive lenders looking to amass volume loans for securitizations.

99.    In addition to ongoing SEC, FBI and Federal Trade Commission ("FTC") investigations, the Attorneys General of California, Florida and Illinois all launched investigations of Countrywide for deceptive business practices relating to its mortgage lending, and more recently, both California and Illinois have commenced lawsuits against Countrywide.

100.    *The New York Times* reported that the Illinois Attorney General initiated a lawsuit against Countrywide and Angelo Mozilo, Chairman of the Board and Chief Executive Officer through July 1, 2008, contending that the company and its executives defrauded borrowers in the state by selling them costly and defective loans that quickly went into foreclosure. The lawsuit accuses Countrywide and Mozilo of relaxing underwriting standards, structuring loans with risky features, misleading consumers with hidden fees and marketing claims, and creating incentives for its employees and brokers to sell questionable loans. As the Illinois Attorney General explained, "[t]his mounting disaster has had an impact on individual homeowners statewide and is having an impact on the global economy. It is all from the greed of people like Mozilo."

101.    *The New York Times* reported that the complaint, derived from 111,000 pages of Countrywide documents and interviews with former employees, "paints a picture of a lending machine that was more concerned with volume of loans than quality." *See* Gretchen Morgenson, "Illinois to Sue Countrywide," *The New York Times,* June 25, 2008.

102.    As reported in the June 26, 2008 edition of *The New York Times*, California filed a similar lawsuit against Countrywide and Mozilo, accusing defendants of engaging in unfair trade practices that encouraged homeowners to take out risky loans, regardless of whether they could repay them. Jerry Brown, California's Attorney General, stated: "Countrywide exploited

the American dream of homeownership and then sold its mortgages for huge profits on the secondary market."

103.    On July 24, 2008, *The Los Angeles Times* reported that "three big Southland lenders (are) under federal investigation; Sources say IndyMac, Countrywide and New Century [have been] subpoenaed."  *The Los Angeles Times* further reported that officials have begun to investigate whether investors were defrauded by the value of mortgage-backed securities:

> A federal grand jury in Los Angeles has begun probing three of the nation's largest subprime mortgage lenders in the clearest sign yet that prosecutors are investigating whether fraud and other crimes contributed to the mortgage debacle.
>
> ***Grand jury subpoenas have been issued in recent weeks and months to Countrywide Financial Corp., New Century Financial Corp. and IndyMac*** Federal Bank seeking a wide range of information, according to sources with direct knowledge of the subpoenas.
>
> People familiar with the situation told The Times that the subpoenas seek e-mails, phone bills and bank records and follow interviews that federal investigators have conducted with employees and others knowledgeable about the lending operations of the three Southern California institutions, which all collapsed under the weight of bad loans.
>
> ***In the case of Countrywide, the sources said, investigators have also begun looking into news reports that the firm and its former chairman, Angelo Mozilo, gave mortgage breaks to members of Congress and other influential "friends of Angelo," including Richard Aldrich, an associate justice of the California Court of Appeal.***
>
> The investigations are part of a coordinated Justice Department effort that until now has focused primarily on smaller operators suspected of defrauding homeowners and mortgage lenders.
>
> The subpoenas, while indicating that the effort is still at an early stage, show that the government is starting to take aim at the largest lenders and their executives to determine whether they were complicit in the multibillion-dollar mortgage crisis. The sources familiar with the subpoenas spoke on condition of anonymity because they were not allowed to discuss them publicly.
>
> The mortgage losses have regulators and law enforcement personnel gearing up for what experts say could prove to be the biggest financial fraud case since the savings and loan crisis of the 1980s.

> *Officials have said they are beginning to investigate whether securities investors were defrauded about the value of subprime mortgages they purchased, as well as other possible crimes such as insider trading by corporate officials who sold stock knowing their holdings were about to deflate in value.*

(Emphasis added).

104.    As reported in the October 6, 2008 edition of *The New York Times*, Countrywide agreed to commit $8.4 billion in loan aid as part of a settlement with the Attorneys General of eleven states, including Illinois and California, which brought suit against Countrywide alleging that the bank engaged in predatory lending practices.  The settlement provides a program by which existing loans would be modified:

> [B]orrowers were placed in the riskiest loans, including adjustable-rate mortgages whose interest rates reset significantly several years after the loans were made. Pay-option mortgages, under which a borrower must pay only a small fraction of the interest and principal, thereby allowing the loan balance to increase, also are included in the modification.

### 4.    Subsequent Disclosures Reflected IndyMac Systematically Disregarded Mortgage Loan Underwriting Guidelines

105.    Following the issuance of the Certificates collateralized by mortgages originated by IndyMac, delinquency rates on the underlying loans skyrocketed to 30.86%.  Moreover, the foreclosure rates on these loans increased to 15.59%.  The large increases in delinquency and foreclosure rates resulted in substantial downgrades of the Certificates by Moody's and S&P beginning in 2007 through 2009.  In making these substantial downgrades, the Ratings Agencies cited, in part, "aggressive underwriting practices."

106.    IndyMac's growth was propelled by its utilization of Alt-A, stated-income high CLTV/piggyback and negative/interest only amortizing loans.  Alt-A loans are those loans offered to applicants who lack proof of income from traditional employment, such as investors or self-employed borrowers.

107.    By the third quarter of 2006, IndyMac was the top Alt-A lender nationwide, earning the nickname "the kingpin of Alt-A loans."  IndyMac had originated more than $49 billion in Alt-A production, representing 77.5% of IndyMac's total origination volume.  *See* Zelman Credit Suisse Analyst Report, "Mortgage Liquidity du Jour: Underestimated No More," March 12, 2007.

108.    In response to media sources' characterization of IndyMac as a subprime lender, IndyMac issued a press release on March 15, 2007 claiming it had been inappropriately categorized.  IndyMac stated that it is primarily a prime/Alt-A mortgage lender with minimal exposure to the subprime market.  Further, IndyMac maintained that subprime mortgages generally include loans where the borrower's FICO score is 620 or below and that their customer's average score was 701 in 2006.

109.    Soon after IndyMac's press release, CNNMoney.com published the article "'Liar's Loans': Mortgage Woes Beyond Subprime," which disclosed that there was a growing indication that Alt-A mortgages issued by lenders, such as IndyMac, "could be the next threat to the troubled real estate market – and the economy."

> NEW YORK (CNNMoney.com) -- Subprime mortgages have been generating a lot of attention, and worry, among investors, economists and regulators, but those loans may be only part of the threat posed to the housing market by risky lending.
>
> Some experts in the field are now concerned about the so-called Alt.-A mortgage loan market, which has grown even faster than the market for subprime mortgage loans to borrowers with less than top credit.
>
> Alt-A refers to people with better credit scores (A-rated) who borrow with little or no verification of income, or so-called alternative documentation.
>
> But some people in the industry call them "stated income" loans, or worse, "liar loans."  And they were an important part of the record real estate boom of 2004 and 2005 that has recently shown signs of turning into a bust.

*        *        *

*Inside Mortgage Finance's Cecala said he believes underwriting of the loans had grown too loose by the end of last year, and that even some subprime borrowers were getting so-called low-doc or no-doc loans. He believes as much as a quarter of Alt.-A loans were going to subprime borrowers. "In some ways it's the worst possible combination," he said.*

Now with the market correcting, even some borrowers with good credit are having Alt. A loan applications rejected, Ohlbaum said. That will cut off another source of financing for the battered real estate market.

The biggest Alt-A lender is Pasadena, Calif-based IndyMac Bancorp. Trade publication Inside Mortgage Finance estimates it did $70.2 billion of the loans in 2006, up 48 percent from a year earlier. As the sector grew, its shares shot up nearly 50 percent in a year and hit a record high in April 2006. But with rising concern about the mortgage sector, its shares have plunged 36 percent since the start of 2007.

110.    On March 21, 2007, *Housing Market* published an article entitled "US Housing Market – IndyMac – We are Not a Subprime Lender!" which criticized the differentiation between subprime and Alt-A provided by IndyMac. IndyMac's key differentiating factor – the borrower's FICO score – "is hardly the root cause of the escalating subprime defaults," but rather "[t]he problem lies in the type of loans that have been originated." The article described IndyMac's Alt-A loans as "Liar Loans" since income is taken as fact:

No further documentation is required. As long as the automated property appraisal software is functioning, approval is only a few keystrokes away. *These loans are tremendously profitable, since the underwriting costs are much lower and the rates are higher than a standard 30 year fixed mortgage.*

111.    IndyMac's use of piggyback loans, as part of its Alt-A loan production, was equally as risky. It was only after the Offerings that IndyMac first separated out its loan production to include a delineation of piggyback loans, which showed that a significant portion of IndyMac's loan production was risky 80/20 piggyback mortgage loans.

112.    In response to IndyMac's risky loan preferences, Moody's announced that it would begin modeling Alt-A loans as subprime loans absent strong compensating factors. The

113.    On August 20, 2007, an article in *Business Week* entitled, "Did Big Lenders Cross the Line? Law Suits Assert Some Firms Doctored Loan Documents," provided glaring examples of IndyMac's loose underwriting and aggressive mortgage lending practices.  The article discussed the disturbing story of Elouise Manuel, where an IndyMac underwriter directed that certain income documentation in her stated-income loan application be blacked-out in order for the loan to be approved.  The conditional approval letter from IndyMac even informed the loan applicant that to be approved it needed "[Social Security] benefits letters for the last two years with income blacked out."  Ultimately, Ms. Manuel was unable to pay the loan, and subsequently lost her home.

114.    These types of stated-income loans were the easiest to manipulate, and the easiest for IndyMac to follow through on due diligence had it so desired.  IndyMac could have insisted on double-checking a client's stated income by utilizing IRS Form 4506.  When asked by analysts during the November 2, 2006 Conference Call, as to what percentage of IndyMac's Alt-A customers provided IndyMac with IRS Form 4506, Michael W. Perry ("Perry"), Chairman of IndyMac Bancorp, Inc.'s Board of Directors and Chief Executive Officer was evasive and non-responsive.  Indeed, studies have confirmed that upwards of 90% of stated-income loan borrowers exaggerated their stated income by over 50%.  "Eighth Periodic Mortgage Fraud Case Report to Mortgage Bankers' Association," produced by Mortgage Asset Research Institute, Inc., April 2006.

115.    In its Letter to Shareholders, contained in IndyMac Bancorp's 2007 Annual Report, dated February 12, 2008, IndyMac Bancorp Chairman and CEO Perry "[took] full responsibility for the mistakes [IndyMac] made," indicating that IndyMac's "innovative home lending went too far" and resulted in a "'systemic' underestimation of credit risk."  Perry also confirmed that once "we began to realize [the systemic underestimation of credit risk], we tightened our [underwriting] guidelines throughout the last year…."

Dear shareholders,

2007 was a terrible year for our industry, for IndyMac and for you, our owners. …

\*         \*         \*

Who is to blame for the mortgage industry's financial losses and also the record number of Americans losing their homes?

**All home lenders, including Indymac, were a part of the problem, and, as Indymac's CEO, I take full responsibility for the mistakes that we made… Most of us believed that innovative home lending served a legitimate economic and social purpose, allowing many U.S. consumers to be able to achieve the American dream of homeownership … and we still do.**  Homeownership is the main way we Americans accumulate wealth, and, in fact, a recent Federal Reserve Bank study shows that homeowners on average have 46 times the personal wealth of renters.

**As innovative home lending and loan products became more widespread, the result was more people succeeding (in homeownership) and more people failing (losing their home) than ever before.** …

**However, in retrospect, like many innovations (e.g., the Internet, railroads, etc.), innovative home lending went too far…**

\*         \*         \*

**… Automated risk-based models, on which the entire market relied, replaced portions of traditional underwriting and credit evaluation, and only in retrospect is it now clear that these models did not perform as predicted during a period of severe economic stress.  As events unfolded, this proved to be particularly the case with respect to programs such as piggyback loans and high LTV cash-out refinance transactions, including home equity and second mortgages.**

> *The bottom line of the housing crisis for Indymac and its leadership team.  As I said earlier, I take full responsibility for the errors we made at Indymac…*

IndyMac 2007 Annual Report, Letter to Shareholders, pp. 1-9 (emphasis added).

116.    On June 6, 2008, a detailed amended complaint was filed in federal court in the Central District of California against IndyMac and Perry, for violations of the federal securities laws.  As alleged, IndyMac issued numerous materially false and misleading statements regarding the company's strong internal controls and underwriting practices.  In reality, however, IndyMac's internal controls were grossly deficient.  According to the IndyMac complaint, IndyMac's management, including Perry, exploited internal control weaknesses or overrode controls to drive loan originations and sales growth.

117.    For example, a former IndyMac vice-president states Perry sought to make his short term goals for the company "at all costs."  To this end, Perry put immense pressure on subordinates to "push loans through," even if it meant consistently making "exceptions" to the company's guidelines and policies.  According to confidential witnesses, the following practices, which were contrary to stated IndyMac guidelines, were employed to close loans: (a) intentionally manipulating software used to compute loan eligibility; (b) violating stated rate lock protocols and controls; and (c) disregarding underwriting guidelines generally, with a focus on growing loans without the required documentation.  On January 13, 2009, the Honorable George H. Wu, United States District Judge for the Central District of California, indicated that the federal securities law violations against IndyMac's CEO Perry will move forward.

118.    As reported by *CNNMoney.com* on July 11, 2008, the Federal Deposit Insurance Corporation (the "FDIC") shut down IndyMac Bancorp and operations were taken over by federal regulators.  At the center of IndyMac's demise was its focus on Alt-A loans that it had

> *IndyMac specialized in loans it had long argued were of minimal risk: low documentation loans to residential mortgage borrowers.*
>
> On Tuesday, IndyMac - which had 33 branches - announced that it was firing 53% of its workforce and exiting its retail and wholesale lending units. Last year, the lender was ranked 11th in residential mortgage origination, according to trade publication *Inside Mortgage Finance*.
>
> *    *    *
>
> IndyMac lost $184.2 million in the first quarter and announced on Monday that it was expecting a wider loss for the second quarter. *It lost $614 million last year stemming from its focus on the Alt-A mortgage sector, where it originates loans to borrowers who fall between prime (or conforming) and sub-prime on the credit spectrum.* The lender's chief executive, Michael Perry, had long argued that it was being unfairly punished given its relatively paltry exposure to sub-prime mortgages.
>
> Rising Alt-A and prime mortgage delinquencies likely were enough indication for investors that the housing crisis had moved beyond the weakest borrowers. Even worse, with the securitization markets in collapse, IndyMac had no way to get new loans off its books. *As it turned out, IndyMac was a leader in loans requiring little income and asset documentation, a category that has had disastrous levels of delinquencies at other troubled lenders.* What loans the bank had made recently were to borrowers with well-documented assets and income, but those are sharply less profitable with respect to fees and interest income.

(Emphasis added).

### 5.    Subsequent Disclosures Reflected GreenPoint Systematically Disregarded Mortgage Loan Underwriting Guidelines

119.    Following the issuance of the Certificates collateralized by mortgages originated by GreenPoint, delinquency rates on the underlying loans skyrocketed to 28.28%. Moreover, the foreclosure rates on these same loans rose to 12.27%. The large increases in delinquency and foreclosure rates resulted in substantial downgrades of the Certificates by Moody's and S&P

beginning in 2007 through 2009.  In making these substantial downgrades, the Ratings Agencies cited, in part, "aggressive underwriting practices."

120.    GreenPoint, which once originated $25 billion in mortgages a year nationwide, was one of the nation's largest originators of Alt-A loans, according to an interview with S.A. Ibrahim, the CEO of GreenPoint Mortgage Funding, a subsidiary of GreenPoint Financial Corp, published in *Mortgage Banking* on February 1, 2004.

121.    The Prospectuses issued by the Issuing Trusts, as set forth in ¶ 32, each stated with respect to GreenPoint's origination standards that that the loans originated by GreenPoint were issued based on borrower creditworthiness, value of the collateral underlying the mortgage loan and that no documentation or limited documentation loans were limited to individuals with good credit history.

122.    GreenPoint specialized in non-confirming and Alt-A mortgages which generated higher origination fees than standard loans.  (*See* Capital One to shutter mortgage-banking unit, cut 1,900 jobs, *Washington Business Journal*, Wednesday August 21, 2007).  GreenPoint's employees and independent mortgage brokers, accordingly, targeted more and more borrowers who were less able to afford the loan payments they were required to make, and many had no realistic ability to pay off the loans.  (*See* Mara Der Hovanesian, Sex, Lies and Subprime Mortgages, *Business Week Magazine*, November 24, 2008).  According to a wrongful termination suit filed by a former GreenPoint employee in September 2005, if underwriters denied an application for creditworthiness, managers would override their decisions and approve the loans anyway.

123.    Greenpoint's employees used this system to increase their own commissions at the expense of their underwriting guidelines.  The practice of quantity over quality continued

124.    Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in 2006.    However, according to GreenPoint's website, in October, 2007, the company ceased accepting new loan applications, and was eventually liquidated by Capital One in December 2008.    As a result, Capital One took an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business. (*See* Capital One to shutter mortgage-banking unit, cut 1,900 jobs, *Washington Business Journal*, Wednesday August 21, 2007).

125.    In 2008, the New York State Office of the Attorney General announced that it was investigating GreenPoint for potential predatory and discriminatory lending practices occurring between 2004 and 2006.    The investigation resulted in a July 2008 settlement between GreenPoint and the NYAG for $1 million, after the NYAG's office investigation revealed that GreenPoint had been charging African American and Latino borrowers more than Caucasians for mortgage loans.

126.    "Stated income" or "no doc" loans were based on borrower's bare representations about his or her ability to repay, with little or no documentation to substantiate those representations.    In these loans, the lender typically agreed not to inquire behind the borrower's represented income or assets, or simply loaned the money without making such an inquiry. These loans generally required the highest level credit scores and low loan-to-value ratios. GreenPoint, however, routinely extended these loans to borrowers with weak credit, and knew

that such "low doc" or "no doc" loans, particularly when coupled with nontraditional products like adjustable rate mortgages ("ARMs"), were highly likely to contain misinformation from the borrower, such as overstated incomes, that would result in increased defaults.

127.    GreenPoint's CEO, S.A. Ibrahim, maintained that these no-doc loans were the preferred instrument in their arsenal including minimal to no losses even in times of economic slowdown, and that, although GreenPoint's guidelines claim that they do not calculate the borrowers Loan-to-value ratio, Ibrahim, has said that Loan-to-value ratios of 70% or 80% are not uncommon.

### 6.    Subsequent Disclosures Reflected First Franklin Systematically Disregarded Mortgage Loan Underwriting Guidelines

128.    Following the issuance of the Certificates collateralized by mortgages originated by First Franklin, delinquency rates on the underlying loans skyrocketed to 30.19%.  The large increases in delinquency and foreclosure rates resulted in substantial downgrades of the Certificates by Moody's and S&P beginning in 2007 through 2009.  In making these substantial downgrades, the Ratings Agencies cited, in part, "aggressive underwriting practices."

129.    First Franklin was a subsidiary of National City Corp. ("National City" or "NCC") from 1999, when National City acquired the First Franklin Financial Companies, until it was sold to Merrill Lynch in 2006.  National City is also the parent company of National City Mortgage Services which was also sold to Merrill Lynch in the same 2006 sale.

130.    National City itself was purchased in a "take-under" by PNC Financial Service in December 2008 with the use of U.S. treasury funds.  The merger was the direct result of catastrophic losses the Corporation had incurred as a result of the subprime mortgage market collapse and bad loans issued through its subsidiaries First Franklin and National City Mortgage Services.

131.    First Franklin was a leading player in the subprime and non-traditional loan markets. Originally a subsidiary of National City, it was acquired by Merrill Lynch Bank and Trust Company in September 2006.  In the asset sale of First Franklin to Merrill Lynch, National City retained 2 million in run off loans that had been previously originated by First Franklin.

132.    Following the collapse of the subprime market, First Franklin denied any wrongdoing.  On March 22, 2007 Andres L. Pollock, President and CEO of First Franklin, testified during a Hearing on the Subprime Mortgage Market, before the United State Senate Committee on Banking, Housing, and Urban Affairs ("Senate Banking Committee").  He denied any responsibility in the deterioration of the subprime mortgage market, stating that First Franklin "does not intake the loans based solely on collateral value; specifically all loans are underwritten based on the applicant's credit history and the ability to repay the debt." Subsequent to that hearing, media reports began to emerge that refuted those statements.

133.    One day after Pollock testified before the Senate Banking Committee, *The New York Times* reported that First Franklin had lowered its lending standards and applied lax controls in its underwriting practice by customizing underwriting software in order to approve the wrong borrowers.  (*See* The Subprime Loan Machine; Automated Underwriting Software, *The New York Times*, March 23, 2007).  The article stated in part that "the push for speed influenced some lenders to take shortcuts, ignore the warning signs or focus entirely on credit scores."  First Franklin's proprietary computer system was just one of the methods the article cited as an example of the shortcuts that lenders like them had used to undermine the underwriting process.

134.    On March 8, 2008 a *CNN Money* article entitled Credit Market Woes Hit Stocks, reported that Merrill Lynch would stop making subprime mortgages through First Franklin.  This

news coincided with the deteriorating market for subprime home loans, and reports of a lawsuit filed in the Northern District of Georgia against First Franklin alleging unfair and deceptive acts and practices. The suit alleges that the plaintiffs were denied a mortgage based on company claims that the plaintiffs say are fabrications and misrepresentations of their credit information.

135. Similarly, National City took a large plunge as a direct result of its association with First Franklin and First Franklin's reckless lending and underwriting practices. On March 17, 2008 Cleveland.com reported that National City lost 43% of its market value, due largely to the poor performance of mortgage loans originated by First Franklin. Moreover, analysts commented that the plunge was due to investor concerns regarding "loans that were originated under the backdrop of past loose lending standards."

136. A few months later Reuters reported that the SEC had launched an investigation of National City Corp., regarding its loan underwriting when the First Franklin was wholly owned by the National City, as well as the sale of First Franklin Financial Corp. to Merrill Lynch. (*See Reuters*, "National City Faces SEC Probe," August 11, 2008).

137. On December 23, 2008, a class action lawsuit was filed in federal court in the Northern District of Ohio alleging violations of federal securities laws by National City Corporation in connection with the underwriting practices employed by National City and First Franklin.

138. The Complaint identified specific deviations from First Franklin's stated underwriting guidelines. For example, with respect to National City's residential real estate loans the company represented that those loans were "'**prime**' quality 'conforming' loans '**made to borrowers in good credit standing**'" (emphasis in NCC Complaint). But instead, as the complaint alleges, "the Company did not consider borrower creditworthiness in originating loans

and, in fact, a substantial portion of National City's residential loans were provided to subprime

borrowers" and that "the Company did not adhere to its strict underwriting and loan-origination

policies … a material portion of the Company's loans were issued with little, if any, supporting

documentation …"

### 7. Subsequent Disclosures Reflected Wells Fargo Systematically Disregarded Mortgage Loan Underwriting Guidelines

139.    Following the issuance of the Certificates collateralized by mortgages originated

by Wells Fargo, delinquency rates on the underlying loans skyrocketed to 27.13%.  Moreover,

the foreclosure rates on these same loans rose to 12.32%.  The large increases in delinquency and

foreclosure rates resulted in substantial downgrades of the Certificates by Moody's and S&P

beginning in 2007 through 2009.  In making these substantial downgrades, the Ratings Agencies

cited, in part, "aggressive underwriting practices."

140.    In 2006, Wells Fargo was the number one-ranked subprime mortgage lender in

the US, originating $83.2 billion, or 13%, of all subprime loans issued.  (*The Globe & Mail

(Canada)*, "Lehman's Rise & Fall," S. Stewart and P. Waldie, Dec. 22, 2008).  However,

ongoing investigations and court cases have revealed that a substantial portion of the bank's

subprime loans derived from an undisclosed, illegal predatory lending program that put quantity

ahead of quality.

141.    For example, in an issue paper entitled A Review of Wells Fargo's Subprime

Lending, published by the Center for Responsible Lending, April 2004, Wells Fargo was accused

of widespread predatory lending practices.  More recently, the City of Baltimore sued Wells

Fargo in federal court in Maryland, accusing the company of issuing loans without regard for

whether the borrower could repay them.  Specifically, the Baltimore lawsuit accused Wells

Fargo of a practice known as "reverse redlining."  In contrast to "redlining," which involves

denying prime credit to specific geographic areas because of its racial or ethnic composition, reverse redlining involves the targeting of an area for the marketing of deceptive, predatory or otherwise unfair lending practices because of the race or ethnicity of the area's residents. Reverse redlining exploits lower income borrowers by charging them excessive fees and higher rates than more creditworthy borrowers.

142.    The end result of these illegal and discriminatory practices is loans that are more likely to default.  This eventually forced Wells Fargo to exit the subprime wholesale and correspondent channels in 2007 and to put all such remaining loans in an $11.4 billion liquidating portfolio.  Later that same year, Wells Fargo was forced to take a $1.4 billion charge for loss reserves on this portfolio in addition to $1.3 billion in actual charge-offs for credit losses. In making these sweeping changes, Wells Fargo admitted that their credit policies needed to be ""updated" and "tightened." Unfortunately for Plaintiffs and the Class, these measures were taken by Wells Fargo long after it originated the loans that were collateralized into the MBS that form the basis of this case.

### 8.    Subsequent Disclosures Reflected EquiFirst Systematically Disregarded Mortgage Loan Underwriting Guidelines

143.    Following the issuance of the Certificates collateralized by mortgages originated by EquiFirst, delinquency rates on the underlying loans skyrocketed to 32.22%.  Moreover, the foreclosure rates on these same loans rose to 15.19%.  The large increases in delinquency and foreclosure rates resulted in substantial downgrades of the Certificates by Moody's and S&P beginning in 2007 through 2009.  In making these substantial downgrades, the Ratings Agencies cited, in part, "aggressive underwriting practices."

144.    EquiFirst, originally a subsidiary of Regions Financial Corp., was acquired by Barclays in April 2007, for $76 million.  On February 17, 2009, Barclays closed EquiFirst, citing

tough market conditions.  EquiFirst focused on "innovative" subprime products that relied on, among other things, inappropriately lax underwriting standards and temporary payment reductions.

145.    Prior to the sale of EquiFirst to Barclays, EquiFirst's residential loan portfolio (including subprime mortgages), significantly deteriorated due to its underwriting practices. Regions recorded $142 million of after tax losses which it later attributed to significant and rapid deterioration of the subprime market during the first three months of 2007.   Additionally, Regions 2007 10-K revealed loan losses from continuing operations (including subprime mortgages made through EquiFirst, prior to the Barclay sale) that more than tripled from 2006 levels, increasing from $142.4 million by the end of 2006 to $555 million by the end of 2007.

### 9.    Subsequent Disclosures Reflected Aegis Systematically Disregarded Mortgage Loan Underwriting Guidelines

146.    Following the issuance of the Certificates collateralized by mortgages originated by Aegis, delinquency rates on the underlying loans skyrocketed to 48.84%.   Similarly, foreclosure rates on these same loans rose to 24.57%. The large increases in delinquency and foreclosure rates resulted in substantial downgrades of the Certificates by Moody's and S&P beginning in 2007 through 2009.  In making these substantial downgrades, the Ratings Agencies cited, in part, "aggressive underwriting practices."

147.    According to a complaint filed by one of the founders of Aegis in District Court of Harris County, Texas captioned *D. Richard Thompson v. Aegis Mortgage Corp.*, Case No 07-33593 (the "Thompson Compl."), Aegis was founded in 1993 with a $500,000 investment. Aegis began life as a privately held mortgage banking company owned by three individuals.  By 1998, the company was generating $1 billion in annual loan volume. In 1998 and 1999, Cerberus Capital Management, LP ("Cerberus) made a $45 million investment in Aegis, enabling the

company to delve further into the murky depths of the subprime mortgage industry. (Thompson Compl., p. 5).

148.    With this substantial cash infusion, Aegis acquired two extremely distressed mortgage production operations, UC Lending and New America. These and subsequent acquisitions enabled Aegis to grow from 150 employees in nine locations in 1999 to 3,800 employees in over 100 locations in 2005. By 2006, Aegis was ranked as the 13th largest subprime lender in the country, generating close to $20 billion in annual originations. In eight years, the company's subprime originations grew by an incredible 1,750%. (Thompson Compl., pp. 6-9).

149.    Aegis' astronomic growth was fueled by an insatiable appetite for high fee, high-risk mortgages. As the need for these mortgages increased, loan underwriting standards were loosened to the point of nearly abandoning them by 2006. A large portion of the loans Aegis originated during this time were purchased from unlicensed mortgage brokers. Because Aegis was feeding all the loans it originated to the hungry investment banks like Lehman, underwriting standards were thrown by the wayside. Quantity became more important than quality. The small underwriting department for Aegis' East Coast operations, located in Jacksonville Florida, was understaffed and bullied by the Divisional head of underwriting, Helen Spavile, to approve whatever loans were sent there for approval. With no choice in the matter, the guidelines were ignored and the loans approved.

150.    But the bad loans finally caught up with Aegis, and on August 13, 2007, the company was forced to file for bankruptcy protection.

**B.    The Offering Documents Failed To Disclose Lehman's
Inadequate Due Diligence With Respect To Originator
<u>Compliance With Mortgage Loan Underwriting Guidelines</u>**

151.    The Registration Statements provided that the loan underwriting guidelines used to originate the loan collateral is as specifically set forth each of the Prospectus Supplements. (¶¶ 185-273).  The Prospectus Supplements provides that the Mortgage Loans underlying the Certificates were originated pursuant to stated underwriting guidelines of the principal loan Originators as set forth in the Prospectus Supplements.  (*Id.*)

152.    Lehman conducted inadequate due diligence as underwriter of the Certificates Offerings with respect to whether the Originator complied with the loan underwriting guidelines described in the Prospectus Supplement.

153.    LBHI and other investment banks contracted with external firms to review whether the loans included in MBS that they underwrote were in compliance with the loan originators' represented standards.  LBHI was a noted client of Clayton.  In June of 2007, the New York Attorney General subpoenaed documents from Clayton and Bohan, seeking information regarding whether the investment banks withheld information that should have been disclosed to investors.  Similar subpoenas were issued by the SEC and by Massachusetts and Connecticut regulators.

154.    In June 2007, the New York Attorney General, Andrew Cuomo, subpoenaed documents from Bohan and Clayton related to their due diligence efforts on behalf of the investment banks, such as Merrill, that underwrote mortgage backed securities. The NYAG, along with Massachusetts, Connecticut and the SEC (all of which also subpoenaed documents) are investigating whether investment banks held back information they should have provided in the disclosure documents related to the sale of mortgage backed securities to investors.

155.    In a January 12, 2008 article titled "Inquiry Focuses on Withholding of Data on

Loans", *The New York Times* reported,

An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.

Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms. But the banks did not disclose the details of these reports to credit-rating agencies or investors.

The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments, according to people with knowledge of the matter.  Charges could be filed in coming weeks.

*       *       *

The inquiries highlight Wall Street's leading role in igniting the mortgage boom that has imploded with a burst of defaults and foreclosures.  The crisis is sending shock waves through the financial world, and several big banks are expected to disclose additional losses on mortgage-related investments when they report earnings next week.

As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans.  In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.

It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans.  Some industry officials say such loans made up a quarter to a half of the portfolios they saw.  In some cases, the loans accounted for as much as 80 percent.  While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured because banks disclose little information about them, officials say.

Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.

*       *       *

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including **Lehman Brothers** and Deutsche Bank, which are big underwriters of mortgage securities; the three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a number of mortgage consultants, known as due diligence firms, which vetted the loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco. Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August.

\*       \*       \*

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws. But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said lenders and investment banks routinely ignored concerns raised by these consultants,

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said, "We stopped checking."

156.    On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in the state of New York in exchange for agreeing to provide additional documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients. On the same day, both the *New York Times* (Anderson, J. and Bajaj, V., "Reviewer of Subprime Loans Agrees to Aid Inquiry of Banks," Jan. 27, 2008), and the *Wall Street Journal* ran articles describing the nature of the NYAG's investigation and Clayton's testimony. The *Wall Street Journal* reported that the NYAG's investigation is focused on "the broad language written in prospectuses about the risky nature of these securities changed little in recent years, even as due diligence reports noted that the number of exception loans backing the securities was rising." According to the *New York Times* article, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

157.    A March 23, 2008 *Los Angeles Times* article reported that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports" as follows:

> The reviewers' role was just one of several safeguards – including home appraisals, lending standards and ratings on mortgage-backed bonds – that were built into the country's mortgage-financing system.
>
> But in the chain of brokers, lenders and investment banks that transformed mortgages into securities sold worldwide, no one seemed to care about loans that looked bad from the start.  Yet profit abounded until defaults spawned hundreds of billions of dollars in losses on mortgage-backed securities.
>
> "The investors were paying us big money to filter this business," said loan checker Cesar Valenz.  "It's like with water.  If you don't filter it, it's dangerous.  And it didn't get filtered."
>
> As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention.
>
> The FBI is conducting more than a dozen investigations into whether companies along the financing chain concealed problems with mortgages.  And a presidential working group has blamed the subprime debacle in part on a lack of due diligence by investment banks, rating outfits and mortgage-bond buyers.

E. Scott Reckard, Subprime Watchdogs Ignored, *Los Angeles Times*, March 23, 2008.

158.    Moreover, while underwriters would have sought to have Clayton review 25% to 40% of loans in a pool that was going to be securitized earlier in the decade, by 2006 the typical percentage of loans reviewed for due diligence purposes was just 10%.  Mark Bohan, President of Bohan stated that "[b]y contrast [to investment banks in RMBS deals], buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined."

C.    **The Offering Documents Failed To Disclose That Lehman
Relied On S&P's And Moody's Outdated Models To
Determine Levels of Credit Enhancement And Ratings**

159.    The Prospectus Supplements describe the varying forms of credit enhancement including by way of subordination and over-collateralization. These statements contained material misstatements and omissions of fact including that the amount and form of credit enhancement was insufficient and understated since it was largely determined by Ratings Agencies Models that had not been materially updated since 1999 for S&P and 2002 for Moody's and thus was based primarily on the performance of fixed interest loans and not subprime, Alt-A, no or limited documentation loans, or loans with interest only, option ARM and negative amortization provisions as were substantially included in the Certificate collateralizations. As a result, the models failed to provide sufficient and appropriate credit enhancement or disclose the deficiencies in the manner in which credit enhancement was determined.

160.    The Ratings Agencies' determinations of the amount and kind of credit enhancement to be included in the Certificates were faulty and then later were used by the same firms to assign inflated and faulty AAA ratings to most of the Certificates sold to investors (89% by S&P and 79% by Moody's). These ratings were inflated and unjustifiably high since they were determined pursuant to the same models used to determine credit enhancement – models which had not adequately been updated at the time of the Certificate issuances.

161.    The truth about the Ratings Agencies' undisclosed use of outdated models in rating RMBS deals also only began to emerge in 2008. The inadequacy of the models used to rate (and determine the amount of credit enhancement needed to support the rating) was also discussed in the April 2008 issue of *Mortgage Banking* which explained the Ratings Agencies'

models used statistical assumptions based too heavily on the performance of 30-year fixed

mortgages not the kind of mortgages being securitized in prior four years as follows:

> S & P's Coughlin admits that "assumptions that went into decision-making [on credit ratings] were informed by what had happened in the past," and yet in this instance "previous loss data proved to be much less of a guide to future performance."

> But why? Drexel University's Mason believes it's because the CRAs relied on statistical models that were misleading, at best. "I think their [credit-rating] methodologies were demonstrably insufficient," he says.

> "Unlike the traditional rating processes for single-named issuers, which rely on empirical analysis at their core, structured-finance rating analysis is essentially driven by statistical models," write Mason and Rosner in their paper. And the data that the rating agencies used when evaluating mortgage-backed securities-- including those backed by subprime mortgages--were heavily biased by over-reliance on traditional 30-year fixed prime mortgage loans. But it turns out that a subprime loan, as Mason explains during an interview, is a very different animal.

> "This is not your historical mortgage loan," he says. "This is more like a credit-card loan." Mason cites the increased popularity during the mortgage boom of so-called option ARMs, which are home loans that give the borrower a variety of monthly payment options and have variable cash-flow characteristics that are more like credit cards.

162.    In an article appearing in *The New York Times* on April 8, 2008, entitled "Triple

A Failure," *The New York Times* took note of Moody's disclosure in April 2007 that it was

"revising" its model which had not been revised since 2002:

> In April 2007, Moody's announced it was revising the model it used to evaluate subprime mortgages. It noted that the model "was first introduced in 2002. Since then, the mortgage market has evolved considerably." This was a rather stunning admission; its model had been based on a world that no longer existed.

163.    The article explained that when Moody's analyzed subprime delinquency data in

2007 it found trends that its 2002 model never accounted for:

> Poring over the data, Moody's discovered that the size of people's first mortgages was no longer a good predictor of whether they would default; rather, it was the size of their first and second loans – that is, their total debt – combined. This was rather intuitive; Moody's simply hadn't reckoned on it. Similarly, credit scores,

long a mainstay of its analyses, had not proved to be a "strong predictor" of defaults this time.    Translation: even people with good credit scores were defaulting.    Amy Tobey, lender of the team that monitored XYZ, told me, "it seems there was a shift in mentality; people are treating homes as investment assets."  Indeed.  And homeowners without equity were making what economists call a rational choice; they were abandoning properties rather than make payments on them.    Homeowners' equity had never been as high as believed because appraisals had been inflated.

164.    On October 22, 2008, the House Oversight Committee heard testimony from Frank Raiter (the "Raiter Testimony"), the former Managing Director and head of Residential Mortgage-Backed Securities at Defendant S&P through April 2005.    Raiter testified that the Ratings on S&P deals turn in part on the credit rating of the individual mortgages.    It was from this credit analysis that S&P determined the *(1) expected default probability* of a loan and *(2) loss that would occur in the event of a default* which, in turn, was used to establish the amount of AAA bonds that could be issued against the pool and amount of equity or "credit enhancement" needed to protect the AAA bonds from experiencing losses:

> A mortgages backed security consists of a pool of individual mortgage loans. Depending on the type of mortgage product (i.e., prime-jumbo, subprime, Alt-A or HEL) underlying a given security, the pool could consist of 1,000 to 25,000 loans.  The ratings process consists of two distinct operations – the credit analysis of individual mortgages and a review of the documents governing the servicing of loans and the payments to investors in the securities.
>
> *The credit analysis is focused on determining the expected default probabilities on each loan and the loss that would occur in the event of a default.*  These, in turn, establish the expected loss for the entire pool and determine the amount of AAA bonds that can be issued against the pool.  It is analogous to your equity position in your home and the underlying mortgage.
>
> The loss estimate determines the equity needed to support the bond – it is intended to protect the AAA bonds from experiencing any losses, much the same as the homeowners' equity stake in a house protects the lender from loss in the mortgage loan.

Raiter Testimony at 3 (emphasis added).

165.    Raiter testified that in 1995, S&P developed a sophisticated model to estimate the default and loss of individual loans and pools – a model based on approximately 500,000 loans with performance data going back five or more years.

166.    This "LEVELS" Model was updated in early 1999 based on a database of 900,000 loans.  Raiter testified further that *"it was critical to maintain the best models as they were the linchpins of the rating process."*  (Raiter Testimony at 4 (emphasis added)).  After the housing boom took off in 2001, S&P developed a far better model in 2001, with updated data in 2003 and 2004, based on approximately 9.5 million loans *"covering the full spectrum of new mortgage products, particularly in AAA and fixed /floating payment type categories."*  (*Id.*)

167.    Nevertheless, S&P failed to implement this updated model, which, in Raiter's view, would have forewarned on the loan-losses from the new loan products, in particular:

> [T]he analysts at S&P had developed better methods for determining default which did capture some of the variations among products that were to become evident at the advent of the crisis.  It is my opinion that had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses.  That, in turn, should have causes the loss estimates mentioned above to increase and could have thus caused some of these products to be withdrawn from the market as they would have been too expensive to put into bonds.

Raiter Testimony at 4.

## D.    The Offering Documents Fail To Disclose Lehman's Ratings Shopping Practices

168.    The Registration Statements disclosed the engagement of Ratings Agencies but omitted disclosure of the manner in which the Ratings Agencies were engaged – so-called Rating Shopping.  As noted, the SEC Report set forth that S&P and Moody's engaged in the practice of "ratings shopping," as indicative of one of the practices which may have pressured Ratings Agencies to issue faulty ratings for MBS.  (¶¶ 17, 66-67, 169-71).

169.    In June, 2008, the New York State Attorney General's Office announced that after an investigation of the Ratings Agencies in the context of mortgage-backed securities, it had reached an agreement with S&P, Moody's and Fitch wich contemplated a complete overhaul of the then-current ratings procedures and guidelines and to put an end to what had been termed "ratings shopping."  Instead of investment banks looking to issue mortgage-backed bonds going to all three agencies for a review, but only use, and pay for, the most optimistic rating, the agencies now will get paid up front regardless if they are hired to assign a rating, a move expected to remove any potential for conflicts of interest.

170.    On October 28, 2008, former Moody's Managing Director Jerome S. Fons ("Fons") testified before the House Oversight Committee (hereinafter "Fons Testimony").  Fons had been an Executive at Moody's for 17 years, in various positions including Managing Director of Credit Policy.  In his testimony, Fons explained that Moody's provided inadequate ratings on RMBS because of conflicts of interest and being forced to "bid" or "shop" its ratings to obtain engagements:

> Why did it take so long for the rating agencies to recognize the problem?  Why were standards so low in the first place?  And what should be done to see that this does not happen again?
>
> ***My view is that a large part of the blame can be placed on the inherent conflicts of interest found in the issuer-pays business model and rating shopping by issuers of structured securities.***  A drive to maintain or expand market share made the rating agencies willing participants in this shopping spree.  It was also relatively easy for the major banks to play the agencies off one another because of the opacity of the structured transactions and the high potential fees earned by the winning agency.  Originators of structured securities typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality.  While the methods used to rate structured securities have rightly come under fire, in my opinion, the business model prevented analysts from putting investor interests first.

Fons Testimony, at 3 (emphasis added).

171.    In further testimony on October 22, 2008 before the House Oversight Committee,

Managing Director of Egan-Jones Rating Co., Sean J. Egan ("Egan"), stated, in part:

> Assigning ratings on structured finance bonds differs from the process for
> corporate and municipal bonds.  In the unsecured corporate and municipal
> markets, debt issuers are subject to being rated by all of the rating agencies
> because financial information is publicly available to all parties.  The structured
> finance market has been a "rating by request" market where the debt issuers invite
> some or all of the major rating agencies to preview the collateral pools so the
> rating agencies can provide preliminary rating indications that can be used to size
> the bond classes and structure the bond transactions.
>
> ***Historically, all of the rating agencies have agreed to bow out of the rating
> process if they are not actually selected by the debt issuer to rate a securities
> transaction.  This has encouraged the debt issuers to shop for the best ratings so
> they can optimize their securitization proceeds.***

Testimony of Sean J. Egan before the House Committee on Oversight and Governmental Reform
("the Egan Testimony"), October 22, 2008, at 9 (emphasis added).

**E.    The Offering Documents Fail To Disclose The True
       Roles of Ratings Agencies In Forming And Structuring
       <u>The Certificates For Sale As Primarily AAA Securities</u>**

172.    The Registration Statements provide:

> In the normal course of its securitization program, Lehman Holdings acquires
> Primary Assets from third party originators and through its affiliates.  Employees
> of Lehman Holdings or its affiliates structure securitization transactions in which
> the Primary Assets are sold to the depositor.
>
> The ratings on the securities depend primarily on an assessment by the rating
> agencies of the mortgage loans and other assets of the trust fund, any credit
> enhancement and the ability of the servicers and the master servicer to service the
> loans.

SASCo, September 16, 2005 Form S-3/A, at 32; see also, SASCo, August 8, 2006 Form S-3/A,
at 45.

173.    The above statement contains material omissions because it fails to disclose the

Ratings Agencies critical involvement in creating and structuring the Certificates.  It creates the

false impression to investors that the Ratings Agencies are independent and only brought in after

the Certificates are "structured" by LBHI.  It also fails to disclose that it was the Ratings Agencies that largely determined the amount and kind of credit enhancement – rather than merely evaluate the credit enhancement after the fact.

174.    In the April 2008 issue of *Mortgage Banking*, critics began to note the role of the Ratings Agencies in providing "structuring advice" as follows:

> But serious concerns have also been voiced by members of Congress about whether the CRAs' business model--where the large investment banks that underwrite mortgage-backed securities (MBS) and collateralized debt offerings actually pay to have their deals rated by the agencies, and the agencies in turn provide feedback to the underwriters on how to boost their deals' credit rating to the highly coveted triple-A status--may have prejudiced their objectivity and integrity.

> "It seems to me that the credit-rating agencies are playing both coach and referee," said Sen. Robert Menendez (D-New Jersey), during a September 2007 hearing by the Senate Banking Committee on the collapse of the subprime market.

> Critics also argue that the CRAs are actively involved in the structuring of RMBS and CDO deals, and thus can hardly claim that their ratings are merely "opinions" on the likelihood that a debt security might go into default – or, as one agency official has called them, "the world's shortest editorials."

> Joseph Mason, an associate professor of finance at Drexel University in Philadelphia and a former economist at the Office of the Comptroller of the Currency (OCC), says ***it is indisputable that the CRAs provide underwriters with "active structuring advice" on how to get a triple-A credit rating for their deals. While the CRAs insist they're merely providing information to the investment bankers during the underwriting process, Mason says they're trying to draw "an artificial line between advice and communication."***

(Emphasis added).

175.    As reported in the *International Herald Tribune* on June 1, 2007, the Ratings Agencies did "much more than evaluate [MBS instruments] and give them letter grades," they played an "integral role" in structuring the transactions and instructing the assemblers "how to squeeze the most profit out" of the MBS by maximizing the tranches with the highest ratings.

Now, it is evident that these credit ratings agencies indirectly and directly participated in and took steps necessary to the distribution of mortgage pass-through certificates and other MBS.

176.    An article appearing in *The Financial Times* on October 17, 2008 entitled "When Junk Was Gold," addressed the unique role of the Ratings Agencies in structured finance deals such as mortgage backed securities:

> The first mortgage-backed bonds were created in the late 1980's, well before Clarkson's time, by a trader called "Lewie" Ranieri.  Ranieri, the head of the mortgage trading desk at the former investment bank Salomon Brothers, was famous for the huge sums of money he netted for his employer and for the quantity of cheeseburgers he ate.  What he struck upon in structured finance was a process of pure alchemy: a way of turning myriad messy mortgage loans into standardized, regimented and east-to-assess bonds.
>
> Ranieri knew that the magic of structuring was in the packaging. Packaged in the right way, mortgages could come to create a huge, new tradable bond market. And this is where the rating agencies came in.  Structured bonds, like any other bond, needed ratings in order to be sold.  ***But with a structured bond, the pools of debt could be built or modified in order to attain a particular rating.  This wasn't a matter of disguising the risk, rather a way of reapportioning it and allowing investors with different risk appetites to buy the right product for them. "The rating is what gives birth to the structure in the first place," explains Sylvain Raynes, a financial modeling expert who was with Moody's in the 1990s, when Clarkson joined.  In some cases, the ratings are known before the bonds have even been inked.  "You start with a rating and build a deal around a rating," Clarkson told an investment magazine last year.***

(Emphasis added).

177.    The actual role of the Ratings Agencies in structuring the securitizations first began to emerge in an article appearing on *Conde Naste's* <u>Portfolio.com</u> in September 2007. The article described a presentation that Moody's gave to a group of Russian investors in 2006 where Moody's explained the "interative" process of MBS securitization where Moody's gave "feedback" to underwriters before the bonds were issued as follows:

> Moody's revealed a significant, and ultimately more dangerous, role that the agencies play in financial markets.  ***The slides detailed an "iterative process, giving feedback" to underwriters before bonds are even issued.  They laid out***

*how Moody's and its peer's help their clients put together complicated mortgage securities before they receive an official ratings stamp.* But this give-and-take can go too far: Imagine if you wanted a B-plus on your term paper and your high-school teacher sat down with you and helped you write an essay to make that grade.

*The [investors] had just been let in on one of the dirtiest open secrets in the mortgage-ratings world, one that may have played a part in creating the housing bubble that's now popping: The ratings agencies have had a bigger role in the subprime-mortgage meltdown than most people know. So far, irate investors have focused on—and upcoming congressional hearings and investigations will probe—the agencies' overly optimistic ratings for packages of subprime mortgages, many of which are now blowing up. It's becoming clear that the ratings agencies were far from passive raters, particularly when it came to housing bonds. With these, the agencies were integral to the process, and that could give regulators and critics the ammunition they've been looking for to finally force the Big Three to change.* The credit-ratings agencies "made the market. Nobody would have been able to sell these bonds without the ratings," says Ohio attorney general Marc Dann, who is investigating the agencies for possibly aiding and abetting mortgage fraud. "That relationship was never disclosed to anybody."

(Emphasis added).

178. The Ratings Agencies' unique role in influencing the structure of the securitization was more fully discussed in the July 2008 SEC Report. The SEC Report confirmed that S&P and Moody's provided "feed back" to the Sponsor of the Offerings as to the structure, which would result in the highest rating:

The three examined rating agencies generally followed similar procedures to develop ratings for subprime RMBS and CDOs. *The arranger of the RMBS initiates the ratings process by sending the credit rating agency a range of data on each of the subprime loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan: first lien, second lien, primary residence, secondary residence),* the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each RMBS trance issued by the trust. Typically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger. *The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the*

> *desired highest rating. Generally, arrangers aim for the larges possible senior*
> *tranche, i.e., to provide the least amount of credit enhancement possible, since*
> *the senior tranche – as the highest rated tranche – pays the lowest coupon rate*
> *of the RMBS' tranches and, therefore, costs the arranger the least to fund.*

(Emphasis added).

**F.    The Offering Documents Failed To Disclose Material Financial**
**Conflicts of Interest Between Lehman And The Ratings Agencies**

179.    The Offering Documents make no mention of the material financial conflicts of

interest between Lehman and the Ratings Agencies, including the fact that the analysts involved

in rating were also involved in the rating fees or the Ratings Agencies' business interests. The

SEC Report confirmed significant undisclosed conflicts of interest which incented ratings

agencies to issue inflated ratings.  The SEC Report found, in violation of SEC Rules, "key

participants" in the securitization process negotiated fees the rating agency would receive in

exchange for their high ratings.  (SEC Report at 23-24).

180.    The SEC noted, *inter alia*, that analysts are "aware" of the rating firm's "business

interests when securing the rating of the deal" as follows:

- *While each rating agency has policies and procedures restricting analysts*
  *from participating in fee discussions with issuers,* these policies still allowed
  key participants in the ratings process to participate in fee discussions.

- Analysts appeared to be aware, when rating an issuer, of the rating agency's
  business interest in securing the rating of the deal.  The Staff notes multiple
  communications that indicated that some analysts were aware of the firm's fee
  schedules, and actual (negotiated) fees.  There does not appear to be any
  internal effort to shield analysts from emails and other communications that
  discuss fees and revenue from individual issuers.

- *"Rating agencies do not appear to take steps to prevent considerations of*
  *market share and other business interests from the possibility that they*
  *could influence ratings or ratings criteria."*

SEC Report at 24-25 (emphasis added).

181.    The July 2008 SEC Report found that a number of factors unique to the rating of RMBS may have "exacerbated" the effect of conflicts of interest inherent in the fact that the issuer or arranger pays for the ratings.  These factors include that the arranger of the deal has:

- *"More flexibility to adjust the deal to obtain a desired credit rating as compared to arrangers of non-structured asset classes."*

- "Second, there is a high concentration in the firms conducting the underwriting function…  While 22 different arrangers underwrote subprime RMBS deals, 12 arrangers accounted for 80% of the deals, in both number and dollar volume."

- With a fast-changing market, rating processes are frequently and quickly changed.  The high concentration of arrangers with the influence to determine the *choice of rating agency heightened the inherent conflicts in the "issuer pays" compensation model.*  Compensation is calculated by volume of deals and total dollar volume, as a result arrangers prefer fast and predictable ratings processes.

- Ratings Agencies may be pressured by arrangers to produce a more *favorable outcome or reduce credit enhancement levels,* thus reducing *the cost of the debt for a given level of cash inflows from the asset pool.*  When the arranger also sponsors the RMBS or CDO trust, pressure can influence an agency's decision to update a model when the update would lead to a less favorable outcome.

- *High profit margins may have provided an incentive for rating agencies to encourage the arrangers to route future business its way.*  Unsolicited ratings were not available to provide independent checks on the rating agencies' ratings, nor was information regarding the structure of the security or portfolio of assets readily available to parties unrelated to the transaction, especially before issuance.

SEC Report at 31-33 (emphasis added).

182.    As reported in *The Washington Post* on June 6, 2008, the New York State Attorney General's Office announced that it had reached an agreement with the credit-rating companies, S&P, Moody's and Fitch to:

…change the way they evaluate mortgage securities that have roiled financial markets for the past year.

The deal with Moody's Investors Service, Standard & Poor's and Fitch Ratings aims to restore confidence among investors -- who saw top-rated securities lose much of their worth in a matter of months -- by revising how the agencies are paid for issuing ratings. The agreement also requires credit-rating agencies to direct investment banks to provide them with more data on the pools of mortgages that make up the bonds.

The agencies have been under fire for the role they played in the subprime mortgage crisis by awarding top ratings to securities that soured. Regulators and investors have alleged that the agencies have a conflict of interest because they are paid by the investment banks issuing the securities, thus encouraging the credit agencies to give high ratings to win business.

The agreement seeks to end this practice by having the issuers pay the credit-rating agencies at four points during the rating process, not just at the end when the rating is given.

Credit-rating agencies will also be required to disclose information about all securities submitted for review, allowing investors to determine whether issuers sought, but subsequently decided not to use, ratings from a specific agency. This will allow investors to see whether investment banks shopped around for the agency that would give their securities the best rating, said Andrew M. Cuomo, New York's attorney general.

183.    NYAG Cuomo stated further that:

"The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of mortgage securities," Cuomo said in a statement. "By increasing the independence of the rating agencies, ensuring they get adequate information to make their ratings, and increasing industry-wide transparency, these reforms will address one of the central causes of that collapse."

*Id.*, at 2.

184.    In or about July 2008, both Moody's and S&P sought to make internal changes to reform the conflicts of interest problems identified by the SEC. In an article published on July 2, 2008, it was reported that S&P had "unveiled an overhaul of its ratings process on Thursday, responding to widespread criticism of the quality and accuracy of credit ratings" and had

…[a]nnounced 27 steps that its aid would boost confidence in credit ratings. It came on the heels of planned reforms announced this week by its major rivals, [Moody's and Fitch].

Ratings agencies have come under fire from regulators and investors who say they helped precipitate the U.S. subprime mortgage crisis and credit tightening that began in 2007.

"The supposed reforms announced today by Standard & Poor's and by Moody's on Tuesday are too little, too late," New York State Attorney General Andrew Cuomo said in a statement.  "Both S&P and Moody's are attempting to make piecemeal change that seem more like public relations window-dressing than systematic reform."  He pledged to continue investigating their roles in the mortgage crisis.

Critics say the agencies at first assigned high ratings to hundreds of billions of dollars of securities linked to low-quality debt, only to exacerbate market turmoil by later rapidly downgrading many of those same securities.

This has contributed to write-downs piling up in the financial industry, hurting stock prices and causing losses in a variety of pension and mutual funds.

S&P Draws Criticism as Sets Ratings Reform, *www.Reuters.com*, February 7, 2008.

**VI.**

**MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS**

A.    **Material Misstatements and Omissions**
      **Regarding Mortgage Loan Underwriting Guidelines**

185.    The 2005 Registration Statement contained the following statements:

The depositor expects that Loans comprising the Primary Assets for a series of Securities will have been originated generally in accordance with underwriting procedures and standards similar to those described in this prospectus, except as otherwise described in the prospectus supplement.

\*        \*        \*

***…Except as otherwise set forth in the prospectus supplement, the originator of a Loan will have applied underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and the value and adequacy of the related property as collateral…***

In general, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information about the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished information with respect to its assets,

liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.   In general, an employment verification is obtained from an independent source (typically the borrower's employer), which reports the length of employment with that organization, the borrower's current salary and whether it is expected that the borrower will continue that employment in the future.  If the borrower was self-employed, the borrower may have been required to submit copies of recent signed tax returns.  The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts… *Certain considerations may cause an originator of Loans to depart from these guidelines.  For example, when two individuals co-sign the loan documents, the incomes and expenses of both individuals may be included in the computation.*

SASCo, August 16, 2005 Form S-3/A, at 76 (emphasis added).

186.    *Omitted Information:* These statements were materially false and misleading because they failed to disclose that the issues of borrower creditworthiness were largely disregarded as alleged above.

187.    The 2005 Registration Statement also described that generally the adequacy of the property financed by the loan will have been determined by an appraisal according to guidelines as follows:

The adequacy of the property financed by the related Loan as security for repayment of the Loan will generally have been determined by appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  Appraisers may be staff appraisers employed by the Loan originator or independent appraisers selected in accordance with pre-established guidelines established by the Loan originator.  The appraisal procedure guidelines will have required that the appraiser or an agent on its behalf personally inspect the property and verify that it was in good condition and that construction, if new, had been completed.  If an appraisal was required, the appraisal will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

In general, based on the data provided, certain verifications and the appraisal, a determination will have been made by the original lender that the borrower's monthly income would be sufficient to enable the borrower to meet its monthly obligations on the Loan and other expenses related to the property (such as

property taxes, utility costs, standard hazard and primary mortgage insurance and, if applicable, maintenance fees and other levies assessed by a Cooperative or a condominium association) and certain other fixed obligations other than housing expenses. The originating lender's guidelines for Loans secured by Single Family Property generally will specify that Scheduled Payments plus taxes and insurance and all Scheduled Payments extending beyond one year (including those mentioned above and other fixed obligations, such as car payments) would equal no more than specified percentages of the prospective borrower's gross income. These guidelines will generally be applied only to the payments to be made during the first year of the Loan.

*Id.*, at 77.

188. **Omitted Information:** These statements were materially false and misleading since appraisal standards were largely disregarded and the values of the underlying mortgage properties were in many instances inflated in the loan underwriting process.

### a. Prospectus Supplement Statements Regarding Aurora And LBB's Mortgage Loan Underwriting Guidelines

189. The underlying loan collateral for a certain number of the Issuing Trusts[9] was originated principally by Aurora or LBB. The Prospectus Supplements described the underwriting guidelines used by Aurora in originating the Certificate Collateral.

---

[9] The Issuing Trusts which offered Certificates collateralized by underlying mortgage loans originated principally by Aurora or LBB were Structured Adjustable Rate Mortgage Loan Trust 2006-2, Mortgage Pass-Through Certificates, Series 2006-2; Structured Adjustable Rate Mortgage Loan Trust 2007-5, Mortgage Pass-Through Certificates, Series 2007-5; Lehman XS Trust 2007-5H, Mortgage Pass-Through Certificates, Series 2007-5H; Structured Adjustable Rate Mortgage Loan Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3; Structured Adjustable Rate Mortgage Loan Trust 2007-6, Mortgage Pass-Through Certificates, Series 2007-6; Lehman XS Trust 2007-6, Mortgage Pass-Through Certificates, Series 2007-6; Structured Asset Securities Corporation Mortgage Loan Trust 2006-S1, Mortgage Pass-Through Certificates, Series 2006-S1; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC2, Mortgage Pass-Through Certificates, Series 2006-BC2; Lehman XS Trust 2007-7N, Mortgage Pass-Through Certificates, Series 2007-7N; Lehman XS Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC3, Mortgage Pass-Through Certificates, Series 2006-BC3; Lehman XS Trust 2007-10H, Mortgage Pass-Through Certificates, Series 2007-10H; Lehman XS Trust 2006-5, Mortgage Pass-Through Certificates, Series 2006-5; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC4, Mortgage Pass-Through Certificates, Series 2006-BC4; Lehman XS Trust 2007-11, Mortgage Pass-Through Certificates, Series 2007-11; Lehman XS Trust 2006-11, Mortgage Pass-Through Certificates, Series 2006-11; Structured Asset Securities Corporation Mortgage Loan Trust 2006-S3, Mortgage Pass-Through Certificates, Series 2006-S3; Lehman Mortgage Trust 2006-5, Mortgage Pass-Through Certificates, Series 2006-5; Lehman Mortgage Trust 2006-2, Mortgage Pass-Through Certificates, Series 2006-2; Structured Asset Securities Corporation Mortgage Loan Trust 2006-S4, Mortgage Pass-Through Certificates, Series 2006-S4 Lehman Mortgage Trust 2006-6, Mortgage Pass-Through Certificates, Series 2006-6; Structured Adjustable Rate Mortgage Loan Trust 2006-8, Mortgage Pass-

190.    As one example, the Registration Statement/Prospectus Supplement dated May 29, 2007 for Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-9 stated:

> The LBB Underwriting Guidelines are intended to evaluate the value and adequacy of the mortgaged property as collateral and to consider the applicant's credit standing and repayment ability. On a case-by-case basis, the underwriter may determine that, based upon compensating factors, an applicant not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratios, low debt-to-income ratios, good credit history, stable employment, financial reserves, and time in residence at the applicant's current address. A significant number of the Mortgage Loans may contain underwriting exceptions.

Lehman XS Trust 2007-9 Prospectus Supplement, May 29, 2007, at S-83.

191.    *Omitted Information:* LBB, Aurora and independent third-party underwriters were not nearly as thorough in getting documentation from or about borrowers as the statement implied. The emphasis was on getting loans done. Exceptions not only were granted in

---

Through Certificates, Series 2006-8; Structured Asset Securities Corporation Mortgage Loan Trust 2007-BC1, Mortgage Pass-Through Certificates, Series 2007-BC1; Lehman Mortgage Trust 2006-7, Mortgage Pass-Through Certificates, Series 2006-7; Structured Adjustable Rate Mortgage Loan Trust 2006-9, Mortgage Pass-Through Certificates, Series 2006-9; Structured Asset Securities Corporation Mortgage Loan Trust 2007-BC2, Mortgage Pass-Through Certificates, Series 2007-BC2 Lehman Mortgage Trust 2006-8, Mortgage Pass-Through Certificates, Series 2006-8; Structured Adjustable Rate Mortgage Loan Trust 2006-10, Mortgage Pass-Through Certificates, Series 2006-10; Structured Asset Securities Corporation Mortgage Loan Trust 2007-OSI, Mortgage Pass-Through Certificates, Series 2007-OSI; Lehman Mortgage Trust 2006-9, Mortgage Pass-Through Certificates, Series 2006-9; Structured Adjustable Rate Mortgage Loan Trust 2006-11, Mortgage Pass-Through Certificates, Series 2006-11; Lehman XS Trust 2006-13, Mortgage Pass-Through Certificates, Series 2006-13 Lehman Mortgage Trust 2007-1, Mortgage Pass-Through Certificates, Series 2007-1; Structured Adjustable Rate Mortgage Loan Trust 2006-12, Mortgage Pass-Through Certificates, Series 2006-12; Lehman XS Trust 2006-15, Mortgage Pass-Through Certificates, Series 2006-15; Lehman Mortgage Trust 2007-2, Mortgage Pass-Through Certificates, Series 2007-2; Structured Adjustable Rate Mortgage Loan Trust 2007-1, Mortgage Pass-Through Certificates, Series 2007-1; Lehman XS Trust 2006-17, Mortgage Pass-Through Certificates, Series 2006-17; Lehman Mortgage Trust 2007-3, Mortgage Pass-Through Certificates, Series 2007-3; Structured Adjustable Rate Mortgage Loan Trust 2007-2, Mortgage Pass-Through Certificates, Series 2007-2; Lehman XS Trust 2006-19, Mortgage Pass-Through Certificates, Series 2006-19; Lehman Mortgage Trust 2007-4, Mortgage Pass-Through Certificates, Series 2007-4; Structured Adjustable Rate Mortgage Loan Trust 2007-3, Mortgage Pass-Through Certificates, Series 2007-3; Lehman XS Trust 2006-20, Mortgage Pass-Through Certificates, Series 2006-20 Lehman Mortgage Trust 2007-5, Mortgage Pass-Through Certificates, Series 2007-5; Structured Adjustable Rate Mortgage Loan Trust 2007-4, Mortgage Pass-Through Certificates, Series 2007-4; Lehman XS Trust 2007-1, Mortgage Pass-Through Certificates, Series 2007-1; Lehman Mortgage Trust 2007-6, Mortgage Pass-Through Certificates, Series 2007-6; Lehman XS Trust 2005-4, Mortgage Pass-Through Certificates, Series 2005-4; Lehman XS Trust 2005-8, Mortgage Pass-Through Certificates, Series 2005-8 Lehman XS Trust 2006-1, Mortgage Pass-Through Certificates, Series 2006-1; Lehman XS Trust 2005-6, Mortgage Pass-Through Certificates, Series 2005-6; Lehman XS Trust 2005-10, Mortgage Pass-Through Certificates, Series 2005-10; and, Lehman XS Trust 2007-9, Mortgage Pass-Through Certificates, Series 2007-9.

situations where compensating factors existed but also were extensively granted to maintain loan volume.

192.    The LXST 2007-9 Prospectus Supplement also stated:

> In these cases, Aurora will fund loans which are in compliance with all conditions set forth in the loan approval and Aurora's Seller's Guide. Certain correspondents are given delegated underwriting authority. Full delegated underwriting authority is granted only to correspondents who meet a minimum net worth requirement and have a satisfactory quality control program in place; if Aurora has prior experience with the correspondent, such prior experience is reviewed to ensure satisfactory quality of production.

*Id.,* at S-82.

193.    ***Omitted Information:*** Aurora's background check of correspondents was extremely limited and opened the door for the acquisition of mortgage loans from brokers who did very little, if any, verification of the borrower's ability to repay the loans. Aurora's controls were inadequate to prevent it from acquiring suspect loans which were sure to default absent rapid, significant price appreciation of the underlying property. The correspondents' motivation was to generate as many loans as possible since they were only paid on loans generated and they suffered little adverse consequences when loans went bad. As a result, Aurora's failure to initiate valid controls and verifications over the correspondents' practices predictably caused many questionable loans to be acquired by the Trusts. The delegation of underwriting authority to correspondents was not nearly as limited as represented but was widespread and liberal in an effort to keep loan volume high and increasing.

194.    The LXST 2007-9 Prospectus Supplement further stated:

> A third group of correspondents sell to LBB through Aurora in "mini-bulk" transactions, in which they generally represent and warrant compliance with LBB's Underwriting Guidelines or other guidelines approved by Aurora.

> Some correspondents selling through mini-bulk transactions apply for and are granted authority to underwrite mortgage loans for sale to LBB using

underwriting guidelines of a company other than Aurora/LBB.  These are referred to "Other People's Guidelines", or OPG.  The OPG are reviewed by the credit staff at Aurora to determine that they are acceptable to LBB.  OPG may vary from LBB's guidelines but the products are deemed by Aurora to be substantially similar to the products produced in accordance with LBB's underwriting guidelines.  Aurora's Credit Policy staff reviews all proposed OPG guidelines in detail and identifies material differences from LBB Underwriting Guidelines that represent an increased risk.  Those identified areas are either determined to be acceptable, unacceptable (in which case the correspondent is notified that loans with such features are not eligible for purchase), or "materially different, but not prohibited".  This ''material difference list'' is used primarily as a reference by the due diligence team to focus/prioritize their credit review on loans with these material difference characteristics.

*Id.*

195.    ***Omitted Information:*** LBB and Aurora did very little to ensure that Other People's Guidelines or "OPG" loan underwriting complied with LBB/Aurora's own guidelines, acquiring  the loans of many correspondents under this program with little or no review of either the correspondents' practices or the loans themselves.  Many of these loans were to borrowers with little evidence of their ability or willingness to pay the amounts owed under their loans.

196.    The May 29, 2007 Registration Statement/Prospectus Supplement also stated:

Under "No Documentation'' program guidelines, no information is obtained regarding the borrowers' income or employment and there is no verification of the borrowers' assets.  The no documentation program guidelines require stronger credit profiles than the other loan programs, and have substantially more restrictive requirements for loan amounts, loan-to-value ratios and occupancy.

*Id.*, at S-85.

197.    ***Omitted Information***: LBB and Aurora failed to adhere to this "good credit history only" guideline for issuing these risky loans.  In order to continue receiving their high origination fees, LBB and Aurora underwriters routinely disregarded their own guidelines for these no-doc loans and offered them to many loan applicants with little or no inquiry into their credit history, creating what became known as "liar loans."  Moreover, due diligence firms,

**b.    Prospectus Supplement Statements Regarding
BNC's Mortgage Loan Underwriting Guidelines**

198.    The underlying loan collateral for a certain number of the Issuing Trusts[10] was originated principally by BNC Mortgage, Inc. (defined herein as "BNC"). The Prospectus Supplements described the underwriting guidelines used by BNC in originating the Certificate Collateral.

199.    For example, the Prospectus Supplement for Structured Asset Securities Corporation Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2006-BC2, dated August 28, 2006, stated:

> The BNC Underwriting Guidelines are generally intended to evaluate the credit risk of Mortgage Loans made to borrowers with imperfect credit histories ranging from minor delinquencies to bankruptcy, or borrowers with relatively high ratios of monthly mortgage payments to income, or relatively high ratios of total monthly credit payments to income. In addition; such guidelines also evaluate the value and adequacy of the mortgaged property as collateral. On a case-by-case basis, BNC may determine that, based upon compensating factors, a prospective borrower who does not strictly qualify under the applicable underwriting guidelines warrants an underwriting exception. Compensating factors may

---

[10]    The Issuing Trusts which offered Certificates collateralized by underlying mortgage loans originated principally by BNC were Structured Asset Investment Loan Trust 2006-2, Mortgage Pass-Through Certificates, Series 2006-2; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC2, Mortgage Pass-Through Certificates, Series 2006-BC2; Structured Asset Securities Corporation Mortgage Loan Trust 2007-BC3, Mortgage Pass-Through Certificates, Series 2007-BC3; Structured Asset Investment Loan Trust 2006-BNC1, Mortgage Pass-Through Certificates, Series 2006-BNC1; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC3, Mortgage Pass-Through Certificates, Series 2006-BC3; Structured Asset Securities Corporation Mortgage Loan Trust 2007-OSI, Mortgage Pass-Through Certificates, Series 2007-OSI; Structured Asset Investment Loan Trust 2006-BNC3, Mortgage Pass-Through Certificates, Series 2006-BNC3; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC4, Mortgage Pass-Through Certificates, Series 2006-BC4; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC3, Mortgage Pass-Through Certificates, Series 2006-BC3; BNC Mortgage Loan Trust 2006-1, Mortgage Pass-Through Certificates, Series 2006-1; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC5, Mortgage Pass-Through Certificates, Series 2006-BC5; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC4, Mortgage Pass-Through Certificates, Series 2006-BC4; BNC Mortgage Loan Trust 2006-2, Mortgage Pass-Through Certificates, Series 2006-2; and, Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC6, Mortgage Pass-Through Certificates, Series 2006-BC6.

include, but are not limited to, relatively low loan-to-value ratio, relatively low debt-to-income ratio, good credit history, stable employment, and financial reserves.

Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC2 Prospectus Supplement, August 28, 2006, at S-74.

200.    *Omitted Information:* BNC was very liberal in granting exceptions on underwriting.  In reality, the emphasis was more focused on generating loan volume than ensuring that borrowers would and could repay their loans.  BNC's practices were so aggressive and its controls so poor, that by August 2007, Lehman Brothers had to shut down BNC.

201.    The August 28, 2006 Prospectus Supplement also stated:

Under the BNC Underwriting Guidelines, BNC reviews the loan applicant's sources of income, calculates the amount of income from all such sources indicated on the loan application or similar documentation (except under the "Stated Income" programs), reviews the credit history of the applicant and calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the BNC Underwriting Guidelines.  The BNC Underwriting Guidelines are applied in accordance with a procedure that generally requires (I) an appraisal of the mortgaged property that conforms generally to Fannie Mae and Freddie Mac standards and (2) a review of the appraisal, such review may be conducted by a BNC staff appraiser or representative which, depending upon the original principal balance and loan-to-value ratio of the mortgaged property, may include a desk review of the original appraisal or a drive-by review appraisal of the mortgaged property. The BNC Underwriting Guidelines generally permit one-to-two family loans with loan-value ratios or combined loan-to-value ratios at origination of up to 100% for the highest credit grading category, depending on the creditworthiness of the borrower and, in some cases, the type and use of the property and the dept-to-income ratio.  Under the BNC Underwriting Guidelines, the maximum combined loan-to-value ratio for purchase money mortgage loans may differ depending on whether the secondary financing is institutional or private.

*Id.*

202.    *Omitted Information:* Appraisals for the mortgages were not nearly as meticulous as suggested by the Prospectus Supplement.  They were much more perfunctory, and appraisers were motivated to reach a certain conclusion – much more so than to use their professional

judgment.  Given the credit problems of many of these borrowers, the lack of valid appraisals was a significant adverse fact and indication of future problems.  BNC's analysis of the borrower's income was very cursory such that the debt-to-income ratios were misleading.

**c.      Prospectus Supplement Statements Regarding GreenPoint's Mortgage Loan Underwriting Guidelines**

203.    The underlying loan collateral for a certain number of the Issuing Trusts[11] were originated principally by GreenPoint Mortgage Funding, Inc. (defined herein as "GreenPoint"). The Prospectus Supplements described the underwriting guidelines used by GreenPoint in originating the Certificate Collateral.

204.    For example, the Prospectus Supplement dated May 29, 2007, for Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-9, stated:

> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Exceptions to the guidelines are permitted where compensating factors are present.

Lehman XS Trust 2007-9 Prospectus Supplement, May 29, 2007, at S-87.

---

[11]    The Issuing Trusts which offered Certificates collateralized by underlying mortgage loans originated principally by GreenPoint were Lehman XS Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3; Structured Adjustable Rate Mortgage Loan Trust, Series 2007-6, Mortgage Pass-Through Certificates, Series 2007-6; GreenPoint Mortgage Funding Trust, Series 2006-AR8, Mortgage Pass-Through Certificates, Series 2006-AR8; Lehman XS Trust 2006-4N, Mortgage Pass-Through Certificates, Series 2006-4N; Lehman XS Trust 2007-9, Mortgage Pass-Through Certificates, Series 2007-9; GreenPoint Mortgage Funding Trust, Series 2006-HE1, Mortgage Pass-Through Certificates, Series 2006-HE1; Lehman XS Trust 2006-GP1, Mortgage Pass-Through Certificates, Series 2006-GP1; GreenPoint Mortgage Funding Trust, Series 2006-AR4, Mortgage Pass-Through Certificates, Series 2006-AR4; GreenPoint Mortgage Funding Trust, Series 2007-AR1, Mortgage Pass-Through Certificates, Series 2007-AR1; Lehman XS Trust 2006-GP2, Mortgage Pass-Through Certificates, Series 2006-GP2; GreenPoint Mortgage Funding Trust, Series 2006-AR5, Mortgage Pass-Through Certificates, Series 2006-AR5; GreenPoint Mortgage Funding Trust, Series 2007-AR2, Mortgage Pass-Through Certificates, Series 2007-AR2; Structured Adjustable Rate Mortgage Loan Trust, Series 2006-12, Mortgage Pass-Through Certificates, Series 2006-12; GreenPoint Mortgage Funding Trust, Series 2006-AR6, Mortgage Pass-Through Certificates, Series 2006-AR6; GreenPoint Mortgage Funding Trust, Series 2007-AR3, Mortgage Pass-Through Certificates, Series 2007-AR3; Structured Adjustable Rate Mortgage Loan Trust, Series 2007-5, Mortgage Pass-Through Certificates, Series 2007-5; GreenPoint Mortgage Funding Trust, Series 2006-AR7, Mortgage Pass-Through Certificates, Series 2006-AR7; and, GreenPoint Mortgage Funding Trust, Series 2006-AR5, Mortgage Pass-Through Certificates, Series 2006-AR5.

205.   **Omitted Information:** Exceptions to guidelines were granted in many circumstances – not just where compensating factors existed. The exceptions were granted when the borrower could not qualify. Many of the loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any degree of realistic control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved.

206.   The Prospectus Supplement dated May 29, 2007, for Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-9, also stated:

> GreenPoint acquires or originates many mortgage loans under "limited documentation" or ''no documentation" programs. Under limited documentation programs, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower, than on verified income of the borrower. Mortgage loans underwritten under this type of program are generally limited to borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion, and certain credit underwriting documentation concerning income or income verification and/or employment verification is waived. Mortgage loans originated and acquired with limited documentation programs include cash-out refinance loans, super-jumbo mortgage loans and mortgage loans secured by investor-owned properties. Permitted maximum loan-to-value ratios (including secondary financing) under limited documentation programs are generally more restrictive than mortgage loans originated with full documentation requirements. Under no documentation programs, income ratios for the prospective borrower are not calculated. Emphasis is placed on the value and adequacy of the mortgaged property as collateral and the credit history of the prospective borrower, rather than on verified income and assets of the borrower. Documentation concerning income, employment verification and asset verification is not required and income ratios are not calculated. Mortgage loans underwritten under no documentation programs are generally limited to borrowers with favorable credit histories and who satisfy other standards for limited documentation programs.

*Id.*

207.   **Omitted Information:** These deficiencies in income documentation made accurate and reliable appraisals essential since so much emphasis was placed on the value of the mortgaged property. However, appraisers were in fact pressured to appraise to certain levels.

Appraisers knew if they appraised under certain levels they would not be hired again. Thus, the appraisals were inherently unreliable and there was little to support the value and adequacy of the mortgaged property.

208. In addition, the Prospectus Supplement dated May 29, 2007, for Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-9, stated:

> In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in a good Condition and verify that construction, if new, has been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties determined in accordance with Fannie Mae and Freddie Mac guidelines. In certain 'cases, an analysis based on income generated by the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used. GreenPoint's Underwriting Guidelines require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values.

*Id.*, at S-88.

209. ***Omitted Information:*** The documents failed to describe GreenPoint's practice of allowing its staff or outside brokers to push appraisal values which distorted the loan-to-value ratios referred to in the Prospectus Supplement.

210. The Prospectus Supplement dated May 29, 2007, for Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-9, also stated:

> As part of its evaluation of potential borrowers, GreenPoint generally requires a description of the borrower's income. If required, by its underwriting guidelines, GreenPoint obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Employment verification may be obtained through analysis of the prospective borrower's

recent pay stubs and/or W-2 forms for the most recent two years or relevant portions of the borrower's most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the borrower's length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

*Id.*, at S-87.

211.    **Omitted Information:** GreenPoint did not verify the income of borrowers as represented. Many of GreenPoint's Alt-A loans were actually subprime loans, an innovation later copied by others. GreenPoint was very liberal with terms even to borrowers with low credit scores. As a result of GreenPoint's poor underwriting practices, GreenPoint's parent, Capital One, recently took an $850 million charge as a result of the company's decision to close GreenPoint's doors.

        d.      **Prospectus Supplements Statements Regarding Countrywide's Mortgage Loan Underwriting Guidelines**

212.    The underlying loan collateral for a certain number of the Issuing Trusts[12] was originated principally by Countrywide Home Loans, Inc. (defined herein as "Countrywide").

---

[12]    The Issuing Trusts which offered Certificates collateralized by underlying mortgage loans originated principally by Countrywide were Structured Adjustable Rate Mortgage Loan Trust 2006-1, Mortgage Pass-Through Certificates, Series 2006-1; Structured Adjustable Rate Mortgage Loan Trust 2006-10, Mortgage Pass-Through Certificates, Series 2006-10; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC4, Mortgage Pass-Through Certificates, Series 2006-BC4; Structured Adjustable Rate Mortgage Loan Trust 2006-2, Mortgage Pass-Through Certificates, Series 2006-2; Structured Adjustable Rate Mortgage Loan Trust 2006-11, Mortgage Pass-Through Certificates, Series 2006-11; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC5, Mortgage Pass-Through Certificates, Series 2006-BC5; Structured Adjustable Rate Mortgage Loan Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3; Structured Adjustable Rate Mortgage Loan Trust 2006-12, Mortgage Pass-Through Certificates, Series 2006-12; Lehman XS Trust 2006-16N, Mortgage Pass-Through Certificates, Series 2006-16N; Lehman XS Trust 2005-5N, Mortgage Pass-Through Certificates, Series 2005-5N; Structured Adjustable Rate Mortgage Loan Trust 2007-1, Mortgage Pass-Through Certificates, Series 2007-1; Lehman XS Trust 2006-18N, Mortgage Pass-Through Certificates, Series 2006-18N; Lehman XS Trust 2005-7N, Mortgage Pass-Through Certificates, Series 2005-7N; Structured Adjustable Rate Mortgage Loan Trust 2007-2, Mortgage Pass-Through Certificates, Series 2007-2; Lehman XS Trust 2007-2N, Mortgage Pass-Through Certificates, Series 2007-2N; Lehman XS Trust 2005-9N, Mortgage Pass-Through Certificates, Series 2005-9N; Structured Adjustable Rate Mortgage Loan Trust 2007-3, Mortgage Pass-Through Certificates, Series 2007-3; Lehman XS Trust 2007-4N, Mortgage Pass-Through Certificates, Series 2007-4N; Lehman XS Trust 2006-2N, Mortgage Pass-Through Certificates, Series 2006-2N; Structured Adjustable Rate Mortgage Loan Trust 2007-5, Mortgage Pass-Through Certificates, Series 2007-5; Lehman XS Trust 2007-12N, Mortgage Pass-Through Certificates, Series 2007-12N; Lehman XS Trust 2006-4N, Mortgage Pass-Through Certificates, Series 2006-4N;

The Prospectus Supplements described the underwriting guidelines used by Countrywide in originating Certificate Collateral.

213.    The Prospectus Supplement for Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-9, dated September 28, 2006, stated:

> For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loans obtains a credit report relating to the applicant from a credit-reporting company.  The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments.  All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

Structured Adjustable Rate Mortgage Loan Trust 2006-9 Prospectus Supplement, September 28, 2006, at S-55.

214.    *Omitted Information:*  In fact, lending officers were regularly satisfied about adverse information in a borrower's credit report by ignoring such adverse information.  Rating agencies must remove non-confirmable adverse information within a certain time period from consumer credit reports.  Lending officers and originators knew that borrowers frequently complained to credit ratings agencies about accurate adverse information in an effort to increase their credit scores.

215.    Moreover, as *The Wall Street Journal* reported on May 7, 2008, loan applications frequently included inflated borrower income levels, which Countrywide executives overlooked:

> [P]rosecutors in the Central District of California in Los Angeles, near Countrywide's headquarters, are investigating possible fraud in the company's origination of loans.  Representatives for the prosecutors' offices declined to comment.

---

Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC2, Mortgage Pass-Through Certificates, Series 2006-BC2; Lehman XS Trust 2007-7N, Mortgage Pass-Through Certificates, Series 2007-7N; Structured Adjustable Rate Mortgage Loan Trust 2006-8, Mortgage Pass-Through Certificates, Series 2006-8; Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC3, Mortgage Pass-Through Certificates, Series 2006-BC3; Lehman Mortgage Trust 2006-9, Mortgage Pass-Through Certificates, Series 2006-9; and, Structured Adjustable Rate Mortgage Loan Trust 2006-9, Mortgage Pass-Through Certificates, Series 2006-9.

People involved in the California inquiry say the Federal Bureau of Investigation, which has carried out the probes under the direction of prosecutors, has seen evidence of *extensive fraud during loan origination, with sales executives deliberately overlooking inflated income figures for many borrowers.*

216.    The September 28, 2006 Prospectus Supplement also stated:

Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

Structured Adjustable Rate Mortgage Loan Trust 2006-9 Prospectus Supplement, September 28, 2006, at S-55.

217.    ***Omitted Information:*** In fact, Countrywide's home loan appraisals were not obtained from independent appraisers or appraisal services, but rather from appraisers who understood that their appraisals must conform to predetermined levels at which a loan could be approved, or risk their association and employment with Countrywide or brokers working with Countrywide. The effect was that purportedly independent appraisals were not prepared in conformance with Fannie Mae or Freddie Mac appraisal standards. Countrywide failed to confirm that appraisers were following the guidelines described, and this, combined with the implied or express pressures placed on appraisers to appraise to the desired value, created enormous upward pressure on appraisal values, distorting loan-to-value ratios and making the mortgage loans in the pool much riskier than suggested by the Offering Documents. This was particularly true in 2006 and 2007 when real estate values in many of the areas where the mortgage pools were located had stopped increasing at the rapid pace of 2004 to 2005. Thus, the

aggressive lending practices introduced during those years where, for example, borrowers with mortgages in excess of their ability to pay were assured that by the promise of refinancing to a lower rate, were unavailable.

218.    The September 28, 2006 Prospectus Supplement also stated:

> Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.

*Id.*, at S-56.

219.    ***Omitted Information:*** Countrywide's debt-to-income ratios were misstated by the manipulation of reported income levels on loan applications, many times with the knowledge of the mortgage broker.  Brokers were compensated when loans were approved – even with false information – and denied compensation when they questioned obviously distorted income levels. Because Countrywide was financially motivated to close and securitize loans, it took no meaningful steps to prevent these practices regardless of the underlying risk profile.  In fact, during the summer of 2007, when there was increasing publicity about suspect lending practices, Countrywide did an audit of lending practices by certain mortgage brokers and found many inconsistencies in loan applications, but did nothing about it.

220.    The September 28, 2006 Prospectus Supplement also stated:

> Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.  The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%. Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

*Id.*, at S-58.

221.    ***Omitted Information:*** In fact, stated income amounts far in excess of those reasonable for the borrowers' employment were regularly ignored in order to approve loans under the stated income and stated asset documentation programs.  Countrywide offered stated income loans up to 100% loan-to-value until March 2007.

222.    In fact, in March 2007, Countrywide assured borrowers that 100% financing was still available:

> "We want to assure homeowners that there is still an extensive selection of mortgage loans to suit a multitude of personal and financial circumstances," said Tom Hunt, managing director of Countrywide Home Loans. "We recognize it's been widely reported that some major lenders, like Countrywide, no longer offer 100% financing. In fact, we have made changes to certain subprime and other special mortgage programs, but we have not eliminated 100% financing. We still offer one of the widest selections of low- and no-down payment options to qualified customers, including those with less-than-perfect credit.

*MortgageDaily.com*, <u>Press Release: Countrywide Home Loans Assures Homeowners and Homebuyers That They Still Have Many Mortgage Loan Choices</u>, March 17, 2007.

### e.    Prospectus Supplements Statements Regarding <u>IndyMac's Mortgage Loan Underwriting Guidelines</u>

223.    The underlying loan collateral for a certain number of the Issuing Trusts[13] was originated principally by IndyMac Bank, F.S.B. (defined herein as "IndyMac").  The Prospectus

---

[13]    The Issuing Trusts which offered Certificates collateralized by underlying mortgage loans originated principally by IndyMac were Lehman XS Trust 2005-5N, Mortgage Pass-Through Certificates, Series 2005-5N; Lehman XS Trust 2006-17, Mortgage Pass-Through Certificates, Series 2006-17; Lehman Mortgage Trust 2006-6, Mortgage Pass-Through Certificates, Series 2006-6; Lehman XS Trust 2005-7N, Mortgage Pass-Through Certificates, Series 2005-7N; Lehman XS Trust 2006-18N, Mortgage Pass-Through Certificates, Series 2006-18N; Lehman Mortgage Trust 2006-7, Mortgage Pass-Through Certificates, Series 2006-7; Lehman XS Trust 2005-9N, Mortgage Pass-Through Certificates, Series 2005-9N; Lehman XS Trust 2007-1, Mortgage Pass-Through Certificates, Series 2007-1; Lehman Mortgage Trust 2006-8, Mortgage Pass-Through Certificates, Series 2006-8; Lehman XS Trust 2006-2N, Mortgage Pass-Through Certificates, Series 2006-2N; Lehman XS Trust 2007-2N, Mortgage Pass-Through Certificates, Series 2007-2N; Lehman Mortgage Trust 2006-9, Mortgage Pass-Through Certificates, Series 2006-9; Lehman XS Trust 2006-11, Mortgage Pass-Through Certificates, Series 2006-11; Lehman XS Trust 2007-4N, Mortgage Pass-Through Certificates, Series 2007-4N; Lehman Mortgage Trust 2007-1, Mortgage Pass-Through Certificates, Series 2007-1; Structured Adjustable Rate Mortgage Loan Trust 2006-8, Mortgage Pass-Through Certificates, Series 2006-8; Lehman XS Trust 2007-12N, Mortgage Pass-Through Certificates, Series 2007-12N; Lehman Mortgage Trust 2007-2, Mortgage Pass-Through Certificates, Series 2007-2; Lehman XS Trust 2006-13, Mortgage Pass-Through Certificates, Series 2006-13; Lehman XS Trust 2007-6, Mortgage Pass-Through Certificates, Series 2007-6; Lehman Mortgage Trust 2007-3, Mortgage Pass-Through

Supplements described the underwriting guidelines used by IndyMac in originating the Certificate Collateral.

224.    The Prospectus Supplement dated September 28, 2006, for Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2006-6, stated in part:

> IndyMac Bank approves each mortgage loan seller prior to the initial transaction on the basis of the seller's financial and management strength, reputation and prior experience. Sellers are periodically reviewed and if their performance, as measured by compliance with the applicable loan sale agreement, is unsatisfactory, IndyMac Bank will cease doing business with them.

Lehman Mortgage Trust 2006-6 Prospectus Supplement, September 28, 2006, at S-62.

225.    ***Omitted Information:*** In fact, by the time of the Prospectus Supplements, IndyMac, a large originator of Alt-A loans, had become more and more aggressive in the types of loans it would acquire, blurring the line between Alt-A and subprime borrowers. Some industry analysts dubbed these loans "Alt-B" products. The more aggressive acceptance by IndyMac of more questionable borrowers led to higher delinquencies overall. More than 80% of Alt-A mortgages that were securitized in 2006 were low-documentation, stated-income loans, according to *Inside Mortgage Finance*. This was an increase from 68% in 2005. Thus, IndyMac was disregarding its responsibility to ensure compliance with its producers to the extent it had represented. Moreover, IndyMac did not, in fact, monitor its mortgage loan sellers in either pre-purchase quality control due diligence or post-purchase quality control due diligence, as is made evident in litigation filed by IndyMac against recidivist mortgage originators, such as Silver State Mortgage ("Silver State"), revealed that IndyMac continued to purchase loans from originators

---

Certificates, Series 2007-3; Lehman XS Trust 2006-14N, Mortgage Pass-Through Certificates, Series 2006-14N; Lehman XS Trust 2007-9, Mortgage Pass-Through Certificates, Series 2007-9; Lehman Mortgage Trust 2007-4, Mortgage Pass-Through Certificates, Series 2007-4; and Lehman XS Trust 2006-16N, Mortgage Pass-Through Certificates, Series 2006-16N.

who were in default for breaches of their early payment defaults and first-payment default repurchase obligations to IndyMac.

226.    The September 28, 2006 Prospectus Supplement also stated:

Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac's guidelines, or pursuant to an exception to those guidelines based on IndyMac Bank's procedures for approving such exceptions.

*Id.*

227.    ***Omitted Information:*** IndyMac, prior to August 2007, had been granting stated income loans at relatively high loan-to-value ratios.

228.    As *blownmortgage.com* noted on August 16, 2007:

Stated income loans at high loan-to-value ratios have been a major source of abuse over the last few years by lenders and brokers. It is a loan that has put a large portion of the home buying public in jeopardy of losing their homes - wittingly or unwittingly.  It needs to go; or it needs to be heavily curtailed - and we're definitely seeing that.

*            *            *

IndyMac released another round of massive product changes that specifically focus on making the "liar loans," stated income and no income loan products completely irrelevant to the majority of lending situations; and especially for anyone firmly planted in the Alt-A camp.

They also eliminate some of the more "affordability" type products including the 40-year amortized loans.

229.    The September 28, 2006 Prospectus Supplement also stated:

In general, documentation types that provide for less than full documentation of employment, income and liquid assets require higher credit quality and have lower loan-to-value ratios and loan amount limits.

Under the Full/Alternate Documentation program, the prospective borrower's employment, income and assets are verified through written documentation such as tax returns, pay stubs or W-2 forms.  Generally, a two-year history of

employment or continuous source of income is required to demonstrate adequacy and continuance of income. Borrowers applying under the Full/Alternate Documentation Program may, based on certain loan characteristics and higher credit quality, qualify for IndyMac Bank's FastForward program and be entitled to income and asset documentation relief. Borrowers who qualify for FastForward must state their income, provide a signed Internal Revenue Service Form 4506 (authorizing IndyMac Bank to obtain copies of their tax returns), and state their assets. IndyMac Bank does not require any verification of income or assets under this program.

Lehman Mortgage Trust 2006-6 Prospectus Supplement, September 28, 2006, at S-63.

230.    **Omitted Information:** In the industry, these loans were referred to as "liar loans" which were much riskier than suggested by the Prospectus Supplement. The Prospectus Supplements failed to disclose that IndyMac advertised to mortgage loan originators that IndyMac would not check Internal Revenue Service Form 4506, thereby insuring that fabricated applications submitted mortgage underwriters would be approved by IndyMac without review or verification check.

231.    As *marketOracle* reported:

On March 15, IndyMac released a rather lengthy press release claiming that it had been inappropriately categorized by many media sources as a subprime lender. IndyMac stated that it is primarily a prime/Alt-A mortgage lender with minimal exposure to subprime. With the subprime lenders in melt-down mode, it is quite understandable why IndyMac would want to differentiate itself.

However, it doing so, it brought more attention to itself and was featured in an article by CNN Money called "Liar Loans: Mortgage Woes Beyond Subprime."

*        *        *

Alt-A loans are also known as "Stated Income" or "Liar Loans" since income is taken as fact. No further documentation is required. As long the [sic] automated property appraisal software is functioning, approval is only a few keystrokes away. These loans are tremendously profitable, since the underwritings costs are much lower and the rates are higher than a standard 30 year fixed mortgage.

IndyMac pointed-out in its press release that subprime mortgages generally include loans where the borrower's FICO score is 620 or below and that their customer's average score was 701 in 2006. This is an interesting data point, but a

person's FICO score is hardly the root cause of the escalating subprime defaults. The problem lies in the type of loans that have been originated.

\* \* \*

Resetting of such loans is causing the subprime sector to explode. Guess what? Alt-A is dominated by these loans as well. Regardless of a person's FICO score, a doubling or tripling of their mortgage is going to cause a problem. The higher FICO person may be able to buy a little more time, but the end result will be the same.

232. The September 28, 2006 Prospectus Supplement also stated:

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories.

Lehman Mortgage Trust 2006-6 Prospectus Supplement, September 28, 2006, at S-63.

233. **Omitted Information**: IndyMac, in fact, did not adhere to this "excellent credit history only" guideline for issuing these risky loans.

### f. Prospectus Supplement Statements Regarding Wells Fargo's Mortgage Loan Underwriting Guidelines

234. The underlying loan collateral for a certain number of the Issuing Trusts[14] were originated principally by Wells Fargo Bank, N.A. (defined herein as "Wells Fargo"). The Prospectus Supplements described the underwriting guidelines used by Wells Fargo in

---

[14] The Issuing Trusts which offered Certificates collateralized by underlying mortgage loans originated principally by Wells Fargo were Structured Adjustable Rate Mortgage Loan Trust 2006-2, Mortgage Pass-Through Certificates, Series 2006-2; Structured Asset Securities Corporation Mortgage Loan Trust 2006-WF3, Mortgage Pass-Through Certificates, Series 2006-WF3; Lehman XS Trust 2007-1, Mortgage Pass-Through Certificates, Series 2007-1; Structured Asset Securities Corporation Mortgage Loan Trust 2006-WF1, Mortgage Pass-Through Certificates, Series 2006-WF1; Structured Asset Securities Corporation Mortgage Loan Trust 2007-WF1, Mortgage Pass-Through Certificates, Series 2007-WF1; Lehman XS Trust 2007-9, Mortgage Pass-Through Certificates, Series 2007-9; Lehman XS Trust 2006-1, Mortgage Pass-Through Certificates, Series 2006-1; Lehman XS Trust 2006-13, Mortgage Pass-Through Certificates, Series 2006-13 Lehman Mortgage Trust 2006-5, Mortgage Pass-Through Certificates, Series 2006-5; and, Structured Adjustable Rate Mortgage Loan Trust 2006-8, Mortgage Pass-Through Certificates, Series 2006-8.

originating the Certificate Collateral. The Prospectus Supplements made false statements about

the loans originated by Wells Fargo.

235.    The Prospectus Supplement dated August 30, 2006, for Structured Adjustable

Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-8 stated in part:

> With respect to all mortgage loans underwritten by Wells Fargo Bank, Wells
> Fargo Bank's underwriting of a mortgage loan may be based on data obtained by
> parties other than Wells Fargo Bank that are involved at various stages in the
> mortgage origination or acquisition process. This typically occurs under
> circumstances in which loans are subject to an alternative approval process, as
> when Correspondents, certain mortgage brokers or similar entities that have been
> approved by Wells Fargo Bank to process loans on its behalf, or independent
> contractors hired by Wells Fargo Bank to perform underwriting services on its
> behalf ("contract underwriters") make initial determinations as to the consistency
> of loans with Wells Fargo Bank underwriting guidelines. Wells Fargo Bank may
> also permit these third parties to utilize scoring systems in connection with their
> underwriting process. The underwriting of mortgage loans acquired by Wells
> Fargo Bank pursuant to a Delegated Underwriting arrangement with a
> Correspondent is not reviewed prior to acquisition of the mortgage loan by Wells
> Fargo Bank although the mortgage loan file is reviewed by Wells Fargo Bank to
> confirm that certain documents are included in the file. In addition, in order to be
> eligible to sell mortgage loans to Wells Fargo Bank pursuant to a Delegated
> Underwriting arrangement; the originator must meet certain requirements
> including, among other things, certain quality, operational and financial
> guidelines.

Structured Adjustable Rate Mortgage Loan Trust 2006-8 Prospectus Supplement, August 30,
2006, at S-60.

236.    ***Omitted Information:*** In fact, Wells Fargo did not attempt to confirm the

standards actually used by mortgage brokers, correspondents and other third parties from which

Wells Fargo acquired mortgages. These third parties were able to engage in serious underwriting

deficiencies without review or correction by Wells Fargo. Wells Fargo has subsequently

attributed much of its $1.3 billion mortgage-related write-down to loans it held which were

originated by third parties.

237.    From 1996 through 2006, Wells Fargo and its affiliates and predecessors originated or acquired a total of $2.461 trillion of residential mortgage loans.  In 2004-2006, Wells Fargo originated or acquired over $10 billion of Alt-A Minus Fixed Rate Loans and over $4 billion of Alt-A Minus Adjustable Rate Loans.

238.    The prospectus supplements issued by the forgoing trusts made false statements about the loans originated or acquired by Wells Fargo.  For example, the prospectus supplement dated August 30, 2006 for Structured Adjustable Rate Mortgage Loan Trust 2006-8 stated in part as follows:

> Wells Fargo employs loan credit underwriters to scrutinize the applicant's credit profile and to evaluate whether an impaired credit history is a result of adverse circumstances or a continuing inability or unwillingness to meet credit obligations in a timely manner."

*Id.,* at S-91.

239.    ***Omitted Information:*** The City of Baltimore sued Wells Fargo in federal court in Maryland, accusing the company of issuing loans without regard for whether the borrower could repay them.  Specifically, the Baltimore lawsuit accused Wells Fargo of a practice known as "reverse redlining."  In contrast to "redlining," which involves denying prime credit to specific geographic areas because of its racial or ethnic composition, reverse redlining involves the targeting of an area for the marketing of deceptive, predatory or otherwise unfair lending practices because of the race or ethnicity of the area's residents.  Reverse redlining exploits lower income borrowers by charging them excessive fees and higher rates than more creditworthy borrowers.

240.    The August 30, 2006 Prospectus Supplement also stated that:

> Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. A

prospective borrower applying for a mortgage loan is required to complete a detailed application.

*Id.*

241.    **Omitted Information:** As set forth above, Wells Fargo's did not take credit standing of the applicant or ability to repay the loan into account in issuing its subprime and Alt-A loans to borrowers.  In fact, Wells Fargo's lending practices were used to exploit lower income borrowers by charging excessive fees and higher rates.

g.    **Prospectus Supplements Statements Regarding First Franklin's Mortgage Loan Underwriting Guidelines**

242.    The underlying loan collateral for a certain number of the Issuing Trusts[15] were originated principally by First Franklin Financial Corporation (defined herein as "First Franklin").

243.    The Prospectus Supplement dated August 18,2006, for First Franklin Mortgage Loan Trust 2006-FF12 Mortgage Pass-Through Certificates, Series FFI2, of which substantially all the mortgage loans were originated by First Franklin (which at the time was a division of National City Bank of Indiana), stated in part:

> The Mortgage Loan Seller's acquisition underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.

First Franklin Mortgage Loan Trust 2006-FF12 Prospectus Supplement, August 18, 2006, at S-53.

244.    **Omitted Information:** First Franklin was extremely flexible in granting mortgages to borrowers with poor credit, so much so that First Franklin was the "go-to" lender

---

[15]    The Issuing Trusts which offered Certificates collateralized by underlying mortgage loans originated principally by First Franklin were First Franklin Mortgage Loan Trust 2006-FF2, Mortgage Pass-Through Certificates, Series 2006-FF2; First Franklin Mortgage Loan Trust 2006-FF12, Mortgage Pass-Through Certificates, Series 2006-FF12; First Franklin Mortgage Loan Trust 2006-FFB, Mortgage Pass-Through Certificates, Series 2006-FFB; First Franklin Mortgage Loan Trust 2006-FFA, Mortgage Pass-Through Certificates, Series 2006-FFA.

for brokers when they had a borrower emerging from bankruptcy. First Franklin did not have

adequate compensating controls for the risky loans it made. Soon after being acquired by Merrill

Lynch, First Franklin was forced to severely tighten up its standards in early 2007.

245.    The August 18, 2006 Prospectus Supplement also stated that:

> Substantially all of the non-prime mortgage loans that were acquired from NC
> Bank were based on loan application packages submitted to NC Bank by third
> party mortgage brokers, which do not fund the mortgage loans.  These mortgage
> brokers must meet minimum standards set by NC Bank and, once approved by
> NC Bank, the mortgage brokers are eligible to submit loan application packages
> in compliance with the terms of the mortgage broker agreement with the NC
> Bank.
>
> Third party lenders must meet minimum standards set by the Mortgage Loan
> Seller, based on acquisition guidelines that require an analysis of the following
> information submitted with an application for approval: any applicable state
> lending license (in good standing), satisfactory credit report only if no federal
> income tax identification number, signed mortgage loan purchase agreement,
> signed W-9 and signed lender authorization.

*Id.*

246.    ***Omitted Information:***   In fact, subsequent to the relevant offerings, court papers

would show First Franklin had been burned by lax underwriting, fraudulent home appraisals and

exaggeration of income by borrowers.  First Franklin continued to rely heavily on an army of

independent brokers to find borrowers and submit loan applications, even as other U.S. lenders

abandoned that channel, citing problems with underwriting and outright fraud.

247.    The Prospectus Supplement dated March 1, 2006 for First Franklin Mortgage

Loan Trust 2006-FF2 stated that the underwriting guidelines set forth are primarily intended to

assess creditworthiness of the borrower and value of the collateral:

> The Mortgage Loan Seller's [First Franklin Corporation] acquisition underwriting
> standards are primarily intended to assess the ability and willingness of the
> borrower to repay the debt and to evaluate the adequacy of the mortgaged
> property as collateral for the mortgage loan.

First Franklin Mortgage Loan Trust 2006-FF2 Prospectus Supplement, March 1, 2006, at S-46.

248.    ***Omitted Information:*** First Franklin, National City and independent third-party underwriters were not nearly as thorough in getting documentation from or about borrowers as the statement implied.  The emphasis was on getting loans done, a practice that would soon hurt them with an SEC investigation and a class action lawsuit filed in the Northern District of Ohio.

249.    The Prospectus Supplements issued in connection with Offerings for which the majority of the collateral was originated by First Franklin stressed the importance of Credit Score of the borrower, stating, in part:

> …  All non-prime mortgage loans are acquired by the Mortgage Loan Seller under the Direct Access Program.  While each underwriting program is intended to assess the risk of default, the Direct Access Program makes use of credit bureau risk scores (the "Credit Score")…  The Credit Score is used as an aid to, not a substitute for, the underwriter's judgment.
>
> The Direct Access Program was developed to simplify the origination process.  In contrast to assignment of credit grades according to traditional non-agency credit assessment methods, i.e., mortgage and other credit delinquencies, Direct Access relies upon a borrower's Credit Score initially to determine a borrower's likely future credit performance.
>
> *        *        *
>
> In accordance with the Mortgage Loan Seller's guidelines for acquisition, for substantially all of the loans acquired under the Direct Access Program, the Credit Score of the primary borrower (the borrower with at least 51.00% of total income) must be used to determine program eligibility…  In all cases, a borrower's complete credit history must be detailed in the credit report that produces a given Credit Score or the borrower is not eligible for the Direct Access Program.  Generally, the minimum Credit Bureau Risk Score allowed under the Direct Access Program is 540.
>
> …NC Bank or the Mortgage Loan Seller, with respect to mortgage loans originated by third party lenders, reviews each Direct Access loan to determine whether the Mortgage Loan Seller's acquisition guidelines for income, assets, employment and collateral are met.
>
> *        *        *

> The applicant generally must have a sufficiently established credit history to qualify for the appropriate Credit Bureau Risk Score range under the Direct Access Program. This credit history is substantiated by a two repository merged report prepared by an independent credit report agency. The report typically summarizes the applicant's entire credit history, and generally includes a seven year public record search for each address where the applicant has lived during the two years prior to the issuance of the credit report and contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In some instances, borrowers with a minimal credit history are eligible for financing under the Direct Access Program.

First Franklin Mortgage Loan Trust 2006-FF12 Prospectus Supplement, August 18, 2006, at S-53-55.

250. **Omitted Information:** Originators often relaxed underwriting guidelines in an effort to increase loan volume. In fact, First Franklin disclosed in its Form 10-Q filing with the SEC on August 8, 2008, that the SEC had commenced an informal investigation into National City, and specifically its subsidiary First Franklin, relating to its lending standards and underwriting practices in the years before National City sold First Franklin to Merrill Lynch. The SEC also sought information from National City regarding the sale of First Franklin itself.

251. Moreover, the Prospectus Supplement issued in connection with Offerings for which the majority of the collateral was originated by First Franklin also stressed the stringent guidelines of First Franklin's appraisers and their compliance with applicable laws and regulations, stating, in part:

> … In accordance with the Mortgage Loan Seller's guidelines for acquisition, the mortgage loans are required to comply with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property prepared in accordance with applicable law and regulation; and if appropriate, a review appraisal. Generally, appraisals are provided by appraisers approved by NC Bank or third party lenders, as applicable. Review appraisals may only be provided by appraisers approved by NC Bank or the third party lender. In some cases, NC Bank or a third party lender may rely on a statistical appraisal methodology provided by a third party.

> Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with NC Bank or a third party lender. Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis. The review appraisal may be an enhanced desk, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises.

*      *      *

> The Mortgage Loan Seller conducts a number of quality control procedures, with respect to NC Bank and third party lenders, including post funding compliance audits as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the post-funding audits, a random sample of loans are required to be reviewed to verify credit grading, documentation compliance and data accuracy.

*Id.,* at S-55.

252.    ***Omitted Information:*** The appraisals were not performed and reviewed in line with the standards implied, but instead, were cursory in nature. In fact, many of First Franklin's loans were not subject to independent appraisal at all but instead were fed through its computer programs which ignored many of the factors that would have ultimately led to First Franklin not originating the loan. The supposedly "independent" appraisers knew they would likely not be hired again if they did not come back with a certain appraised value. Those loans that were given to "independent appraisers" were often accepted by the appraisers' managers even if the appraiser originally rejected the applicant.

253.    The Prospectus Supplement dated November 28, 2006, for First Franklin Mortgage Loan Trust Series 2006-FFB, of which substantially all the mortgage loans were originated by First Franklin (which at the time was a division of NCC), stated in part:

> In accordance with the Mortgage Loan Seller's guidelines for acquisition, the lender's underwriters are required to verify the income of each applicant under various documentation programs as follows: under the Full Documentation Program, applicants are generally required to submit verification of stable income

107

for the periods of six months to two years preceding the application dependent on credit score range; under the LIV Program, the borrower is qualified based on the income stated on the application and applicants are generally required to submit verification of adequate cash flow to meet credit obligations for the six month period preceding the application; the Stated Plus Program allows income to be stated, but requires borrowers to provide verification of liquid assets equaling three months of income stated on the mortgage application; under the NIV Program, applicants are qualified based on monthly income as stated on the mortgage application and the underwriter will determine that the stated income is reasonable and realistic when compared to borrower's employment type, assets and credit history.  For Direct Access first lien mortgage loans from self-employed or 1099 borrowers with a credit score greater than or equal to 540 and not originated in conjunction with a second lien mortgage, bank statements (for 12 months) are acceptable as full documentation.

First Franklin Mortgage Loan Trust 2006-FFB Prospectus Supplement, November 28, 2006, at S-54.

254.    ***Omitted Information:*** Exceptions to the underwriting criteria were granted not only when compensating factors existed but were liberally granted to achieve loan volume.  The improper monitoring of the correspondents finally stopped when Merrill Lynch discovered the incredibly lax standards First Franklin had employed before it was purchased and ultimately stopped originating subprime mortgages through First Franklin in March, 2008

### h.    Prospectus Supplement Statements Regarding EquiFirst's Mortgage Loan Underwriting Guidelines

255.    The underlying loan collateral for a certain number of the Issuing Trusts[16] were originated principally by EquiFirst Corporation (defined herein as "EquiFirst").  The Prospectus Supplements described the underwriting guidelines used by EquiFirst in originating the Certificate Collateral.

---

[16]    The Issuing Trusts which offered Certificates collateralized by underlying mortgage loans originated principally by EquiFirst were Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC6, Mortgage Pass-Through Certificates, Series 2006-BC6; Structured Asset Securities Corporation Mortgage Loan Trust 2007-BC1, Mortgage Pass-Through Certificates, Series 2007-BC1; Structured Asset Securities Corporation Mortgage Loan Trust 2007-EQ1, Mortgage Pass-Through Certificates, Series 2007-EQ1; and, Structured Asset Securities Corporation Mortgage Loan Trust 2007-BC2, Mortgage Pass-Through Certificates, Series 2007-BC2.

256.    The Prospectus Supplement dated April 20, 2007, for the Structured Asset

Securities Corporation Mortgage Loan Trust, Series 2007-EQ1, stated:

> EquiFirst's underwriting standards are primarily intended to assess the ability and
> willingness of the borrower to repay the debt and to evaluate the adequacy of the
> mortgaged property as collateral for the mortgage loan. All of the Mortgage
> Loans were underwritten with a view toward the resale thereof in the secondary
> mortgage market. EquiFirst considers, among other things, a mortgagor's credit
> history, repayment ability, as well as the value, type and use of the mortgaged
> property.

Structured Asset Securities Corporation Mortgage Loan Trust 2007-EQ1 Prospectus Supplement,
April 20, 2007, at S-55.

257.    *Omitted Information:* EquiFirst's focus on increasing loan volume caused its

consideration' of borrowers' repayment ability to' be cursory at best.  The extent of their

deviation from their registration statement is evinced by the stricter standards put into place as

late as 2008, including: (a) ''no more 1099 treated as full doc'' (suggesting that 1099 Forms had

previously served as full documentation); (b) minimum score allowed of 560 (suggesting they

offered mortgages to individuals with lower scores while Vantage Score rates anything below

600 as F); and (c) max DTI (debt-to-income) of 50% (suggesting that borrowers' whose loan

payment exceeded 50% of their income were granted loans).

258.    The April 20, 2007 Prospectus Supplement also stated:

> All of the mortgage loans originated by EquiFirst are based on loan application
> packages submitted through mortgage brokerage companies.  These brokers must
> meet minimum standards set by EquiFirst based on an analysis of the following
> information submitted with an application for approval: applicable state lending
> license (in good standing) and a signed broker agreement.  Once approved,
> mortgage brokerage companies are eligible to submit loan application packages in
> compliance with the terms of a signed broker agreement.

*Id.*

259.    *Omitted Information:*  EquiFirst, which was purchased by Barclays in early 2007,

placed very few controls over brokers and correspondents, resulting in approvals with high loan-

to-value ratios to borrowers with extremely poor credit.  As a result, EquiFirst acquired loans

from borrowers with poor credit, in mortgages too large for their income levels.

260.    The April 20, 2007 Prospectus Supplement also stated:

> EquiFirst's guidelines comply with applicable federal and state laws and
> regulations and generally require an appraisal of the mortgaged property which
> conforms to Freddie Mac and/or Fannie Mae standards.  All loans are subject to
> EquiFirst's appraisal review process. Appraisals are provided by qualified
> independent appraisers licensed in their respective states.

> Qualified independent appraisers must meet minimum standards of licensing.
> Each Uniform Residential Appraisal Report includes a market data analysis based
> on recent sales of comparable homes in the area.  The appraisal review process
> includes steps that may require (but are not limited to) an automated valuation
> report, or a manual review from one of our internal staff appraisers to confirm or
> support the original appraiser's value of the mortgaged premises.

*Id.,* at S-56-57.

261.    ***Omitted Information:***  Due to improper controls over brokers, there was little

consequence to those who passed along bad loans.  Thus, brokers had no incentive to obtain

legitimate appraisals, but every incentive to make sure the appraisals were high enough to justify

the loans.  Appraisers were similarly motivated to inflate appraisals where necessary

### i.    Prospectus Supplements Statements Regarding Aegis' Mortgage Loan Underwriting Guidelines

262.    The underlying loan collateral for a certain number of the Issuing Trusts[17] were

originated principally by Aegis Mortgage Corporation (defined herein as "Aegis").  The

prospectus supplements described the underwriting guidelines used by Aegis in originating the

Certificate Collateral.

263.    The Prospectus Supplement for Structured Asset Securities Corporation Mortgage

Loan Trust 2006-BC1 stated:

---

[17]    The Issuing Trusts which offered Certificates collateralized by underlying mortgage loans originated
principally by Aegis was Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC1, Mortgage Pass-
Through Certificates, Series 2006-BC1.

> Initially, a prospective borrower is required to fill out a detailed application
> providing pertinent credit information.  As part of the application, the borrower is
> required to provide a current balance sheet describing assets and liabilities and a
> statement of income and expenses, as well as an authorization for the lender to
> obtain for a credit report that summarizes the borrower's credit history with
> merchants and lenders and any record of bankruptcy.  Salaried prospective
> borrowers generally are required to submit pay stubs covering a consecutive 30-
> day period and their W-2 form for the most recent year.  In addition, the Aegis
> Underwriting Standards require either a verbal or written verification of
> employment from the prospective borrower's employer. If a prospective borrower
> is self-employed, the borrower may be required to submit copies of signed tax
> returns or provide bank statements.

Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC1 Prospectus Supplement,
May 2, 2006, at S-57.

264.    ***Omitted Information***: Aegis employees often relaxed these documentation

requirements allowing applicants who did not qualify to obtain mortgages.  This allowed the

company to increase its loan volume, but ultimately served as its demise once the mortgage

bubble burst.

265.    The Prospectus Supplement for Structured Asset Securities Corporation Mortgage

Loan Trust 2006-BC1 also stated:

> Some of the Mortgage Loans have been originated under "stated income,"
> "limited documentation" or "no documentation" programs that require less
> documentation and verification than do traditional "full documentation"
> programs.  Under a "stated income" program, some borrowers with acceptable
> payment histories will not be required to provide any information regarding
> income and no other investigation regarding the borrower's income, except
> verification of employment, will be undertaken.  Under a "limited documentation"
> program, applicants usually are required to submit verification of stable income
> for at least 12 months, such as 12 consecutive months of complete personal
> checking account bank statements.  Generally, in order for a borrower to be
> eligible for a "stated income" or "limited documentation" program, the loan-to-
> value ratio must meet applicable guidelines, the borrower must have a good credit
> history and the borrower's eligibility for this type of program may be determined
> by use of a credit-scoring model.  Under a "no documentation" program, no
> information is obtained regarding the borrower's income and there is no
> verification of the borrower's assets.  The "No Documentation" program
> guidelines require stronger credit profiles than the other programs, and have

111

substantially more restrictive requirements for loan-to- value ratios, occupancy requirements and credit scores.

*Id.*

266.    **Omitted Information:** As stated below, Aegis' small underwriting department was easily bullied both by managers within the Company and by the larger investment banks to disregard their underwriting guidelines and approve loans that should not have been considered. Credit scores became more of a suggestion than a requirement or guideline and many loans were approved for applicants who had no business receiving one.

267.    The indicated underwriting standards applicable to the Mortgage Loans include the foregoing categories and characteristics as guidelines only.  On a case-by-case basis, it may be determined that an applicant warrants a debt service-to-income ratio exception, a pricing exception, a loan-to-value ratio exception, an exception from certain requirements of a particular risk category, etc. An exception may be allowed if the application reflects compensating factors, such as: low loan-to-value ratio; stable ownership; low debt ratios; strong residual income; a maximum of one 30-day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years.

**B.    Registration Statements' Material Misstatements
And Omissions Regarding Credit Enhancement**

268.    With respect to Credit Support, the Registration Statements provided as follows:

Credit support may be provided with respect to one or more classes of a series of Securities or for the related Primary Assets.  Credit support may take the form of one or more of the following:

- An irrevocable letter of credit;
- The subordination of one or more classes of the Securities of a series;
- Reserve funds;
- A pool insurance policy, bankruptcy bond, repurchase bond or special hazard insurance policy;
- A surety bond or financial guaranty insurance policy;

- The use of cross-support features; or
- Another method of credit support described in the prospectus supplement.

*        *        *

If credit support is provided with respect to a series, or the related Primary Assets, the prospectus supplement will include a description of:

- The amount payable under the credit support;
- Any conditions to payment thereunder not otherwise described in this prospectus;
- The conditions (if any) under which the amount payable under the credit support maybe reduced and under which the credit support may be terminated or replaced; and
- The material provision of any agreement relating to the credit support.

SASCo, September 16, 2005 Form S-3/A, at 91; *see also,* SASCo, August 8, 2006 Form S-3/A, at 103.

269.    ***Omitted Information:*** The above statements failed to disclose that the Ratings Agencies largely determined the amount and kind of Credit Support or Credit Enhancement to be provided for each Certificate, both before and after Ratings Agencies were formally "engaged" by Lehman, in order for the Certificates to be assigned predetermined ratings.  The above statements also failed to disclose that the amounts and kind of Credit Support the Ratings Agencies determined was appropriate for the Certificates, as specifically set forth in each Prospectus Supplement, were faulty, erroneous and inaccurate since the Ratings Agency models had not been updated and failed to accurately or adequately reflect the performance of the Certificate mortgage loans.

270.    Each Prospectus Supplement contained statements defining the specific kind and amount of Credit Support or Credit Enhancement provided for that Series of Certificates as well as the ratings for the Certificate Classes.  For example, the Prospectus Supplement for $2.74 billion  Offering of Lehman XS Trust Series 2005-5N Prospectus Supplement provided that:

113

Credit enhancement for the Offered Certificates consists of the subordination of the Offered Subordinate Certificates, the priority of application of Realized Losses, excess interest, an interest rate swap agreement and overcollateralization, in each case as described herein.

**Subordination.** The rights of holders of the Offered Subordinate Certificates to receive distributions with respect to the Mortgage Loans will be subordinated, to the extent described herein, to such rights of holders of each class of Offered Certificates having a higher priority of distribution, as described under ''—Distributions of Interest'' and ''—Distributions of Principal.'' This subordination is intended to enhance the likelihood of regular receipt by holders of Offered Certificates having a higher priority of distribution of the full amount of interest and principal distributable thereon, and to afford such Certificate holders limited protection against Realized Losses incurred with respect to the related Mortgage Loans.

*      *      *

**Excess Interest.** The Mortgage Loans from each Mortgage Pool bear interest each month that in the aggregate is expected to exceed the amount needed to pay monthly interest on the related Offered Certificates, the fees and expenses of the Servicers, the Master Servicer and the Trustee allocated to such Mortgage Pool and any Net Swap Payments owed to the Swap Counterparty. Such excess interest from the Mortgage Loans from each Mortgage Pool each month will be available to absorb Realized Losses on the related Mortgage Loans and to create and maintain overcollateralization at the required level.

*      *      *

**Overcollateralization.** The Pool Balance as of the Cut-off Date will exceed the initial aggregate Class Principal Amount of the Offered Certificates by approximately **$16,542,956,** which represents approximately 0.60% of the Cut-off Date Balance. The weighted average of the Net Mortgage Rates of the Mortgage Loans is currently, and generally in the future is expected to be, higher than the weighted average interest rate on the Offered Certificates and fees and expenses of the Trust Fund and any Net Swap Payments owed to the Swap Counterparty. As described below, excess interest collections will be applied to distributions of principal to the extent needed to create and maintain overcollateralization (i.e., the excess of the Pool Balance over the aggregate Class Principal Amount of the Offered Certificates) to and at the required Targeted Overcollateralization Amount. However, Realized Losses with respect to Mortgage Loans will reduce overcollateralization, and could result in an Overcollateralization Deficiency.

Lehman XS Trust 2005-5N Prospectus Supplement, October 28, 2005 at S-43-44.

271.    *Omitted Information:* These statements contained material omissions in failing to disclose the role of the Ratings Agencies in determining the terms and amount of credit enhancement before, during and after its engagement to assign ratings to the Certificates; that as

a result of the material undisclosed conflicts of interest, the Ratings Agencies were incentivized to understate the required amount of credit enhancement needed to appropriately rate the Certificates AAA or investment grade; that the amount of credit enhancement was, in fact, understated; including the sufficiency of stated overcollateralization figure of $16,542,956, (*i.e.,* because it was largely determined by the Ratings Agencies' outdated models as described herein).

### C.   Registration Statements' Material Misstatements And Omissions Regarding The Activities of Lehman And The Ratings Agencies

272.   The Registration Statements provided:

In the normal course of its securitization program, Lehman Holdings acquires Primary Assets from third party originators and through its affiliates. Employees of Lehman Holdings or its affiliates structure securitization transactions in which the Primary Assets are sold to the depositor.

The ratings on the securities depend primarily on an assessment by the rating agencies of the mortgage loans and other assets of the trust fund, any credit enhancement and the ability of the servicers and the master servicer to service the loans.

SASCo, September 16, 2005 Form S-3/A, at 32; *see also*, SASCo, August 8, 2006 Form S-3/A, at 45.

273.   ***Omitted Information:*** This above statements contained material misstatements and omissions because they fail to disclose the Ratings Agencies true role in structuring the Certificates either before or after they were engaged to rate the certificates. These statements created the false impression to investors that the ratings agencies were independent and only brought in after the Certificates were "structured" by LBHI and the LBHI Issuer subsidiaries. They also fail to disclose that it was the Ratings Agencies that largely determined, again before the securitization process was completed, the amount and kind of credit enhancement necessary

to support the credit rating to be assigned to the Certificates – rather than merely evaluating the credit enhancement after the fact.

## VII.

## CLASS ACTION ALLEGATIONS

274.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure behalf of a class consisting of all persons or entities who acquired the Certificates issued by the Defendant Issuers, as set forth in ¶¶ 30-32, pursuant and/or traceable to the false and misleading Registration Statements and who were damaged thereby (the "Class").

275.    Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

276.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by SASCo or LBHI or their transfer agents and maybe notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  The Registration Statements issued billions of dollars worth of Certificates.

277.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

278.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

279.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether Defendants violated the Securities Act; whether the Registration Statement issued by Defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

280.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### For Violation of § 11 of the Securities Act
### (Against The Individual Defendants, Issuing Trusts and Ratings Agency Underwriters)

281.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

282.    This Cause of Action is brought pursuant to § 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Individual Defendants, the Issuing Trusts and the Ratings Agency Underwriters.  This Cause of Action is predicated upon defendants' strict liability for making false and misleading statements in the Offering Documents.

283.    The Offering Documents were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

284.    The Individual Defendants, Issuing Trusts and Ratings Agency Underwriters are strictly liable to Plaintiffs and the Class for making the misstatements and omissions in issuing the Certificates.

285.    The Individual Defendants each signed the Registration Statement.

286.    The Ratings Agency Underwriters acted as underwriters in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, directly and indirectly solicited offers to purchase the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates. The Ratings Agency Underwriters were underwriters for the respective Issuing Trusts.

287.    The Individual Defendants, Issuing Trusts and Ratings Agency Underwriters owed to the Plaintiffs and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

288.    The Individual Defendants, Issuing Trusts and Ratings Agency Underwriters knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

289.    Each of the Individual Defendants, Issuing Trusts and Ratings Agency Underwriters failed to possess a reasonable basis for believing, and failed to make a reasonable

investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

290.    The Individual Defendants, Issuing Trusts and Ratings Agency Underwriters issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

291.    By reason of the conduct alleged herein, each of the Individual Defendants, Issuing Trusts and Ratings Agency Underwriters violated § 11 of the Securities Act, and is liable to Plaintiffs and the Class.

292.    Plaintiffs and other Class members acquired the Certificates pursuant and/or traceable to the Registration Statements.  At the time Plaintiffs and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

293.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Individual Defendants, Issuing Trusts and Ratings Agency Underwriters.

294.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Individual Defendants, Issuing Trusts and Ratings Agency Underwriters, as set forth in § 11 of the Securities Act.

295.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates

being offered to the public. Despite the exercise of reasonable diligence, Plaintiffs could not

have reasonably discovered the untrue statements and omissions in the Offering Documents at an

earlier time.

## SECOND CAUSE OF ACTION

### For Violation of § 12(a)(2) of the Securities Act
### (Against the Issuing Trusts and Ratings Agency Underwriters)

296.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full

herein, to the extent that such allegations do not sound in fraud.

297.    This Cause of Action is brought pursuant to § 12(a)(2) of the Securities Act, on

behalf of Plaintiffs and the Class, against the Issuing Trusts and Ratings Agency Underwriters.

298.    The Issuing Trusts and Ratings Agency Underwriters promoted and sold the

Certificates pursuant to the defective Prospectuses for their own financial gain.    The

Prospectuses contained untrue statements of material fact, omitted to state facts necessary to

make statements not misleading, and concealed and failed to disclose material facts.

299.    The Issuing Trusts and Ratings Agency Underwriters owed to Plaintiffs and the

other Class members who purchased Certificates pursuant to the Offering Documents, a duty to

make a reasonable and diligent investigation of the statements contained in the Offering

Documents, to ensure that such statements were true and that there was no omission of material

fact necessary to make the statements contained therein not misleading. The Issuing Trusts and

Ratings Agency Underwriters knew of, or in the exercise of reasonable care should have known

of, the misstatements and omissions contained in the Offering Documents, as set forth herein.

300.    Plaintiffs and other Class members purchased or otherwise acquired Certificates

pursuant to and/or traceable to the defective Offering Documents. Plaintiffs did not know, and in

the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Offering Documents.

301.    By reason of the conduct alleged herein, the Issuing Trusts and Ratings Agency Underwriters violated § 12(a)(2) of the Securities Act, and are liable to Plaintiffs and other Class members who purchased Certificates pursuant to and/or traceable to the Offering Documents.

302.    Plaintiffs and other Class members were damaged by the Issuing Trusts' and Ratings Agency Underwriters' wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in § 12(a)(2) of the Securities Act.  Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in § 12(a)(2) of the Securities Act.

303.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents, within one year after reasonable discovery of the untrue statements and material omissions and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## THIRD CAUSE OF ACTION

### Violations of § 15 of the Securities Act
### (Against the Individual Defendants and Ratings Agency Underwriters)

304.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

305.    This Cause of Action is brought pursuant to § 15 of the Securities Act against the Individual Defendants and the Ratings Agency Underwriters.

306.    Each of the Individual Defendants, by virtue of his or her control, ownership, offices, directorship, and specific acts set forth above was, at the time of the wrongs alleged herein, a controlling person of SASCo, LBI and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  Each of the Individual Defendants had the power to influence, and exercised that power and influence, to cause SASCo, LBI and the Issuing Trusts to engage in violations of the Securities Act, as described above.

307.    The Ratings Agency Underwriters, by virtue of their control, influence, participation and solicitation of offers to purchase the Certificates and specific acts set forth above were, at the time of the wrongs alleged herein, a controlling person of SASCo, LBI and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  The Ratings Agency Underwriters had the power to influence, and exercised that power and influence, to cause SASCo, LBI and the Issuing Trusts to engage in violations of the Securities Act, as described above.

308.    The Individual Defendants' and the Ratings Agency Underwriters' control, position and influence made them privy to, and provided them with actual knowledge of, the material facts and omissions concealed from Plaintiffs and the other Class members.

309.    Each of the Individual Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statements and having otherwise participated in the consummation of the Offerings detailed herein.  The Defendants named herein were responsible for overseeing the formation and operation of the Issuing Trusts, including routing payments from the borrowers to investors.

310.    Individual Defendants prepared, reviewed and/or caused the Registration Statements and Prospectus Supplements to be filed and disseminated.

311. Since the Ratings Agencies controlled the ultimate decision of which mortgage loans would be included and excluded from the securitized pools of loans as well as the ultimate amount of credit enhancement required in order for the Certificates to be sold to investors as AAA and investment grade investments, the Ratings Agencies controlled all material aspects relating to the acquisition, structure and sale of the Certificates and thus, the activities of the Issuing Trusts, Individual Defendants and LBI within the meaning Section 15 of the Securities Act.

312. By virtue of the wrongful conduct alleged herein, the Individual Defendants and the Ratings Agency Underwriters are liable to plaintiffs and the other Class members for the damages sustained.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Plaintiff as Class representative;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Awarding such additional equitable, injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: New York, New York
February 23, 2009

Respectfully submitted,

By: _____
       Joel P. Laitman (JL-8177)
       Christopher Lometti (CL-9124)
       Daniel B. Rehns (DR-5506)
**SCHOENGOLD SPORN LAITMAN &
       LOMETTI, P.C.**
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile: (212) 267-8137

*Counsel for Lead Plaintiff and the Proposed Class*

124

## CERTIFICATION OF LEHMAN
## SECURITIES CLASS ACTION COMPLAINT

I, Leonard G. Beauchamp, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am the Acting Executive Administrator of Boilermaker Blacksmith National Pension Trust (the "Trust").

2.    I have reviewed the complaint filed in this case (the "Complaint"), and authorize the filing thereof.

3.    The Trust is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.    During the Class Period (as defined in the Complaint), the Trust purchased and/or sold the security that is the subject of the Complaint as set forth on the attached.

5.    The Trust did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.    During the three-year period preceding the date of my signing this Certification, the Trust has not served nor sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act except in Boilermaker Blacksmith National Pension Trust v. Wells Fargo Mortgage-Backed Securities 2006 AR-1 Trust, et al., S.D.N.Y. Docket No. 09-cv-833.

7.    The Trust will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery except for an award, as ordered by the court, for reasonable costs and expenses directly relating to their representation of the Class.

Signed under the penalties of perjury, this 18 day of February 2009.

Leonard G. Beauchamp, on behalf of Boilermaker
Blacksmith National Pension Trust

*Schoengold Sporn Laitman & Lometti, P.C. , 19 Fulton Street, New York, NY 10038 (866) 348-7700*

## SCHEDULE A

| DATE | TRANSACTION | PRICE PER UNIT |
|------|-------------|----------------|
| 1/18/2006 | Purchased 1,385,000 units Structured Adjustable Rate Mortgage Loan, Series 2006-1 | $1.004 |
| 11/28/2007 | Purchased 1,928,417.58 units Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-14N | $.9473 |
| 11/29/2007 | Purchased 1,150,279.25 units Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-7N | $.9303 |

CERTIFICATION OF LEHMAN XS TRUST
SECURITIES CLASS ACTION COMPLAINT

I, George R. Laufenberg, Jr., hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am the Administrative Manager of the New Jersey Carpenters Health Fund (the "Fund").

2.    I have reviewed the complaint filed in this case (the "Complaint"), and authorize the filing thereof.

3.    The Fund is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.    During the Class Period (as defined in the Complaint), the Fund purchased and/or sold the security that is the subject of the Complaint as set forth on the attached.

5.    The Fund did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.    During the three-year period preceding the date of my signing this Certification, the Fund has not served nor sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act except *New Jersey Carpenters Health Fund v. Home Equity Mortgage Trust 2006-5, et al.*, S.D.N.Y. Docket No. 08-cv-05653.

7.    The Fund will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery except for an award, as ordered by the court, for reasonable costs and expenses directly relating to its representation of the Class.

Signed under the penalties of perjury, this _9th_ day of December 2008.

George R. Laufenberg, Jr., on behalf of the
New Jersey Carpenters Health Fund

## SCHEDULE A

| DATE | TRANSACTION | PRICE PER UNIT |
|---|---|---|
| 10/3/2006 | 125,000 -- Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-5N | $1.00625 |
| 2/3/2006 | 255,000 -- Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-6 | $0.97957 |

CERTIFICATION OF LEHMAN XS TRUST
SECURITIES CLASS ACTION COMPLAINT

Richard Dickson

We, Malcom Auble and ~~Brett Ferullo~~, hereby certify that the following is true and correct to the best of our knowledge, information, and belief:

1.     We are the Chairman and ~~Secretary~~, an employer trustee respectively, of The Locals 302 and 612 of the International Union of Operating Engineers- Employers Construction Industry Retirement Trust (the "Trust").

2.     We have reviewed the complaint filed in this case (the "Complaint"), and authorize the filing thereof.

3.     The Trust is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.     During the Class Period (as defined in the Complaint), the Trust purchased and/or sold the security that is the subject of the Complaint as set forth on the attached.

5.     The Trust did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.     During the three-year period preceding the date of our signing this Certification, the Trust has not served nor sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act except *Zwickel v. Taro Pharmaceutical Industries, Ltd., et al.*, S.D.N.Y. Docket No. 1:04-cv-5969 (RMB); *In re FBR Inc. Sec. Litig.*, S.D.N.Y. Docket No. 1:05-cv-04617 (RJH); *In re Boston Scientific Corporation Sec. Litig.*, Docket No. 1:05-cv-11934 (JLT) (D. Mass.); *Candelore v. Force Protection Inc. et al.*, Docket No. 2:08-cv-00845 (CWH) (D.S.C.); and *In re The PMI Group, Inc. Sec. Litig.*, Docket No. 3:08-cv-01405 (SI) (N.D.Ca.).

7.     The Trust will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery except for an award, as ordered by the court, for reasonable costs and expenses directly relating to its representation of the Class.

Signed under the penalties of perjury, this _22_ day of December 2008.

Malcom Auble, on behalf of The Locals 302
and 612 of the International Union of
Operating Engineers- Employers
Construction Industry Retirement Trust

Brett Ferntio, on behalf of The Locals 302
and 612 of the International Union of
Operating Engineers- Employers
Construction Industry Retirement Trust
Richard Dickson

## SCHEDULE A

| DATE | PURCHASED | PRICE PER UNIT | CURRENT VALUE PER UNIT |
|------|-----------|----------------|------------------------|
| 10/1/05 | 1,500,00 -- Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-5N | $1.00 | $.45706 |
| 11/21/05 | 760,000 -- Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-7N | $1.00 | $.29306 |
| 1/13/06 | 1,500,000 -- Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-2N | $1.00 | $.41379 |

AMENDED CERTIFICATION OF LEHMAN XS TRUST
SECURITIES CLASS ACTION COMPLAINT

We, Malcom Auble and Brett Ferullo, hereby certify that the following is true and correct to the best of our knowledge, information, and belief:

1.     We are the Chairman and Secretary, respectively, of The Locals 302 and 612 of the International Union of Operating Engineers- Employers Construction Industry Retirement Trust (the "Trust").

2.     We have reviewed the complaint filed in this case (the "Complaint"), and authorize the filing thereof.

3.     The Trust is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.     During the Class Period (as defined in the Complaint), the Trust purchased and/or sold the security that is the subject of the Complaint as set forth on the attached.

5.     The Trust did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.     During the three-year period preceding the date of our signing this Certification, the Trust has not served nor sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act except *Zwickel v. Taro Pharmaceutical Industries, Ltd., et al.*, S.D.N.Y. Docket No. 1:04-cv-5969 (RMB); *In re FBR Inc. Sec. Litig.*, S.D.N.Y. Docket No. 1:05-cv-04617 (RJH); *In re Boston Scientific Corporation Sec. Litig.*, Docket No. 1:05-cv-11934 (JLT) (D. Mass.); *Candelore v. Force Protection Inc. et al.*, Docket No. 2:08-cv-00845 (CWH) (D.S.C.); and *In re The PMI Group, Inc. Sec. Litig.*, Docket No. 3:08-cv-01405 (SI) (N.D.Ca.).

7.    The Trust will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery except for an award, as ordered by the court, for reasonable costs and expenses directly relating to its representation of the Class.

Signed under the penalties of perjury, this ___ day of February 2009.

_____
Malcom Auble, on behalf of The Locals 302
and 612 of the International Union of
Operating Engineers- Employers
Construction Industry Retirement Trust

_____
Brett Ferullo, on behalf of The Locals
 302 and 612 of the International Union of
Operating Engineers- Employers
Construction Industry Retirement Trust

## SCHEDULE A

| **DATE** | **TRANSACTION** | **PRICE PER UNIT** |
|---|---|---|
| 10/1/05 | 1,500,00 -- Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-5N | $1.00 |
| 11/21/05 | 760,000 -- Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2005-7N | $1.00 |
| 1/13/06 | 1,500,000 -- Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-2N | $1.00 |
| 5/31/06 | 1,500,000 -- Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-GP2 | $1.00 |
| 8/31/06 | 1,500,000 – GreenPoint Mortgage Funding Trust Pass-Through Certificates, Series 2006-AR4 | $0.9998438 |
| 9/29/06 | 1,500,000 – GreenPoint Mortgage Funding Trust Pass-Through Certificates, Series 2006-AR5 | $0.9999219 |

## CERTIFICATE OF SERVICE

I, Daniel B. Rehns, counsel for the Plaintiff, hereby certify that on February 23, 2009, I filed an original of the foregoing by hand with the Clerk of the Court and delivered a copy to all parties to the within action by hand or first-class mail.

Dated: New York, New York
       February 23, 2009

Daniel B. Rehns