UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

In re:

LEHMAN BROTHERS SECURITIES AND ERISA
LITIGATION

09 MD 2017 (LAK)

This document applies to:

*In re Lehman Brothers Mortgage-Backed
Securities Litigation,* No. 08 Civ. 6762 (LAK)              .

------------------------------------------x

## MEMORANDUM OPINION

      Appearances:

                    Joel P. Laitman
                    Christopher Lometti
                    Daniel B. Rehns
                    Kenneth M. Rehns
                    Steven J. Toll
                    Avi Garbow
                    Douglas Bunch
                    COHEN MILSTEIN SELLERS & TOLLS, PLLC
                    *Attorneys for Plaintiffs*

                    Joshua M. Rubins
                    James J. Coster
                    SATTERLEE STEPHENS BURKE & BURKE LP
                    *Attorneys for Defendant Moody's Investors Service, Inc.*

                    Floyd Abrams
                    S. Penny Winkle
                    Adam Zurofksy
                    Tammy L. Roy
                    CAHILL GORDON & REINDEL LP
                    *Attorneys for Defendant The McGraw-Hill Companies, Inc.*

LEWIS A. KAPLAN, *District Judge.*

The complaint in this putative class action concerns the issuance, distribution and sale, by affiliates and subsidiaries of Lehman Brothers Holdings, Inc. (collectively, "Lehman"), of over 90 separate offerings of mortgage pass-through certificates (the "Certificates") issued between September 2005 and July 2007. The matter is before the Court on the motions of two rating agencies – Moody's and Standard & Poor's ("S&P")[1] – to dismiss the complaint as to them on the ground that it fails to state a claim upon which relief may be granted.

*Facts*

The Court assumes for purposes of this motion the truth of the well-pleaded factual allegations of the complaint.

*The Securities at Issue*

This action involves mortgage-backed securities ("MBS"). In a mortgage securitization, mortgage loans are acquired, pooled together, and then sold to a common law trust which in turn issues certificates to purchasers who are the beneficiaries of the trust and who receive distributions from the trustee according to the cash flow generated by the pool of mortgages and the rights of the respective classes of certificate holders.

In this case, the Certificates were registered with the SEC under two shelf registration statements with base prospectuses filed by a Lehman affiliate in August 2005 (amended in September 2005) and August 2006, pursuant to Rule 415 of the Securities Act. For each offering, Lehman filed also a pricing supplement to the relevant base prospectus which amended or updated

---

[1] S&P is a division of defendant The McGraw-Hill Companies, Inc.

3

both the original shelf registration statement to which it was traceable and provided additional information about the particular pools of mortgages underlying the Certificates offered pursuant to that Prospectus Supplement, including the types of loans and the descriptions of underwriting guidelines for those loans that were provided by the originators. The shelf registration statements and the prospectus supplements henceforth referred to as the "Offering Documents."

*The Allegations Against the Rating Agencies*

The complaint alleges that the Offering Documents were materially false and misleading in that they failed to disclose that:

- "the Originators of the underlying Certificate loans failed to comply with the general loan underwriting guidelines in the Registration Statements, including an examination of borrower creditworthiness and performance and review of standardized appraisals of the mortgage properties."[2]

- "the Rating Agencies – and not [Lehman] as stated in the Offering Documents – largely determined the composition of the securitized pool of loans, the amount and form of the Certificates' levels of credit enhancement before the Certificates were created and the Ratings Agencies were 'engaged' to rate the securities."[3]

- "there were material undisclosed conflicts of interest between Lehman and the Rating Agencies, including as reflected in the undisclosed rating

---

[2] Cpt. ¶ 18; *see also id.* ¶ 69-150, 185-266.

[3] *Id.* ¶ 18; *see also id.* ¶¶ 172-78, 272-73.

        shopping practices, which incentivized the Ratings Agencies to understate the appropriate Certificate credit enhancement and inflate the Certificate ratings."[4]

- "the amount of credit enhancement provided to the Certificates was inadequate to support the AAA and investment grade ratings because those amounts were determined primarily by the Ratings Agencies' models which had not been updated in a timely manner."[5]

Plaintiffs seek to hold the Rating Agencies liable for these alleged misstatement and omissions under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933[6] on the theories, respectively, that the Rating Agencies were underwriters and sellers of the offerings or controlled persons who were. Accordingly, I summarize the allegations with respect to the Rating Agencies' alleged underwriter, seller, and control person statuses.

*The Underwriter Allegations*

        The plaintiffs allege that the Rating Agencies, in contrast with their historical practices, were involved intimately in "controll[ing] which mortgages were purchased and securitized and at what price. Once the mortgages were acquired, the [Rating Agencies] then directed the structure of the Certificates, including the number of classes and the nature and amount [of] credit support and investor protections . . . . Further, in submitting competitive bids for the

---

[4] *Id.* ¶ 18; *see also id.* ¶¶ 17, 168-71, 272-73.

[5] *Id.* ¶ 18; *see also id.* ¶¶ 16, 53, 58, 159-67, 268-71.

[6] 15 U.S.C. §§ 77k, 77*l*(a)(2), 77*o*.

5

Certificate ratings engagements, the [Rating Agencies] included their proposed Certificate ratings – so the ratings became part of the economic competition for the job; rather than the result of independent professional judgment after the firms were engaged."[7]

*The Seller Allegations*

The essence of plaintiffs' Section 12(a)(2) claim against the Rating Agencies is that they solicited the sales of the Certificates on the theory that their activities were a "substantial factor" in the sales.[8] Specifically, plaintiffs allege that the Rating Agencies participated in the drafting and dissemination of the Prospectus Supplements, collaborated with Lehman to determine the credit enhancement that ultimately were included in the Offering Documents, and provided models which formed the bases of descriptions of credit enhancements disclosed there,[9]

*Control Person Allegations*

The theory of plaintiffs' control person claim is that "the [Rating Agencies] largely determined which loans were to be included in the securitization, the amount and form of credit enhancement for each Certificate and the Certificate structure before they were actually 'engaged' by Lehman and before the securitization was completed so that Lehman would be assured that

---

[7] Pl. Mem. 2.

[8] *Id.* 19-20.

[9] *Id.*

substantially all the certificates could be sold to investors as AAA-rated securities."[10]

*Discussion*

*The Underwriter Claim*

Plaintiffs would premise underwriter liability of the Rating Agencies on Section 11(a)(5) of the 1933 Act. That statute, however, defines "underwriter" as follows:

> "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph, the term 'issuer' shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by an issuer, or any person under direct or indirect common control with the issuer."[11]

Plaintiffs concede that the Rating Agencies did not purchase Certificates from an issuer, whether for distribution or otherwise. They rest this claim instead on the assertion that the term "underwriter" includes not only those who have purchased securities from an issuer with a view to their resale, but also those who "engaged in steps necessary to the distribution."[12]

Plaintiffs' argument is unpersuasive. I assume for purposes of discussion that the Rating Agencies efforts were necessary to the formulation of the mortgage pools and of the Certificates that ultimately were issued and offered to the public. But as Judge Lynch

---

[10] *Id.* 44-45.

[11] 15 U.S.C. § 77b(a)(11).

[12] Pl. Mem. 12 (quoting *SEC v. Kern,* 425 F.3d 143, 153 (2d Cir. 2005), in turn quoting *SEC v. Chinese Cosol. Benevolent Ass'n, Inc.,* 120 F.2d 738, 741 (2d Cir. 1941)).

recently made clear in *In re Refco, Inc., Secs. Litig.,*[13] that is not sufficient:

> "While the definition of 'underwriter' is indeed broad and is to be interpreted broadly, it must be read in relation to the underwriting function that the definition is intended to capture. Thus, a careful reading of the definition refutes plaintiffs' mistaken contention that a literal reading of the statute favors their interpretation. The definition primarily references those who 'purchase[ ] from an issuer with a view to . . . the distribution of any security.' 15 U.S.C. § 77b(a)(11). The language on which plaintiffs rely then adds to this definition anyone who 'participates . . . direct[ly] or indirect[ly] . . . in any *such undertaking*.' *Id.* (emphasis added). The 'participation' in question is participation in the 'undertaking' referred to immediately before: that of purchasing securities from an issuer with a view to their resale-that is, the underwriting of a securities offering as commonly understood. Whatever conduct may be covered by this language, it cannot easily be read to include the 144A Defendants' merely commenting on a draft of a registration statement for a bond offering in which they took no part in the distribution of the bonds."[14]

So too here. The Rating Agencies' alleged activities may well have had a good deal to do with the composition and characteristics of the pools of mortgage loans and the credit enhancements of the Certificates that ultimately were sold. But there is nothing in the complaint to suggest that they participated in the relevant "undertaking" – that of purchasing the securities here at issue, the Certificates – "from the issuer with a view to their resale." The Section 11 claim therefore is insufficient in law.

*The Seller Claim*

Plaintiffs' seller claim under Section 12(a)(2) shares much with their underwriter claim under Section 11. Its gist is that the Rating Agencies' activities in assisting in the drafting of the Prospectus Supplements, collaborating on credit enhancements, and using their models to

---

[13] No. 05 Civ. 8626(GEL), 2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008).

[14] *Id.* at *4.

8

structure particular deals to obtain the desired AAA ratings transformed them into statutory sellers.

In *Pinter v. Dahl*,[15] the Supreme Court made clear that seller liability under Section 12(a)(2) is confined to those who either pass title or "successfully solicit[] the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."[16] In this case, plaintiffs concede that the Rating Agencies had no direct contact with plaintiffs or any other sales prospects. They argue that such contact is unnecessary because the Second Circuit held in *Capri v. Murphy*[17] that direct communication with a buyer is unnecessary to Section 12(a)(2) liability. But they misread the case.

*Capri* was a case in which the defendants in question, promoters of a stock offering, prepared and circulated a prospectus through a hired sales agent who did no more and no less than he was instructed by those defendants. The fact that the Circuit upheld Section 12(a)(2) liability on the part of the promoter defendants comes as no surprise. More importantly, it does not support plaintiffs' contention that the Ratings Agencies' alleged involvement in advising on what loans to purchase for the pools, drafting Prospectus Supplements, collaborating on credit enhancements and using their models to aid Lehman in structuring the deals that ultimately were offered rendered them statutory sellers. Their role in this respect was no different than those of an architect or a builder in designing and constructing a house for an owner who later resells the house through the sole efforts of a real estate broker. While it doubtless is true that the architect or builder had a lot to do with the characteristics of the house – no doubt characteristics that made it an attractive and salable

---

[15] 486 U.S. 622 (1988).

[16] *Id.* at 647.

[17] 856 F.2d 473 (2d Cir. 1988).

product – they cannot properly be said to have participated in any legally relevant sense in its resale down the line. Accordingly, the Section 12(a)(2) claim will be dismissed.

*The Control Person Claim*

Section 15 of the 1933 Act provides:

"Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."[18]

Thus, in order to survive a motion to dismiss their Section 15 claim against the Rating Agencies, plaintiffs must point to allegations in the complaint sufficient to justify a conclusion that the Rating Agencies controlled others who violated Section 11 or 12 of the Act. As I assume *arguendo* that the complaint alleges primary violations of Sections 11 and 12(2) by others, the remaining question is whether plaintiffs have made sufficient allegations of control.

As noted above, plaintiffs theory here is that "the [Rating Agencies] largely determined which loans were to be included in the securitization, the amount and form of credit enhancement for each Certificate and the Certificate structure before they were actually 'engaged' by Lehman and before the securitization was completed so that Lehman would be assured that substantially all the Certificates could be sold to investors as AAA-rated securities."[19] Elsewhere

---

[18] 15 U.S.C. § 77o.

[19] Pl. Mem. 44-45.

in the complaint, they allege that the Rating Agencies "had the power to influence" the alleged primary violators and "exercised that power and influence,"[20] but that Lehman "controlled every aspect of the securitization and underwriting process."[21]

The power to influence or persuade is not control for purposes of Section 15 of the 1933 Act. What is required is "the practical ability to *direct* the actions of people who issue or sell securities."[22] This complaint, fairly read, alleges only that the Rating Agencies had the power to influence Lehman with respect to the composition of the pools of mortgages to be securitized and the credit enhancements the Rating Agencies regarded as necessary to obtain the desired ratings. But those allegations fall considerably short of anything that could justify a reasonable trier of fact in concluding that the decision making power lay entirely with the Rating Agencies.

*Conclusion*

The collapse of the mortgage-backed securities market has been a national disaster. Many actors, quite likely including the Rating Agencies, contributed to the catastrophe. But the task before this Court is a narrow one. It is to compare this complaint with the law governing liability on the particular legal theories selected by the plaintiffs and to determine whether the complaint,

---

[20] Cpt. ¶ 307.

[21] *Id.* ¶ 6.

[22] *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 352 F. Supp.2d 429, 458 (S.D.N.Y. 2005). *Accord SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472-73 (2d Cir. 1996) (control is "power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.); *see also In re Global Crossing, Ltd. Sec. Litig.,* No. 02 Civ. 910(GEL), 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005) (Lynch, J.).

11

even if every word in it were proved at trial, would satisfy any of those theories. I have concluded that it would not.

Accordingly, the motions of defendants Moody's Investors Service, Inc., and The McGraw-Hill Book Companies, Inc., [09 MD 2017, docket items 105, 108; 08 Civ. 6762, docket items 61, 64] to dismiss the complaint as against them are granted.

SO ORDERED.

Dated: February 1, 2010

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)