```
C6LZLEHH                          Hearing
```

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     IN RE:  LEHMAN BROTHERS
 3   MORTGAGE-BACKED SECURITIES
     LITIGATION,
 4
                                             09 MD 2017 (LAK)
 5                                           08 CV 6762 (LAK)
     ------------------------------x
 6
                                             June 21, 2012
 7                                           11:40 a.m.

 8   Before:

 9                      HON. LEWIS A. KAPLAN,

10                                             District Judge

11                            APPEARANCES

12   COHEN MILSTEIN SELLERS & TOLL P.L.L.C.
          Attorneys for Plaintiffs
13   BY:  STEVEN J. TOLL
          RICHARD A. SPEIRS
14        CHRISTOPHER LOMETTI

15   WOLLMUTH MAHER & DEUTSCH LLP
          Attorneys for Defendants
16   BY:  MICHAEL C. LEDLEY

17   WOLF POPPER LLP
          Attorneys for Mississippi Intervenor
18   BY:  JAMES A. HARROD

19

20

21

22

23

24

25
```

1                THE DEPUTY CLERK:  All rise.  Please be seated.

2                (Case called)

3                THE DEPUTY CLERK:  Counsel for the lead plaintiffs,
4      are you ready?

5                MR. TOLL:  Yes, Mr. Toll.

6                THE COURT:  Okay, Mr. Toll, I'll hear you.

7                MR. TOLL:  Good morning, your Honor.

8                Would you like me to go to the podium?

9                THE COURT:  I'm more likely to hear you.

10               MR. TOLL:  Thank you.

11               THE COURT:  Your choice.

12               MR. TOLL:  No, no.  Either is fine.  I think I'd like
13     you to hear me.

14               Your Honor, I'll address the approval of the
15     settlement first.  Obviously, you're familiar with the prior
16     case and your ruling in the debt equity case, and of course the
17     stands for approval.

18               After your Honor's order here in March and the notice
19     order pursuant to the declaration of the affidavits submitted
20     from the administrator, notice was mailed out to over 5,000
21     class members in April, summary notice was published in the
22     Investors Business Daily, all of that is laid out in
23     Mr. Miller's declaration.

24               We're pleased to say, and this happens occasionally,
25     it's always a pleasant thing to happen when you have no

1   objections to a settlement at all, or the fees for that matter
2   as well, fee request.
3          There were five exclusions originally.  Then, as your
4   Honor knows from our supplemental submission, there was a sixth
5   which came in a day late.  We have no objections to that being
6   considered.  It appears it was sent out on time by overnight
7   mail.  So there are now six exclusions to the class.
8          Your Honor, I don't want to go through it at length.
9   In our memo in support, it's addressed.
10         THE COURT:  There isn't any need, really.
11         MR. TOLL:  Okay.
12         THE COURT:  There is a need, I think, on fees.  For
13  better or for worse, I'm more parsimonious than the average
14  bear in these cases, and you know that, and at least I assume
15  you know that.  And I kind of come into this with a lower
16  figure in mind, north of the lodestar, but not nearly as far
17  north as you would like to go.  And I guess some of the things
18  that are going through my mind about it are these.  The
19  recovery by individual class members is pretty much trivial,
20  right?
21         MR. TOLL:  It's very small, your Honor.
22         THE COURT:  All right.  So, basically, what we have is
23  litigation that fundamentally benefits only the lawyers.
24         MR. TOLL:  It's very small.
25         THE COURT:  And I'm all for lawyers benefiting.  You

1   know, I was one for a long time, and I like to benefit from it.
2   But that's a fact.
3          Now, I don't think lawyers shouldn't benefit in these
4   cases by any means.  You know, I've thought long and hard about
5   it.  And I think there is a lot to be said for what the private
6   plaintiffs' bar does.  For one thing, it's not subject to the
7   control of the Congressional appropriation process or political
8   wind blowing in Washington.  It provides some deterrent, I
9   suppose, but I don't know how much.  But I think there is a
10  balance to be struck.  And I think a case like this also is a
11  pretty easy case.  It's low hanging fruit.
12         And so I kind of come to the view that, yes, you did a
13  nice job.  The D&O payment on the 2007, 2008 tower, that was
14  basically there for the asking.  It was going to go to some
15  plaintiff's lawyer, you know, so you were fortunate enough to
16  get it.
17         Some extra points for getting into the next year.  I
18  grant that.  And remind me that the third piece came from?
19         MR. TOLL:  The estate.
20         THE COURT:  Which is a plus.  I grant you the plus on
21  that.  You did what needed to be done in the Bankruptcy Court
22  and you deserve credit for that.
23         Also a little bit on the other side.  I kind of
24  thought that, as angry as everybody was, quite possibly
25  justifiably so at the ratings agencies, a lot of time, effort

1   and money got spent on the rating agencies that was really not
2   well spent in my view.  So even to give a lodestar is really to
3   give possibly more than would be appropriate if you viewed this
4   in terms of what would a private client think is a reasonable
5   fee -- which is offset somewhat by the fact that nobody
6   objects -- but that on a -- I'm just -- this is stream of
7   consciousness almost, but that the value of the failure of
8   objections on the fees is these people are getting next to
9   nothing anyway, so what difference does it make if they object
10  to the fees.
11          Okay.  You now have the benefit of my ramblings on
12  this, and I'm happy to hear you, and maybe you'll move me one
13  way or the other.
14          MR. TOLL:  Thank you, your Honor.
15          I'm happy to respond because, you know, I do think
16  it's a very reasonable request, and I'll explain and respond to
17  the thoughts you made.
18          Number one, and maybe the least important in some
19  sense is the lack of objections.  While you may say it's not
20  that important, these -- you know, for the most part, they're
21  sophisticated class members.  They know institutional money
22  managers, pension funds, and they have been fairly active in
23  opposing fees around the country in class actions.  So the fact
24  that none of them felt 20 percent was unreasonable in a case
25  like this, knowing they're not getting big money back, is some

1  testament I think in our favor -- again, not overwhelming, but
2  a point to be made.
3         THE COURT:  What's the amount of the biggest recovery
4  by a class member that you anticipate here, in dollars?
5         MR. TOLL:  Your Honor, it's actually -- here's the
6  reality, okay.  The reality is it's going to be small no matter
7  what.  Why?  You know, and, as well as in the stock case in a
8  way, there were billions of dollars of losses.  And at most
9  here there was a, you know, a couple hundred million dollars of
10 insurance money.  Unlike the stock equity case, the debt equity
11 case, we don't have underwriters and other, you know, monies to
12 tap.  So our sole source was the policies or the individuals,
13 these mid-level people that really didn't have anything.
14        So from the outset, once that happened it was clear
15 there's going to be a small recovery for people.
16        Now, the only thing I will say, and I don't know this
17 yet, is that the claims rate thus far would indicate the claims
18 are not going to be anywhere near what potential losses are.
19 And so instead of getting, you know, really whatever pennies or
20 some really low percentage, it may be somewhat higher than
21 that; you know, not on a high level obviously, but, you know,
22 instead of, you know, at 1 percent, maybe it's going to be five
23 or 10 percent or something.  It's not clear yet.  But the
24 damage, at least the claims thus far have come in, they're only
25 about $150 million dollars.  You know, there's another month

1    and a half or so, so.
2              THE COURT:  Do you have any feel for whether the
3    biggest check that gets written here to one entity is of the
4    order of $100, $1,000, 10,000, or 100,000 or a million?
5              MR. TOLL:  I don't, your Honor, but I would think it
6    could be tens of thousands, could be 100,000 or more.  If,
7    again, someone comes in with a $10 million loss -- and the
8    claims just aren't that large, you know, they get 10 percent
9    and, you know, they -- I don't know.  You could get some
10   substantial checks.  It really depends on the claims.  So that
11   is -- I don't think we'll be seeing, you know, pennies.
12   Because I think most of these people will have large losses who
13   filed, because again this class, our understanding, is composed
14   mostly of institutions and not individuals.
15             So, again, I think the fact that none of these
16   institutional investors has objected is a big positive, but
17   it's not the most important point.
18             Another point, your Honor, is again looking just at
19   some other cases.  You know, the Wells Fargo case, it's the
20   closest in terms of number and so on.  I'm only focusing now
21   for the mortgage-backed cases, case out in California and the
22   Judge there, Judge Lowe, I believe, gave 19.75 percent, and it
23   was a multiple of 2.8.  And, you know, we thought about our
24   proposal what we came in at, and again our, the lead plaintiff
25   had approved 20 percent, and we decided just to come in lower

1    thinking 19 and a quarter, something off the 20, whatever.
2             THE COURT:  There's something of the character of
3    buying a rug to this.
4             MR. TOLL:  Yeah, I suppose so.
5             But, in any event, looking at the Wells Fargo, and
6    then looking at the Merrill Lynch case here, your Honor -- now
7    again their percentage was slightly lower, 17 percent, and
8    that's out of this district.  But, you know, it was a $300
9    million settlement in the mortgage-backed case there.  And,
10   again, at the end of the day the multiplier was 2.3.  So we've
11   got two mortgage case, backed cases where lawyers are getting
12   2.3 and 2.8 -- unfortunately, we're not lead counsel in any of
13   those.  But, you know, we thought coming in here at 2.01 was a
14   reasonable number.
15            You know, you make a valid point about the rating
16   agencies.  I mean, obviously, that work is in our lodestar and
17   it didn't produce any money.  And in some ways you could say,
18   okay, that means our multiplier, essentially, is more than
19   2.01.  But, again, I don't -- you know, this was not a major
20   part of the effort.  And so maybe our effective multiplier
21   under our 19 and a quarter percent is 2.5, but again, it's
22   still right in the range of what the two other judges did in
23   these mortgage-backed cases.
24            THE COURT:  The lodestar was about three eight, right?
25            MR. TOLL:  I'm sorry?

1        THE COURT:  Your loadstar was about three million
2    eight?
3        MR. TOLL:  Yes, your Honor, 3.82.
4        THE COURT:  I would imagine you didn't do the rating
5    agency part of this for less than somewhere between half
6    million and a million, right?
7        MR. TOLL:  I'm purely guessing now, but I would guess
8    a half million, your Honor, but that's a guess.  But, you know,
9    I don't think -- I mean, at the end of the day it was a brief
10   before your Honor, brief in the Second Circuit, obviously the
11   work on drafting and researching issues, but I'm guessing 500,
12   but I don't know.
13       The other thing you said about -- and, obviously, I
14   think two big pluses for us is getting money from the estate,
15   which is quite rare, and getting money from two insurance
16   policies, which Judge Lowe, Justice Lowe from California who is
17   kind of very knowledgable in the insurance world, which we are
18   not, you know, called it unprecedented in his opinion, to do
19   that.  So, again, I think that is a big plus.
20       I think getting 40 million is a big plus.  While you
21   said, your Honor, it was low hanging fruit, an easy case, I
22   suppose it could be low hanging fruit, but really low hanging
23   fruit at maybe $20 million, something we rejected continuously
24   throughout this case, lower settlement offers.  And at the end
25   of the day I think our perseverance and refusal to kind of cave

probably about doubled the amount we got. And that's a huge point. I think that is probably, number one, emphasizing why, you know, a fee request that we're asking for is reasonable.

There was clearly money available, but I don't know how to explain the dynamics here, were quite problematic, you know. As you saw from the submission, this mediation, you know, was almost interminable. It was over a year, multiple in person meetings and phone calls. And every call it was like, there are other claimants out there and they're about to settle and there's no money left and you guys better take it and, you know, the 250 in policy year 2007 and '08 is down to -- well, first it went down to like 150 and less, and then we knew the Bernstein Litowitz, you know, the debt equity case was a big player and they were going to get a chunk of it, and then -- so there was now less than 50 less, and then they're telling us there are still hundreds of millions of dollars, billions of dollars of claims left; if you guys don't accept it, you're dead, you can get zero.

At the end of the day, you know, we just held off for the higher number, and eventually we knew if we did make a deal, we'd get zero, and, you know, then we would have to play out for years the issue of the second policy, and whether we ever could collect from the second policy, which the defendants said did not apply to our case because of the interrelated acts doctrine. And they said, you'll never be able to -- first of

all, you can't pursue a declaratory judgment action to start it. It has to be brought by the insureds. They're not going to do it. Arguably, they can't even do it unless you get a judgment in your case. You have to litigate your case first and get a judgment for the second policy to come into play at all, at least to have the discussion on it. And we thought that was a little crazy. But a Judge in California in the IndyMac case ruled exactly that way, that it was premature for anyone to bring any kind of declaratory judgment action on whether the second policy would apply in a case like this.

So we had, you know, these dynamics that were all working against us, and there was this enormous pressure to settle early and settle cheaply. And, you know, we just kind of hung in there. And I think -- and, again, I am estimating that we probably got close to double that some other firm might have gotten in this case. Yes, that increased our lodestar, but not to a massive extent.

I got another point, your Honor, it just slipped my mind, which I think is very important.

And again risks -- and again when you say easy case, I mean, you know, obviously the challenges here. Some of these cases have been dismissed. Your Honor's ruling was one of the first, maybe the first to sustain one -- I can't recall right now -- on the underwriting guidelines. But some of them have not survived. Obviously, we've been beaten on some of them on

1   tranche standing.  Obviously, we've been beaten here in statute
2   of repose issues.
3           We also have the issues of actually loss causation
4   would have been a problem.  There were lots and lots of
5   obstacles along the way.  So, again, not an easy case I would
6   say.  But, yes, given the posture we were in after winning the
7   motion to dismiss, we clearly were in a good posture to get a
8   result.  Really the question came about as to what was going to
9   be that result in the circumstances here.
10          Another point, your Honor, I think that kind of
11  justifies the reasonableness of our request.  I think if you --
12  I'm not sure how important it is, but I think it is relevant.
13  Look at this settlement versus the debt equity settlement in
14  this case.  Now again, admittedly, they had other pockets to go
15  after, and they got, you know, whatever four, $500 million from
16  underwriters.  But they got -- and this dwindling policy, they
17  got $90 million.  Their damages were, we estimate, five and a
18  half times greater than our damages.  At the end of the day
19  when you compare their 90 to our 40, it's two or whatever and a
20  quarter times, as opposed to what their damages were.  So I
21  think again just it's -- I'm not sure it's apples to apples,
22  apples to oranges.  But in terms of comparing how we did,
23  again, I think we hung out there, where probably all the people
24  on the defense side and where the money was, wanted, you know,
25  to nail us with, you know, these ten, 20, 50 different lawsuits

1   out there.  They wanted us to at a much lower level and felt we
2   should not be up where we were.  And, you know, I think it was
3   only, again, through our effort to get us there.
4            So I think all of those circumstances, you know,
5   justify what I think is at the end of the day a 2.01 multiplier
6   in a case.  And, again, if you take out the rating agencies
7   let's say 2.5 -- I didn't do the numbers, I'm estimating that.
8   Again, it's certainly within the realm of reason in these cases
9   and, you know, I think a justified fee.  Because you certainly
10  know that there are cases -- these are not -- you know, there
11  are plenty of cases we're getting zero, and there are
12  mortgage-backed cases were going to get zero or God knows
13  negatives.  I can think of a few right now that are ongoing
14  that were never getting near our lodestar.  So I think getting
15  the 2.0 multiplier, 2.01 or even if it was 2.5 and evaluated
16  that way, is not an unreasonable number in light of the risks
17  of these types of cases.  Thank you.
18            THE COURT:  Okay.
19            MR. TOLL:  Anything else you want me to address on
20  allocation?
21            THE COURT:  Thank you, no.
22            Anybody else want to be heard on this?
23            MR. LEDLEY:  Your Honor, we obviously take no position
24  on the fee award.
25            With respect to --

1            THE COURT:  No skin in the game, I know.
2            MR. LEDLEY:  With respect to approval of the
3    settlement, it sounds like your Honor's leaning in that
4    direction, which we appreciate.
5            We request that your Honor make any order approving
6    the final settlement effective on August 2nd or after in order
7    to provide the full 90 days under CAFA.  The CAFA notice was
8    sent out on May 4th to general counsel of the Securities and
9    Exchange Commission, and the Attorney General of all 50 states,
10   and that was May 4th.  The full 90 days would bring you to
11   August 2nd.
12           THE COURT:  Okay.
13           MR. LEDLEY:  I approached plaintiffs' counsel about
14   that and they do not object.
15           THE COURT:  Okay.
16           MR. LEDLEY:  Thank you.
17           THE COURT:  All right.  Thank you very much.
18           The motion to approve the settlement is granted.  I
19   intend to sign the proposed order that was submitted.  It was
20   fair, reasonable and adequate.  I think plaintiffs' counsel did
21   a nice job in the case, generally speaking; happy to have them
22   here.
23           As far as the legal fees, I'm going to award a little
24   more than I thought I was going to award.  The fee award will
25   be $5,157,602.  That is about 1.35 times the lodestar, taking

1   the lodestar at the measure suggested by plaintiffs' counsel.
2   If I were to discount the lodestar for what plaintiffs' counsel
3   guesstimated as a half a million dollars spent ultimately on
4   successfully chasing the rating agencies, it would be a
5   multiplier of 1.5, and the multiplier would be even higher if
6   it were discounted even further for the rating agency piece of
7   this, which I never thought was a particularly sound part of
8   the case.
9           I'll let you all calculate what percentage of the
10  settlement fund the five million one is, but it's north of 12
11  and south of 19, that much we know, and it really -- it
12  represents an accommodation.  I have always preferred to
13  approach this business of fee setting from the lodestar
14  perspective rather than the percentage.  The second Circuit
15  still allows us to do that.  Neither approach is, by any means,
16  problem free.  I just think that I can reach a more principled
17  result from the lodestar than I can the other way.  The other
18  way is kind of like in my mind, saying, well, you know,
19  somebody paid $18,000 for a 2009 Honda Civic and, therefore,
20  the next transaction in the 2009 Honda Civic ought to be a
21  little higher.  I mean, that's not a rationale to me.  So it
22  just doesn't appeal to me.  And I have some narrow scope of
23  discretion, so I'm going to exercise it.
24          Okay.  Is there anything else I need to deal with?
25          MR. TOLL:  Your Honor, the only thing is --

C6LZLEHH                       Hearing

1        THE COURT:  Oh, expenses.

2        MR. TOLL:  Yeah, the expense number.

3        THE COURT:  Expenses.  $499,612.72.

4        MR. TOLL:  Our supplemental submission indicated there
5   were two small items that came in later, so the total number
6   was $501,807.72 is the final request.

7        THE COURT:  Just out of curiosity, what came in late?

8        MR. TOLL:  A bill from the mediator and a bill from --
9   $800, and $1300 bill from -- remind me -- oh, one of the
10  experts.  Sorry.

11       THE COURT:  Okay, I will approve the higher amount.

12            Thanks very much, folks.  And that closes out this
13  case altogether, right?  All right.

14       MR. TOLL:  Yes.  Thank you, Judge.

15       THE DEPUTY CLERK:  All rise.

16            (Adjourned)